## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| RICHARD A. NEWTON, SR., | ) | |
| *Individually and on behalf of a* | ) | |
| *Class of Individuals Similarly* | ) | |
| *Situated*, | ) | CIVIL ACTION |
| | ) | FILE NO._____ |
| Plaintiff, | ) | |
| | ) | COMPLAINT – CLASS ACTION |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| THE TRAVELERS INSURANCE | ) | |
| COMPANY and BRIGHTHOUSE | ) | |
| LIFE INSURANCE COMPANY | ) | |
| *nee* METLIFE INSURANCE | ) | |
| COMPANY USA, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

**COMES NOW**, RICHARD A NEWTON, SR. (hereinafter "Newton" or

"Richard") individually and on behalf of a class of individuals similarly situated,

and complains against The Travelers Insurance Company (hereinafter "Travelers")

and Brighthouse Life Insurance Company (hereinafter "Brighthouse") *nee* Metlife

Insurance Company USA (hereinafter "Metlife", collectively "Defendants"),  and

for a cause of action showing the court as follows:

## NATURE OF ACTION

1.   This case arises from Defendants' breaches of provisions contained in their universal life insurance policies. Defendants marketed this type of insurance as offering more flexibility than traditional "whole life" insurance policies. When universal life insurance was first introduced it was represented as being "transparent" and "understandable", whereas traditional whole life insurance was described as mired in hidden actuarial formulae. This representation was false, and the opposite has proven to be true. Universal life insurance is non-transparent and, to the policyholder, impossible to understand.

2.   Generally, under universal life policies, certain portions of the premium are deducted in order to cover the cost of the life insurance as well as to cover other expenses. The balance is then deposited into an interest-bearing account and becomes the accumulation value of the policy. The implicit promise of – and thus the appeal of – universal life policies is that the earnings from the surplus premiums from the past will cover much of the future cost of insurance for the policy, thus decreasing (if not eliminating) future premium payments.

3.   Travelers persuaded Richard to replace his whole life policy with a new universal life policy with illustrations that were based on projected interest rates that

were much higher than they have been in recent memory. For example, when Richard received his "Statement of Policy Cost and Benefit Information" for his universal life insurance policy number ***6712[1] (hereinafter "Policy") in 1986, Travelers told Richard that during the twentieth year of the life of the Policy, the projected death benefit would be $500,000, the projected cash surrender value would be $124,892, and the annual premium would be $6,489.96. These projections assumed an interest rate of 9.5%. As it turned out, as of July 4, 2006, the cash value of Richard's Policy was only $2,560.89, and Richard had paid $11,300.00 in premiums that year.

4. Further, the Policy assured the policyholder's cash value would collect interest at a minimum rate of 4%. As interest rates have been significantly below 4%, this guarantee caused Defendants to incur losses, which they attempted to recoup from policyholders by way of increasing the cost of insurance charged to policyholders.

5. In the late 1980's and early 1990's Travelers sold millions of dollars of insurance on the basis described above.[2] Richard purchased the Policy so that at his

---

[1] Throughout this Complaint, account numbers have been partially redacted due to privacy concerns.

[2] No claim is made in this cause regarding the sale of the policies by Travelers. Instead, the Complaint seeks damages for breach of contract and other wrongs by Defendants in imposing increased premiums through contractually disallowed means, primarily through COI increases substantially above those limits in the contract.

death the face amount of the insurance policy would be available to his heirs as an asset of his estate. Yet, within the last six years, and during the senior years of Richard, Brighthouse began suddenly, unilaterally, and massively to increase monthly deductions in particular as to the Cost of Insurance (hereinafter "COI") which increased the deductions from the accumulation account.

6. These dramatic COI increases are designed to instigate what are known as "shock lapses."[3] This intentional practice is for the sole purpose of causing a lapse of policies of those insureds who are in advanced age, who have already paid premiums for years and who have a higher rate of mortality. Unfortunately, these people usually cannot procure new life insurance policies at reasonable rates.

7. By violating its contractual duties in bad faith as described herein, the Defendants were unjustly enriched to the detriment of Richard and the class. Defendants' practices described herein resulted not only in excessive premiums and

---

[3] "The initial lapse that occurs immediately before the first premium increase is referred to as the shock lapse and typically is the largest lapse rate. For higher premium increases, these rates can approach 100% and often are modeled at 100% beyond a certain threshold." SCOR, October 12, 2017, available at https://www.scor.com/en/media/news-press-releases/modeling-behavior-post-level-term; *see also McMahon v. Transamerica Life Ins. Co.*, C17-149-LTS, 2018 WL 3381406, at *8 (N.D. Iowa July 11, 2018) (describing plaintiffs' allegations that increases in monthly deductions were "for the purpose of inducing shock lapses" in bad faith).

costs, but also in the cancellation of policies. In Richard's case alone, the Defendants charged hundreds of thousands of dollars of premiums and costs for a policy that has been cancelled.

## PARTIES

8.  Richard A. Newton, Sr. is a resident of the state of Georgia residing in Atlanta, Fulton County, Georgia in the Northern District of Georgia, Atlanta Division. Richard is approximately 85 years of age.

9.  The Travelers Insurance Company is incorporated in the state of Connecticut, where it has its principal place of business. Travelers is authorized to do business in the state of Georgia and is subject to the personal jurisdiction of the courts of this state. Travelers may be served by serving its registered agent in Georgia at the following address:

Douglass R. Granberry
211 Perimeter Center Parkway
DeKalb County
Atlanta, Georgia 30346.

10.  Brighthouse Life Insurance Company *nee* Metlife Insurance Company USA is incorporated under the laws of the state of Delaware. The principal place of business of Brighthouse is the state of North Carolina. Brighthouse is authorized to do business in the state of Georgia and is subject to the personal jurisdiction of the

courts of this state. Brighthouse may be served by serving its registered agent in

Georgia at the following address:

C.T. Corporation System
289 South Culver Street
Gwinnett County
Lawrenceville, Georgia 30046-4805.

## <u>JURISDICTION OF THE NORTHERN DISTRICT OF GEORGIA</u>

11.  The amount in controversy in this cause exceeds the amount of $75,000

exclusive of costs and fees.

12.  Richard is a resident of the state of Georgia. Travelers is a resident of the

State of Connecticut. Brighthouse is a resident of the State of Delaware and the State

of North Carolina. There is, therefore, complete diversity of citizenship between

Richard and the defendants.  The United States District Court of Georgia for the

Northern District of Georgia has jurisdiction to hear and decide this cause pursuant

to 28 U.S.C. § 1332(a).

13. Alternatively, this Court has jurisdiction pursuant to the Class Action

Fairness Act found at 28 U.S.C. § 1332(d), because this is a class action in which at

least one member of the class is a citizen of a state different from Defendant, the

amount in controversy exceeds $5 million exclusive of interest and costs, and the

proposed class contains more than 100 members.

## VENUE

14.    Venue is proper pursuant to 28 U.S.C.A. § 1391 in that Newton is a resident of the Northern District of Georgia, Atlanta Division, where substantial actions occurred which forms the cause of action alleged in this complaint.

15. Further, Defendants have agents in Fulton County, Georgia, and the Plaintiff maintains his legal residence in Fulton County, Georgia

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

16.    Richard is approximately 85 years of age.

17.    On June 5, 1982 Richard purchased from Travelers a life insurance policy Contract Number ***0269 in the face amount of $500,000. When Richard purchased Contract Number ***0269, he was 47 years old.

18.    On July 4, 1986, Richard replaced his whole life policy with a universal life insurance policy being policy number ***6712 issued by Travelers. This Policy had a maturity date of July 5, 2030. A copy of the 1986 Policy issued by Travelers is attached to this Complaint as Exhibit A and is incorporated herein as if fully set forth in this cause. Travelers labeled this universal life insurance policy a "Flexible Premium Adjustable Life Insurance Contract to Maturity Date Without Dividends."

19.    In the 2005-2006 contract year, Metlife acquired Travelers in a cash and stock transaction. In its January 31, 2005 Form 8-K, Metlife disclosed it was

"combining" with Travelers Life & Annuity. After this merger, Metlife became the successor-in-interest to Richard's Policy Number ***6712. In 2017, Metlife announced it was "spinning off" its retail life insurance segment, and Metlife Insurance Company USA was re-branded as Brighthouse Financial. Thus, Brighthouse is the successor-in-interest to Richard's Policy Number ***6712.

20. During the 1990's, Richard made three loans from the accumulation account, all of which were timely re-paid and, at any rate, had no impact on the cost of insurance charged to Richard.

21. The cover page of the Policy from Travelers on July 5, 1986 stated, among other things, that "[w]e are pleased to provide you the benefits of this Life Insurance Contract… This Contract … is subject to the terms and conditions stated on the attached pages, all of which are a part of it. … The entire contract between us and the Applicant consists of the policy, all attached pages, and the written application(s). … No person other than one of our officers can, for us, alter or waive any terms or provisions of this Contract."

22. Among other things, attached to the Life Insurance Contract is a document identified as the "Contract Summary."

23. The face amount of Richard's Policy is $500,000. As set forth in the Contract Summary, the initial monthly premium of the Policy was $661.08 and the

8

planned monthly premium was $540.83, which was generally deducted monthly from the checking account of Richard.

24. The Contract Summary contained a table illustrating that the "planned premiums" continued through the 16th Contract Year. When discussing the "Continuation of Insurance," the Policy stated that "[i]f no planned premium is shown on the CONTRACT SUMMARY, this Contract will continue until the end of the late period following the Deduction Day on which the Cash Surrender Value would not be enough to pay the monthly Deduction Amount due on that day, or until the Maturity Date, if earlier."

25. The portions of the premiums in excess of the COI (and where applicable, the expense charges) were directed to the "Cash Value" of the Policy. The funds accumulated interest for the benefit of policyholders like Richard. The Contract Summary gives an "Assured Cash Value Interest Rate" of 4% per annum.

26. The funds held in the Cash Value are property of policyholders like Richard, and Defendants hold such Cash Value in trust for them. Accordingly, Defendants were authorized to withdraw a "Deduction Amount" from the Cash Value only as set forth in the Policy. Generally speaking, the Policy's "Deduction Amount" was a monthly charge made against the Cash Value, and if there was insufficient cash

value, an additional premium.  The charge was equal to the cost of insurance, cost

of any additional benefits,[4] and the expense charges listed on the Contract Summary.

27.  The Contract Summary states the monthly expense charge for the

administration of the policy is $0.22 per thousand per month for five years. For

Richard, the total amount allowed for administrative costs for five years is $1,320

per year, or $6,600 total.

28.  By way of deductions in the Policy's cash value, Richard duly and timely

paid the amount stated in the Policy for administrative expenses.

29.  With regards to the COI, the Policy stated:

> The cost of insurance for any month is equal to $c$ times the result of $a$ minus $b$ where:
>
>> $a$ is the Amount Insured for the month divided by the Interest Factor shown on the CONTRACT SUMMARY page;
>>
>> $b$ is the Cash Value on the Deduction Day at the beginning of the contract month; and
>>
>> $c$ is the cost for each $1,000 of Coverage Amount as shown in the COST OF INSURANCE TABLE at the Insured's then attained age, divided by $1,000.

---

[4] The Policy has no additional benefits, so this provision does not apply.

30. Crucially, however, Richard's Contract Summary, which was incorporated into the Policy, also stated the COI would not increase over 5% in a contract year. Specifically, the Contract Summary states as follows:

> The Company's declared rates are guaranteed not to exceed the 1980 CSO[5] for the cost of insurance calculation, ***and the company guarantees that they will not be increased by more than 5% in any contract year.*** (emphasis supplied).

For the first contract year, the COI was $2,241.26.

31. Over the life of the Policy, Richard paid $345,271.04 in premiums (inclusive of the administrative charges).[6] The allowed COI with a 5% increase from the preceding year (plus administrative expense of $6,600), totals only $165,193.34.

32. The Defendants overcharged Richard for COI in an amount of at least $**180,077.70.** Additionally, the Defendants breached the terms of the Policy by forcing Richard and other class members to pay for the cost of insurance when it was inflated by improper factors.

---

[5] CSO, which stands for "Commissioners Standard Ordinary," refers to a mortality table.

[6] This sum is net of loan payments for three loans Richard incurred in the 1990s. Loan payments are paid on a last in first out basis from premiums received by the Defendants. Total payments by Richard through contract year 2016 and a partial contract year of 2017, were $345,271.04, which sum includes loan repayments.

33. Under the Policy, "[t]he cost [of insurance] is based on the Insured's: 1. Sex; 2. attained age; 3. Rate class shown on the Contract Summary…" There is no provision in the Policy permitting Defendants to include, among other things, investment losses, persistency, taxes, profit assumptions, capital and research requirements, or other unspecified factors into the calculation of COI. Thus, for example, actual Investment earnings by the Defendant well below those anticipated at the inception of the contract could not have been properly recouped by increasing the COI.

34. When Travelers sold the Policy to Richard on July 5, 1985, the 5-year Treasury Rate (one of the index rates used to determine the "Cash Value Interest Rate" as set forth in the Contract Summary[7]) was 7.15%; in contrast, the current 5-year Treasury rate is under 1%.[8] This caused Richard's cash value to accumulate much less than anticipated. Further, the Contract Summary indicates that the intended "spread" (or the insurer's retained interest) is 1% to 1.5%,[9] and the Contract Summary provides an "Assured Cash Value Interest Rate" of 4% per year[10], meaning

---

[7] *See* Contract Summary, pg. 2.1A.

[8] This rate has been trending downward since 1989, and it has been below 7.15% since 1995.

[9] *See* Contract Summary, pg. 2.1A.

[10] *See id.* Also, the Policy states that "[t]he assured interest rate we use to calculate Cash Values is shown on the Contract Summary. We may use rates greater than the assured rate to calculate all or any part of the Cash Value…" *See* Policy, pg. 7.

that Defendants are incurring losses in crediting interest on these policies. Due to the decrease in interest rates since the issuance of the Policy and others like it, Defendants have incurred investment losses.

35. Defendants could only base the COI upon "future outlook for mortality and expenses," not their "actual mortality and expense experience." Mortality rates have greatly improved since 1985, and expenses are limited under the policy to five years after issuance of the policy.

36. Yet Defendants have increased the COI, apparently in an attempt to recoup expenses and investment losses. These practices are not permitted under the Policy, nor were they disclosed to Richard and other class members.

37. It was never explained to Richard and other class members that a drop in interest crediting rates might lead the Defendants to charge explosive premium increases to make up the difference. In essence, in order to cover the amount needed to pay the Cost of Insurance, Defendants turned what was sold as a life insurance policy with "flexible payments" into a prohibitively expensive term policy.

38. Defendants have breached the contract by, among other things, seeking to recoup losses from decreasing interest rates; increasing the COI to subsidize the losses in meeting the interest guarantee under the Policy; failing to account for

improved mortality rates when charging the cost of insurance; and shocking the insurance policy owners so as to induce a cancellation or lapse of their policies.

39.  Starting approximately six years ago, Richard began receiving demands from MetLife/Brighthouse to pay increasing amounts of COI. Despite Richard's payments, Metlife/Brighthouse kept demanding ever-increasing amounts of premiums to keep Richard's policy from lapsing.  Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

40.  After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017 Brighthouse cancelled Richard's policy, and refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.

41.  Over the years, Richard paid to the Defendants the sum of $345,521.04 in premiums and costs for his $500,000 face amount policy. Now, because of the cancellation of the Policy by Brighthouse, Richard has no death benefit at all.

42. By increasing the COI charge in excess of five percent annually, and by calculating the COI rate with impermissible and undisclosed factors (including, by way of example, outdated mortality information, expenses, and attempted

recoupment of financial or investment losses), Defendants have repeatedly and continuously breached the Policy of Richard and other class members.

43. The nature of Defendants' conduct is such that Richard and other class members would be unaware that Defendants were engaging in charging improperly calculated COI rates. For example, Defendants possess the actuarial and other information used to calculate the COI charges. Defendants did not disclose such information to Richard and the class members (who would not be equipped to interpret such data in any regard), and the information regarding the COI charges were not reasonably discoverable by Plaintiff or the class members harmed by Defendants' breaches.

44. Defendants possessed superior knowledge of their COI calculations and intentionally chose not to disclose such information to Richard and the other class members. This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members.

## CLASS ALLEGATIONS

45. Richard brings this case as a class action under Fed. R. Civ. P. 23, on behalf of himself and as a representative of the following class (the "Class"):

> All persons who own or owned a life insurance policy issued by Travelers (including those persons who own or owned a life insurance policy acquired

by, assigned to, purchased by, or administered by any of Travelers' successors-in-interest), the terms of which provide or provided for: 1) a cost-of-insurance charge based on the insured's sex, age, and applicable rate class, where such rates are based only on future outlook for mortality and expenses and not actual mortality and expense experience, and where any rate change would be made on a uniform basis for the insureds' same age, sex, duration, and rate class; 2) a guarantee that the cost-of-insurance rates would not be increased by more than 5% in any contract year; 3) an interest-earning cash value component; and 4) a death benefit.

46. Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or (c)(4), Richard brings, on behalf of himself and as a representative of the following subclass (the "Georgia Subclass"):

All persons who own or owned a life insurance policy as set forth in the Class Definition, which was issued by Travelers and (including those persons who own or owned a life insurance policy acquired by, assigned to, purchased by, or administered by any of Travelers' successors-in-interest) who are or were citizens or residents of the State of Georgia while owning such a life insurance policy.

47. **Numerosity**. The members of the Class and Subclass are so numerous that individual joinder of Class and Subclass members as parties to this cause would be impractical. It is reasonably believed there are hundreds if not thousands of Class and Subclass members. The exact number of class members may only be determined through appropriate discovery.

48. **Existence and Predominance of Common Questions of Law or Fact**. Questions of law of common and general interest to the class exist as to all Class and Subclass members, and such questions predominate over any questions affecting

only individual members of the class. Such common questions include, but are not limited to, the following.

a. As to all Class members, whether Defendants increased the COI using factors other than future outlook for mortality and expenses, and whether such use is permissible under the Class policies;

b. As to all Class members, whether the Defendants based the COI charges upon actual mortality and expense experience instead of future outlook for mortality and expenses;

c. As to all Class members, whether any rate change for COI was made on a uniform basis for the insureds' same age, sex, duration, and rate class;

d. As to all Class members, whether the Defendants treated investment losses as expenses;

e. As to all Class members, whether the Defendants charged amounts in excess of those specifically authorized;

f. As to all Class members, whether the Defendants breached their contracts with Plaintiff and class members;

g.  As to all Class members, whether Defendants suppressed and concealed the fact that the COI would be increased due to undisclosed and contractually-impermissible factors;

h.  As to all Class members, whether Defendants acted in bad faith by failing to utilize improved mortality outlook in their calculation of COI charges;

i.  As to all Class members, whether Defendants intended to increase COI charges to insureds so that insureds would not be able to afford the premium payment, so as to induce policy lapses, and whether such practices were done in bad faith;

j.  As to all Class members, whether Defendants concealed or suppressed the fact that they experienced losses, and would seek to induce lapses as insureds aged in order to reduce losses due to the low levels of treasury rates on which interest crediting is based;

k.  As to all Class members, whether the terms of the policies of insurance issued by Defendants are so vague, ambiguous, or contradictory that they cannot be performed;

l.  As to all Class members, whether the Class sustained damages as a result of Defendants' breaches of contract;

18

m. As to all Class members, whether the Class is entitled to damages, restitution, and/or other declaratory or equitable relief to remedy Defendant's breaches of contract;

n. As to all Class members, whether the Defendants increased COI charges in excess of 5% annually;

o. As to all Class members, whether Defendants suppressed and concealed that they were imposing increases in COI charges in excess of 5% annually;

p. As to all Class members, whether Defendants concealed the actual COI rates charged, thereby making it impossible for Class members to determine what the COI rates were, and whether such concealment complied with the contract provisions;

q. As to the Georgia Subclass, whether the Defendants have violated the Georgia's RICO Act, for which the members of the Subclass are entitled to recover.

49. **Predominance**. The questions set forth above predominate over any questions affecting only individual persons. Further, individualized damages questions do not predominate as damages due to individual class members can be readily calculated on a uniform and standard basis.

50.  **Typicality**.  The claims of the Plaintiff are typical of the claims of all Class and Subclass members, as all of the claims arise out of the same or similar insurance policies and the breach of such policies by the Defendants. The Class and Subclass have suffered the same or similar injuries as the Plaintiff.

51.  **Adequacy**. The Plaintiff will adequately represent the Class and Subclass, as he is a member of the Class and Subclass and his interests do not conflict with the interests of those he seeks to represent.  The Plaintiff has hired counsel who are experienced class action counsel who have represented consumer classes in numerous actions.

52. Defendants have acted on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the Class as a whole.

53. **Superiority**. A class action is superior to other available methods for a fair and efficient adjudication of this controversy since individual joinder of all members of the class is impractical. This is particularly true in light of the fact class members are in retirement age or senior years, and cannot afford the cost of hiring counsel and litigating the common issues in individual cases. Damages are capable of being computed on a uniform basis as the provisions of the fraud and overcharges arise

from a uniform policy with the same wrongful acts causing damage to each class member.

54.  **Risk of Inconsistent or Varying Individual Adjudications**. Class action treatment is proper as any individual resolution would risk inconsistent or varying adjudications. Such inconsistent or varying adjudications would establish incompatible standards of conduct for Defendants and the adjudication of the claim of one Class or Subclass member over another could, as a practicality, establish precedent which could or would affect the outcome of other Class and Subclass members, all while placing a substantial and unnecessary burden on the courts.

55. This case is appropriate for class action treatment for all the reasons stated herein.

<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT**</u>
<u>**IMPROPER ANNUAL INCREASES IN COST OF INSURANCE**</u>
<u>**As to the Class**</u>

56.  Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

57. The Contract Summary, which was incorporated into the Policy, limits the annual increase in the COI as follows:

> The Company's declared rates are guaranteed not to exceed the 1980 CSO for the cost of insurance calculation, ***and the company***

*guarantees that they will not be increased by more than 5% in*
*any contract year.*  (emphasis supplied).

58. As set forth above, Defendants consistently increased the rate of insurance charges more than 5% from one contract year to the next, and therefore breached the contract of insurance.

59. A reasonable policyholder, even with the legal experience of Richard, has but one interpretation of the 5% rate cap identified in the Contract Summary: That the prior year COI rate could not increase more than 5% in any contract year, and that such COI increase amount was not cumulative.

60. Applying the COI and administrative expenses as described above, the following chart shows the amounts paid by Richard, and the overcharges by the Defendants:

| Age | Calendar Year | Policy Year | Premium Paid | Cost of Insurance Charged | Cost of Insurance With 5% Cap | Admin Cost |
|---|---|---|---|---|---|---|
| 51 | 86-87 | 1 | $6,069.38 | $2,241.26 | $2,241.26 | $1,320. |
| 52 | 87-88 | 2 | $6,489.96 | $2,395.42 | $2,353.32 | $1,320. |
| 53 | 88-89 | 3 | $6,489.96 | $2,537.00 | $2,470.99 | $1,320. |
| 54 | 89-90 | 4 | $6,489.96 | $2,674.34 | $2,594.54 | $1,320. |
| 55 | 90-91 | 5 | $6,489.96 | $2,719.77 | $2,724.27 | $1,320. |
| 56 | 91-92 | 6 | $4,326.64 | $2,846.87 | $2,860.48 | |
| 57 | 92-93 | 7 | $0.00 | $3,109.33 | $3,003.50 | |
| 58 | 93-94 | 8 | $1,044.93 | $3,382.10 | $3,153.68 | |
| 59 | 94-95 | 9 | $6,489.96 | $3,589.13 | $3,311.36 | |
| 60 | 95-96 | 10 | $540.83 | $4,019.40 | $3,476.93 | |
| 61 | 96-97 | 11 | $0.00 | $4,750.86 | $3,650.78 | |
| 62 | 97-98 | 12 | $0.00 | $5,561.22 | $3,833.32 | |
| 63 | 98-99 | 13 | $2,133.26 | $6,443.86 | $4,024.98 | |
| 64 | 99-00 | 14 | $6,489.96 | $7,228.59 | $4,226.23 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 65 | 00-01 | 15 | $6,489.96 | $7,800.02 | $4,437.54 | |
| 66 | 01-02 | 16 | $9,071.70 | $8,503.50 | $4,659.42 | |
| 67 | 02-03 | 17 | $9,460.83 | $9,074.83 | $4,892.39 | |
| 68 | 03-04 | 18 | $8,640.00 | $9,738.37 | $5,137.01 | |
| 69 | 04-05 | 19 | $11,905.00 | $10,262.28 | $5,393.86 | |
| 70 | 05-06 | 20 | $11,300.00 | $10,853.93 | $5,663.55 | |
| 71 | 06-07 | 21 | $10,800.00 | $12,353.48 | $5,946.73 | |
| 72 | 07-08 | 22 | $13,050.00 | $13,732.06 | $6,244.07 | |
| 73 | 08-09 | 23 | $15,500.00 | $15,023.00 | $6,556.27 | |
| 74 | 09-10 | 24 | $17,750.00 | $16,449.34 | $6,884.08 | |
| 75 | 10-11 | 25 | $18,100.00 | $17,658.35 | $7,228.29 | |
| 76 | 11-12 | 26 | $20,643.00 | $19,776.46 | $7,589.70 | |
| 77 | 12-13 | 27 | $20,224.02 | $22,210.39 | $7,969.19 | |
| 78 | 13-14 | 28 | $22,804.72 | $22,474.91 | $8,367.65 | |
| 79 | 14-15 | 29 | $24,775.00 | $26,631.08 | $8,786.03 | |
| 80 | 15-16 | 30 | $24,634.01 | $24,882.97 | $9,225.33 | |
| 81 | 16-17 | 31 | $32,750.00 | $32,334.86 | $9,686.59 | |
| 82 | 17-18 | 32 | $14,318.00 | | | |
| 83 | 18-19 | 33 | | | | |
| **Total** | | | **$345,271.04** | **$333,258.98** | **$158,593.34** | **$6,600.** |
| **Exp** | | | **Included** | **$ 6,600.00** | **$6,600.00** | |
| **Total** | | | **$345,271.04** | **$339,858.98** | **$165,193.34** | |
| **Ovrch** | | | | | **$180,077.70** | |

61.   The chart above is a uniform method of the computation of damages for all class members. Comparison of actual premiums paid and COI to the allowed amount of no more than 5% from the prior year's COI allows the exact and accurate computation of damages on a class-wide basis.

62.   These computations do not include any interest earned on the Cash Value or Accumulation Account, which would make the overcharge even larger. The exact

amount of interest earned on such account is not readily available, and will be determined through the discovery process.

63. The clear terms of the Contract Summary (a document expressly incorporated into the Policy) did not allow a COI increase exceeding 5% from one contract year to the next. Alternatively, even if this language is ambiguous or if it conflicts with other policy language, since Defendants drafted the Policy, the Court should adopt Plaintiff's reasonable construction of the COI rate-setting provisions set forth above.

64. The Defendants repeatedly demanded amounts which were substantially higher than the amounts allowed to be charged under the Policy.

65. The actions of the Defendants were illegal and a breach of the Policy.

66. As a direct and proximate result of Defendants' breach, Richard and the other Subclass members have been damaged.  They are entitled to receive all damages from Defendants' breach, with interest.  Such damages include, but may not be limited to, any cost of insurance paid in excess of the allowed five percent annual increase, as illustrated above.

**COUNT II:**
**BREACH OF CONTRACT FOR USE OF IMPROPER FACTORS IN THE**
**COMPUTATION OF COST OF INSURANCE**
**As to the Class**

67. Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

68. According to the Policy, the COI is computed as follows:

> The cost is based on the Insured's:
>> 1. sex;
>> 2. attained age; and
>> 3. rate class shown on the Contract Summary for;
>>> a. the Initial Stated Amount; and
>>> b. each increase in the Stated Amount.
>
> …
>
> The cost of insurance rates are shown in the Cost of Insurance Table. We may use rates less than those shown. ***We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year.*** Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class. (emphasis supplied)

69. Contrary to the provisions of the Policy, the Defendants used the COI increase to recover past investment losses, unanticipated administrative expenses, and/or other undisclosed and impermissible factors.

70.   Contrary to the express terms of the Policy, the increases in the COI by the Defendants were wholly unrelated to changes of future expectations regarding mortality.

71. Since the issuance of the Policy, life expectancy has dramatically increased due to mortality improvements, and the COI should have reflected such mortality improvement in COI changes. Failure of the Defendants to reflect future mortality outlook as required by the Policy is a breach.

72. The Defendants never specifically set forth their specific method used to calculate the COI for a given year.  Where such discretion is given to a party to a contract, good faith and fair dealing requires the discretion be utilized reasonably and fairly to the other party.

73.   If the Defendants had acted in good faith and fair dealing as required by law, the Defendants would not have sought to collect COI charges in excess of those allowed by the Policy, but instead would have reduced the COI because of increased life expectancy.

74.   The Defendants in bad faith failed to account for improved mortality, instead using improper factors to increase the COI.

75.   The reason the Defendants failed to utilize improved mortality and life expectancy was not, as required by the Policy, to reflect future mortality

expectations, but to recover for (without limitation) past financial and investment losses, as well as for administrative expenses they imprudently limited to the first five years. As such factors are not allowed by the Policy to be considered in computing COI, Defendants have breached the contract of insurance.

76.   Defendants breached their duty of good faith and fair dealing by instituting drastic COI increases with the intention of causing "shock lapses" by insureds like Richard and the class who are in advanced age. Such insured have paid premiums for years, are more likely to cause Defendants to pay a death benefit, and cannot be insured at a reasonable rate by other insurers.

77. As direct and proximate result of Defendants' conduct, Richard and the other class members have been damaged. They are entitled to receive all damages to remedy Defendants' conduct, with interest.

**COUNT III**
**DECLARATORY AND INJUNCTIVE RELIEF**
**As to the Class**

78.   Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

79. An actual controversy has arisen and now exists between Richard and the Class members, on the one hand, and Defendants, on the other, concerning the

respective rights and duties of the parties under the Policies of Richard and the Class members.

80. Plaintiff contends that Defendants have breached the terms of the Policies as set forth in the preceding Counts. The Defendants' breaches have caused Richard and the Class to either a) wrongfully suffer a lapse and/or cancellation of their policies; or b) continue to pay COI charges in excess of contractual limitations.

81. Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies of Richard and the Class members, and Plaintiff requests that the Court declare the Defendants have been in material breach of the Policies so that future controversies may be avoided.

82. Pursuant to a declaration of the parties' respective rights and duties under the Policies of Richard and the Class members, Plaintiff seeks an injunction permanently enjoining Defendants (a) from continuing to engage in conduct in breach of the Policies of Richard and the Class members, which have culminated and will continue to culminate in shock lapses; (b) from ordering Defendants to comply with the terms of the Policies of Richard and the Class members; and (c) where necessary, reinstating policies that have lapsed or cancelled as a result of Defendants' excessive COI charges.

## COUNT IV
## FRAUDULENT SUPPRESSION AND CONCEALMENT
### As to the Class

83.    Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

84.    Travelers prepared and made a part of the Policy a Contract Summary which was attached to the Policy.

85.    The Contract Summary did not give the Defendants the right to increase COI's except in an amount not exceeding 5% of the prior contract year's COI.

86. Nonetheless, (as demonstrated in the chart set forth in Count I), Defendants regularly charged COI increases in excess of 5% annually, especially when considering the cumulative increases in the COI over the life of the policy. Defendants made these charges without notifying Richard (or the other class members) that they were increasing the COI in excess of contractual limits.

87.    After Defendants began incurring investment losses due to incorrect projections about interest rates and return on investment, the Defendants had the specific purpose and intent of breaching the terms of the Policy, especially when their insureds began to reach an advanced age, by steeply increasing the COI in order to recover their investment losses. Defendants concealed their intent from Richard and other Class members.

29

88.  Throughout the term of the Policy, Defendants intentionally withheld information from Richard and other Class members and failed to warn its insureds of the danger and implications of interest rates that were lower than initial projections, including lower cash value accumulations.

89. Further, Defendants intentionally withheld information from Richard and other Class members that they would seek to recoup their own investment losses by steeply increasing the COI charges.

90.  Specifically, Defendants knew, understood and intended:

   a.  the universal life Policy of Richard and class members would not remain in force and effect until maturity, which was decades in the future (in 2030), based upon the premiums collected and prevailing market interest rates;

   b.  the universal life Policy of Richard (and other class members) would, be in danger of lapsing at some point after the 16th contract year (as set forth in the "Table of Values" in the Contract Summary), but before maturity unless Richard and the class paid shockingly increased premiums;

   c.  the COI calculation in the Policy would not be followed, but the Defendants would substantially and shockingly increase the COI so

as to bring about the lapse of the Policy of Richard and class members; and,

d. the Defendants would attempt to recoup lower investment earnings, while also increasing COI's and thereby premiums, based on factors other than future outlook for mortality and expenses, as stipulated by the Policy.

91. The Defendants at all material times, suppressed, concealed and failed to warn Richard and the class of the facts set forth above.

92. In this way, the Defendants planned to obtain the benefit of the payment of premiums by Richard and the class members over a period of years without any reasonable explanation of the impact of the Defendant's flawed product design features.

93. The Defendants knew and intended that, as Richard and the class members reached or neared the end of their working life and entered retirement, they would not be able to pay the increased premiums and their policies would lapse.

94. On behalf of himself and the class, Richard seeks all damages and consequential damages proximately caused by Defendant's conduct.

95.   The suppression and concealment of the facts alleged herein allows the statute of limitations to be tolled so as to allow the recovery of damages from the issuance of the Policy to the filing of this Complaint.

96.   Richard and the class are entitled to recover from the Defendants an award of punitive damages without limitation in an amount so as to punish the Defendants and to deter them from such activity as alleged in this Complaint in the future.

## COUNT V
## UNIFORM AND WRITTEN FRAUD
### As to the Class

97.   Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

98.   After the issuance of the Policy, the Defendants regularly sent out account statements and other account notices to Richard and the other Class members which did not disclose that the COI had been charged at rates higher than allowed under the Policy. Nor did these statements disclose the Defendants were using improper factors to inflate the COI.  The same formulae to compute the fraudulent COI charges and premiums were used uniformly on all class members as were used in the computation of Richard's premiums.

99.  In addition to transmitting statements to Richard and other class members containing inflated COI charges, Defendants began sending notices to Richard and

class members demanding ever-increasing premiums, which resulted from increasing incorrect and fraudulent COI charges.

100.   For example, beginning on July 3, 2014, MetLife/Brighthouse constantly began sending letters demanding ever-increased payments to maintain his policy. Richard received such letters on at least the following dates:

a) A notice from MetLife to Richard dated July 3, 2014 demanding $6,765.78 to keep the Policy in effect until August 5, 2014.

b) A notice from MetLife to Richard dated October 3, 2014, demanding $7,298.80 to keep the Policy in effect until November 5, 2014.

c) A notice from MetLife to Richard dated January 5, 2015, demanding $7,327.25 to keep the Policy in effect until February 5, 2015.

d) A notice from MetLife to Richard dated April 2, 2015, demanding $8,869.40 to keep the Policy in effect until May 5, 2015.

e) A notice from MetLife to Richard dated July 2, 2015, demanding $9,483.41 to keep the Policy in effect until August 5, 2015.

f) A notice from MetLife to Richard dated September 17, 2015, demanding $7,773.90 to keep the Policy in effect until November 5, 2015.

g) A notice from MetLife to Richard dated December 10, 2015, demanding $9,723.69 to keep the Policy in effect until January 5, 2016.

101. In response to these demands, Richard would make ever-increasing payments to MetLife/Brighthouse.

102. This correspondence continued until November 20, 2017, when the Policy was cancelled by Brighthouse *nee* MetLife.

103. The Defendants made similar uniform misrepresentations regarding the improperly computed COI charges to the class members, by way of regular statements or account notices such as the ones described above. The same formulae to compute COI and premiums were used uniformly on all class members as were used in the computation of Richard's premiums.

104. Each account statement and each demand for increased premiums were tantamount to actual fraud. The Defendants knew the premiums were the result of being more than 5% of the prior years' stated COI. Further, the Defendants had actual knowledge that their COI computation included the use of factors not allowed by the terms and conditions of the Policy.

105. The Defendants knew the statements contained therein regarding the COI charges were fraudulent when made, and they made them with the intent to harm.

106.  Richard and the class relied upon such statements regarding the COI charges to their detriment by paying the excessive COI in order to keep their policies in effect.

107. If Richard and the other class members knew the true state of affairs, they would have made different financial decisions rather than pay exorbitant COI increases to continue insurance policies they had no realistic chance of maintaining to maturity.

108.  Each of the statements Defendants made regarding the COI were material. The statements were part of a fraud of the Defendants which was perpetrated by the Defendants in order to unlawfully obtain premiums. The funds paid to the Defendants caused Richard and the class to pay illegal premiums in order to maintain their policies.

109.  Richard and the class were entitled to rely on the representations of the Defendants in order to keep their policies in full force and effect.

110.  The fraud of the Defendants ultimately caused Richard's Policy to lapse after he paid premiums to the Defendants in the amount of $345,271.04.

111.  The Defendants knew that their representations would be relied upon by Richard and the class. Defendants made these representations with the intent to defraud Richard and the class out of their premiums and to cause their policies to

lapse so the Defendants would not be required to pay the policies upon the maturity of the Policies or upon the deaths of the insureds.

112.   Defendants' actions in fraudulently computing COI was uniform among all members of the class.

113. On behalf of himself and the class, Richard seeks all damages and consequential damages proximately caused by Defendants' conduct.

114.   The fraud alleged herein allows the statute of limitations to be tolled so as to allow the recovery of damages from the issuance of the Policy to the filing of this Complaint.

115.   Richard and the class are entitled to recover from the Defendants an award of punitive damages without limitation in an amount so as to punish the Defendants and to deter them from such activity as alleged in this Complaint in the future.

## COUNT VI
## VIOLATION OF THE RACETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## Ga. Code § 16-14-1 *et. seq.* (hereinafter "RICO")
## As to the Georgia Subclass

116.   Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

117.   Each Defendant may be defined as an "enterprise" pursuant to O.C.G.A. § 16-4-3(3).

118.   Defendants have engaged in a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-3 by, among other things, engaging in the following activities:

(a) **Mail and Wire Fraud**. Defendants have demanded and sought to collect improperly inflated cost of insurance payments from insured like Richard for which they are not entitled.  Defendants have done this by: transmitting letters demanding payment; collecting payment through various means (including accepting checks, automatic drafts, and wires, and by improperly crediting excessive amounts against the cash accumulation accounts of insured); and transmitting statements reflecting improperly inflated cost of insurance payments. These transmittals occurred across state lines. The Defendants wrongfully utilized interstate mails and wires to provide false and improper demands for payment of premiums which the Defendants knew were false in order to obtain property to which they were not entitled. Defendants knowingly devised this scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. Defendants acted with the specific intent to deprive Richard and the subclass of money paid in premiums and to increase the probability Richard and the subclass would be required to lapse or

cancel their policies, thereby unlawfully enriching the Defendants. The conduct of the Defendants described herein constitutes repeated and continuous violations of 18 U.S.C. §1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), and conspiracy to violate the same. Such conduct is defined as racketeering activity by 18 U.S.C. § 1961, and thereby by O.C.G.A. § 16-14-3(5)(C).

(b) **Theft by Deception**. Defendants have demanded and collected improperly inflated cost of insurance payments from insured like Richard for which they are not entitled. By failing to disclose that they were not entitled to the cost of insurance payments they demanded and collected, Defendants have obtained property from insured like Richard and other members of the subclass by deceitful means or artful practice with the intention of depriving them of their personal property. Defendants deceived Richard and the other subclass members by: creating the impression that they were charging cost of insurance rates allowed by the policy, when Defendants knew that they were improperly increasing the cost of insurance rates or using improper factors to calculate such rates; failing to inform Richard and other subclass members that they had been demanding and collecting

improperly inflated cost of insurance rates to keep policies from lapsing; and, by failing to disclose its methodology for computation of cost of insurance to Richard and other subclass members, preventing Richard and the subclass members from acquiring information pertinent to the disposition of the property. These deceitful means and artful practices included falsity of matters of pecuniary significance, calculated to deceive a reasonable and ordinary insured.  Such conduct is defined as Theft by Deception by O.C.G.A. § 16-8-3 and thereby as racketeering activity pursuant to O.C.G.A. § 16-14-3(5)(A)(xii).

(c) **Theft by Taking and Theft by Conversion**. Defendants have collected improperly inflated cost of insurance payments from Richard and other members of the subclass by applying the funds in their cash accumulation accounts. Defendants lawfully obtained the funds of Richard and other subclass members by collecting premium payments to fund cost of insurance charges and the cash accumulation accounts. Defendants were only authorized to apply funds from the cash accumulation accounts to pay for cost of insurance charges they were entitled to charge under the Policy. However, Defendants knowingly converted the funds to their own use in violation of the contractually

mandated parameters for setting the cost of insurance, depriving Richard and other members of the subclass of the funds they were properly entitled to in the process. Such conduct meets the requirements of Theft by Taking as defined in O.C.G.A. § 16-8-2 and the requirements of Theft by Conversion, as defined by O.C.G.A. § 16-8-4, and thereby as racketeering activity pursuant to O.C.G.A. § 16-14-3(5)(A)(xii).

119. O.C.G.A. § 16-14-4(a) makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."

120. The Defendants have acquired and maintained money procured through a pattern of racketeering activity as described herein from Richard and the subclass.

121. Further, the Defendants have, through a pattern of racketeering activity or proceeds derived therefrom, intentionally acquired and/or maintained an interest in their respective enterprises.

122. Defendants have violated O.C.G.A. § 16-14-4(b) by conducting or participating in the pattern of racketeering activity specified above.

123.   O.C.G.A. § 16-14-4(c) makes it illegal to conspire with others to take, receive or maintain property, including money, resulting from a racketeering activity, and to conspire to conduct or participate in the pattern of racketeering activity.   The Defendants, acting through their officers and employees, have conspired to acquire and obtain money from racketeering activities, and to conduct or participate in the pattern of racketeering activity.

124. O.C.G.A. § 16-14-4(c) makes it illegal to, through a pattern of racketeering activity or proceeds derived therefore, conspire with others to acquire or maintain an interest in an enterprise. The Defendants, acting through their officers and employees, have conspired to acquire or maintain an interest in their respective enterprises.

125.   The actions of the Defendants, through their pattern of racketeering activity, caused Richard and the subclass to sustain losses.

126.   Richard is entitled to recover treble damages for his loss, punitive damages and attorney fees.

127.   The actions of the Defendants in regard to the fraud and violation of the RICO Act were intentional acts and with a specific intent to harm Richard and the Georgia subclass.

128.    Richard and the members of the Georgia subclass are entitled to recover from the Defendants an award of punitive damages without limitation in an amount so as to punish the Defendants and to deter them from such activity as alleged in this Complaint in the future.

129.    Richard and the subclass are entitled to recover attorney fees for the violation of the RICO Act pursuant to O.C.G.A. § 16-14-6(c).

## COUNT VII
## INTEREST
## As to the Georgia Subclass

130.    Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

131.    The amounts overcharged by the Defendants as part of their scheme are easily computed to a finite number, and are, therefore, liquidated. The Defendants are liable for interest at the rate of 7% on the overcharges as they are liquidated amounts, and such interest is authorized pursuant to O.C.G.A. § 7-4-15 and 7-4-2, for which Richard and the members of the Georgia subclass are entitled to recover.

## COUNT VIII
## ATTORNEY FEES

132.    Plaintiff incorporates and restates by reference all of the preceding allegations as though they were set forth fully herein.

133.   The actions of the Defendants in this cause have been in bad faith. Further, the Defendants have been stubbornly litigious and caused Richard and the class unnecessary trouble and expense.

134.   Richard and the class are entitled to recover attorney fees pursuant to O.C.G.A. § 13-6-11 because of such actions as alleged in this cause.

**WHEREFORE**, the plaintiff prays as follows:

A.   That process and summons issue and the defendants be personally served as provided by law;

B.   That this action be certified as a class action;

C.   That the plaintiff and the class recover on the breach of contract of the defendants for all damages proven at the time of trial, with interest;

D. That the Court award all other declaratory, injunctive, or equitable relief necessary to remedy Defendants' breaches of contract;

E.   That the plaintiff and the class have the statute of limitations tolled because of the fraudulent suppression of facts by the defendants concerning the increasing premiums;

F.   That the plaintiff and the class recover on the uniform and fraudulent representations of the defendants;

G.   That the plaintiff and the Georgia subclass recover for the violation of the

Georgia RICO Act in treble damages for all losses of the plaintiff and the class;

H.  That the plaintiff and the Georgia subclass recover interest on the rate set forth

for liquidated damages;

I.   That the plaintiff and the class recover from the defendants an award of

attorney fees;

J.   That the plaintiff and class recover punitive damages;

K.   That the plaintiff  and the class have a trial by jury on all issues raised in this

cause; and,

L.   That the plaintiff and the class have any and all other relief the court may

deem just and equitable.

Respectfully submitted, this 8th day of May, 2020.

THE BARNES LAW GROUP, LLC

*/s/ Roy E. Barnes*
Roy E. Barnes
Georgia Bar No. 039000
Counsel for Plaintiff and the
Proposed Class

*/s/ J. Cameron Tribble*
J. Cameron Tribble
Georgia Bar No. 754759
Counsel for Plaintiff and the
Proposed Class

THE BARNES LAW GROUP, LLC
31 ATLANTA STREET
MARIETTA, GEORGIA 30060
T: 770.419.8505
F: 770.227.6373
EMAIL: roy@barneslawgroup.com
EMAIL: ctribble@barneslawgroup.com