## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD A. NEWTON, SR.,    )
*Individually and on behalf of a*    )
*Class of Individuals Similarly*    )
*Situated*,    )    CIVIL ACTION
    )    FILE NO. 1:20-cv-02001-AT
    Plaintiff,    )
    )    COMPLAINT – CLASS ACTION
v.    )
    )    JURY TRIAL DEMANDED
BRIGHTHOUSE    )
LIFE INSURANCE COMPANY,    )
    )
    )
    Defendant.    )

## <u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

**COMES NOW**, RICHARD A NEWTON, SR. (hereinafter "Newton" or "Richard") individually and on behalf of a class of individuals similarly situated, and files this Second Amended Complaint against Brighthouse Life Insurance Company (hereinafter "Brighthouse" or "Defendant"), formerly known as MetLife Insurance Company USA (along with its predecessor, MetLife Insurance Company of Connecticut, hereinafter "Metlife") regarding a life insurance policy that was issued by The Travelers Insurance Company (along with its successor-in-interest, Travelers

Life & Annuity, hereinafter, "Travelers")[1],  showing the court as follows:

## NATURE OF ACTION

1.  This case arises from the breaches of Defendant (and those of its predecessors-in-interest) of provisions contained in their universal life insurance policies. Insurance companies have marketed this type of insurance as offering more flexibility than traditional "whole life" insurance policies. When universal life insurance was first introduced it was represented as being "transparent" and "understandable", whereas traditional whole life insurance was described as mired in hidden actuarial formulae. This representation was false, and the opposite has proven to be true. Universal life insurance is not transparent but rather, to the policyholder, impossible to understand.

2.  Generally, under universal life policies, certain portions of the premium are deducted in order to cover the cost of the life insurance as well as to cover other expenses. The balance is then deposited into an interest-bearing account and becomes the accumulation value of the policy. The implicit promise of – and thus the appeal of – universal life policies is that the earnings from the surplus premiums

---

[1] Travelers, along with Metlife, are collectively referred to hereinafter as the "predecessors-in-interest."

from the past will cover much of the future cost of insurance for the policy, thus mitigating the rise of future premium payments.

3. Defendant's predecessor-in-interest, Travelers, persuaded Richard to replace his whole life policy with a new universal life policy with illustrations that were based on projected interest rates that were much higher than they have been in recent memory. For example, when Richard received his "Statement of Policy Cost and Benefit Information" for his universal life insurance policy number ***6712[2] (hereinafter "Policy") in 1986, Travelers told Richard that during the twentieth year of the life of the Policy, the projected death benefit would be $500,000, the projected cash surrender value would be $124,892, and the annual premium would be $6,489.96. These projections assumed an interest rate of 9.5%. As it turned out, as of July 4, 2006, the cash value of Richard's Policy was only $2,560.89, and Richard had paid $11,300.00 in premiums that year.

4. Further, the Policy assured the policyholder's cash value would collect interest at a minimum rate of 4%. As interest rates have been significantly below 4%, this guarantee caused the Defendant (and its predecessors-in-interest) to incur

---

[2] Throughout this Complaint, account numbers have been partially redacted due to privacy concerns.

losses, which they attempted to recoup from policyholders by way of increasing the cost of insurance charged to policyholders.

5.   In the late 1980's and early 1990's Travelers sold millions of dollars of insurance on the basis described above.[3]  Richard purchased the Policy so that at his death the face amount of the insurance policy would be available to his heirs as an asset of his estate. Yet, within the last six years, and during the senior years of Richard, Brighthouse began suddenly, unilaterally, and massively to increase monthly deductions in particular as to the Cost of Insurance (hereinafter "COI") which increased the deductions from the accumulation account.

6.   These dramatic COI increases are designed to instigate what are known as "shock lapses."[4]  This intentional practice is for the sole purpose of causing a lapse

---

[3] No claim is made in this cause regarding the sale of the policies by Travelers. Instead, the Complaint seeks damages for breach of contract and other wrongs by Defendant (and its predecessors-in-interest) in imposing increased premiums through contractually disallowed means, primarily through COI increases substantially above those limits in the contract.

[4] "The initial lapse that occurs immediately before the first premium increase is referred to as the shock lapse and typically is the largest lapse rate. For higher premium increases, these rates can approach 100% and often are modeled at 100% beyond a certain threshold." SCOR, October 12, 2017, available at https://www.scor.com/en/media/news-press-releases/modeling-behavior-post-level-term; *see also McMahon v. Transamerica Life Ins. Co.*, C17-149-LTS, 2018 WL 3381406, at *8 (N.D. Iowa July 11, 2018) (describing plaintiffs' allegations that increases in monthly deductions were "for the purpose of inducing shock lapses" in bad faith).

of policies of those insureds who are in advanced age, who have already paid premiums for years and who have a higher rate of mortality. Unfortunately, these people usually cannot procure new life insurance policies at reasonable rates.

7.  By violating its contractual duties in bad faith as described herein, the Defendant was unjustly enriched to the detriment of Richard and the class. The practice of Defendant (and their predecessors-in-interest) described herein resulted not only in excessive premiums and costs, but also in the cancellation of policies. In Richard's case alone, Defendant (and their predecessors-in-interest) charged hundreds of thousands of dollars of premiums and costs for a policy that has been cancelled, for which Brighthouse is liable.

## **PARTIES**

8.  Richard A. Newton, Sr. is a citizen and resident of the state of Georgia residing in Atlanta, Fulton County, Georgia in the Northern District of Georgia, Atlanta Division. Richard is approximately 85 years of age.

9.  Brighthouse Life Insurance Company is incorporated under the laws of the state of Delaware, and its principal place of business is the state of North Carolina. Brighthouse is authorized to do business in the state of Georgia and is subject to the personal jurisdiction of the courts of this state. Brighthouse may be served by serving its registered agent in Georgia at the following address:

C.T. Corporation System
289 South Culver Street
Gwinnett County
Lawrenceville, Georgia 30046-4805.

## JURISDICTION OF THE NORTHERN DISTRICT OF GEORGIA

10.   The amount in controversy in this cause exceeds the amount of $75,000 exclusive of costs and fees.

11.   Richard is a citizen and resident of the state of Georgia. Brighthouse is incorporated in the State of Delaware and has its principal place of business in the State of North Carolina. There is, therefore, complete diversity of citizenship between Richard and the Defendant.  The United States District Court of Georgia for the Northern District of Georgia has jurisdiction to hear and decide this cause pursuant to 28 U.S.C. § 1332(a).

12.   Alternatively, this Court has jurisdiction pursuant to the Class Action Fairness Act found at 28 U.S.C. § 1332(d), because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million exclusive of interest and costs, and the proposed class contains more than 100 members.

## VENUE

13.   Venue is proper pursuant to 28 U.S.C.A. § 1391 in that Newton is a citizen and resident of Fulton County, Georgia, in the Northern District of Georgia, Atlanta

-6-

Division, where substantial actions occurred which form the cause of action alleged in this complaint.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

14.   Richard is approximately 85 years of age. On June 5, 1982 Richard purchased from Travelers a whole life insurance policy (Contract Number ***0269) in the face amount of $500,000. When Richard purchased Contract Number ***0269, he was 47 years old.

15.   On July 4, 1986, Richard replaced his whole life policy with a universal life insurance policy being policy number ***6712 issued by Travelers. This Policy had a maturity date of July 5, 2030. A copy of the 1986 Policy issued by Travelers is attached to this Complaint as Exhibit A and is incorporated herein as if fully set forth in this cause. Travelers labeled this universal life insurance policy a "Flexible Premium Adjustable Life Insurance Contract to Maturity Date Without Dividends."

16.   In the 2005-2006 contract year, MetLife, Inc. acquired Travelers in a cash and stock transaction. In its January 31, 2005 Form 8-K, MetLife, Inc. disclosed it was "combining" with Travelers Life & Annuity.[5]   After this merger, MetLife, Inc.'s subsidiaries MetLife Insurance Company of Connecticut, and later, MetLife

---

[5] Travelers Life and Annuity became The Travelers Insurance Company's successor-in-interest to Richard's Policy in 1997.

Insurance Company USA became the successors-in-interest to Richard's Policy Number ***6712. (MetLife Insurance Company of Connecticut was merged into MetLife Insurance Company USA in 2014). In 2017, MetLife announced it was "spinning off" its retail life insurance segment, and MetLife Insurance Company USA was re-branded as Brighthouse Financial.  Thus, Brighthouse is the successor-in-interest to Richard's Policy Number ***6712.

17.   During the 1990's, Richard made three loans from the accumulation account, all of which were timely re-paid and, at any rate, had no impact on the cost of insurance charged to Richard.

18.   The cover page of the Policy from Travelers on July 5, 1986 stated, among other things, that "[w]e are pleased to provide you the benefits of this Life Insurance Contract… This Contract … is subject to the terms and conditions stated on the attached pages, all of which are a part of it.  … The entire contract between us and the Applicant consists of the policy, all attached pages, and the written application(s). … No person other than one of our officers can, for us, alter or waive any terms or provisions of this Contract."

19.   Among other things, attached to the Life Insurance Contract is a document identified as the "Contract Summary."

20.   The face amount of Richard's Policy is $500,000. As set forth in the Contract Summary, the initial monthly premium of the Policy was $661.08 and the planned monthly premium was $540.83, which was generally deducted monthly from the checking account of Richard.

21.   The Contract Summary contained a table illustrating that the "planned premiums" continued through the 16th Contract Year.   When discussing the "Continuation of Insurance," the Policy stated that "[i]f no planned premium is shown on the CONTRACT SUMMARY, this Contract will continue until the end of the late period following the Deduction Day on which the Cash Surrender Value would not be enough to pay the monthly Deduction Amount due on that day, or until the Maturity Date, if earlier."

22.   The portions of the premiums in excess of the COI (and where applicable, the expense charges) were directed to the "Cash Value" of the Policy.   The funds accumulated interest for the benefit of policyholders like Richard.   The Contract Summary gives an "Assured Cash Value Interest Rate" of 4% per annum.

23.   The funds held in the Cash Value are property of policyholders like Richard, and Defendant (along with is predecessor-in-interest) held such Cash Value in trust for them. Accordingly, Defendant (and its predecessor-in-interest) were authorized to withdraw a "Deduction Amount" from the Cash Value only as set forth in the

Policy.   Generally speaking, the Policy's "Deduction Amount" was a monthly charge made against the Cash Value, and if there was insufficient cash value, an additional premium.   The charge was equal to the cost of insurance, cost of any additional benefits,[6] and the expense charges listed on the Contract Summary.

24.   The Contract Summary states the monthly expense charge for the administration of the policy was $0.22 per thousand per month for five years. For Richard, the total amount allowed for administrative costs for five years was $1,320 per year, or $6,600 total.

25.   By way of deductions in the Policy's cash value, Richard duly and timely paid the amount stated in the Policy for administrative expenses.

26.   With regards to the COI, the Policy stated:

The cost of insurance for any month is equal to $c$ times the result of $a$ minus $b$ where:

a is the Amount Insured for the month divided by the Interest Factor shown on the CONTRACT SUMMARY page;

b is the Cash Value on the Deduction Day at the beginning of the contract month; and

c is the cost for each $1,000 of Coverage Amount as shown in the COST OF INSURANCE TABLE at the Insured's then attained age, divided by $1,000.

---

[6] The Policy has no additional benefits, so this provision does not apply.

27.   Crucially, however, Richard's Contract Summary, which was incorporated into the Policy, also stated the COI rates would not increase over 5% in a contract year. Specifically, the Contract Summary stated as follows:

> The Company's declared rates are guaranteed not to exceed the 1980 CSO[7] for the cost of insurance calculation, ***and the company guarantees that they will not be increased by more than 5% in any contract year.*** (emphasis supplied).

For the first contract year, the COI was $2,241.26.

28.   From 1986 through 2018, Richard paid approximately $345,071.96 in premiums (inclusive of the administrative charges in the amount of $6,600). Richard has been able to estimate the actual COI rate charged for the first 31 years of the Policy, through the 2016-17 Policy Year.[8]   During those years, exclusive of the administrative charge, Richard paid an estimated $333,153.96 in COI.   For that time period, the allowed COI with a 5% rate increase from the preceding year totals only $159,422.07.

---

[7] CSO, which stands for "Commissioners Standard Ordinary," refers to a mortality table.

[8] In the 2017-18 Contract Year, Richard paid approximately $14,318.00 in premiums, an amount likely in excess of the COI calculated pursuant to the maximum allowable rate increase. Richard does not currently possess sufficient information to estimate the COI rate that Brighthouse actually charged for that year. To the extent that Richard is later able to compute the excessive amount charged for that year, Richard will seek all compensable damages.

29.   Thus, the Defendant (along with its predecessors-in-interest) overcharged Richard for COI in an amount exceeding $173,731.89.

30.   Additionally, the Defendant (along with its predecessors-in-interest) breached the terms of the Policy by forcing Richard and other class members to pay for the cost of insurance when it was inflated by improper factors.

31.   Under the Policy, "[t]he cost [of insurance] is based on the Insured's: 1. Sex; 2. attained age; 3. Rate class shown on the Contract Summary…" There was no provision in the Policy permitting Defendant (or its predecessors-in-interest) to include, among other things, investment losses, persistency, taxes, profit assumptions, capital and research requirements, or other unspecified factors into the calculation of COI. Thus, for example, actual Investment earnings by the Defendant well below those anticipated at the inception of the contract could not have been properly recouped by increasing the COI.

32.   When Travelers sold the Policy to Richard on July 5, 1986, the 5-year Treasury Rate (one of the index rates used to determine the "Cash Value Interest Rate" as set forth in the Contract Summary[9]) was 7.15%; in contrast, the current 5-year Treasury rate is under 1%.[10] This caused Richard's cash value to accumulate

_____

[9] *See* Contract Summary, pg. 2.1A.
[10] This rate has been trending downward since 1989, and it has been below 7.15% since 1995.

much less than anticipated.  Further, the Contract Summary indicates that the intended "spread" (or the insurer's retained interest) is 1% to 1.5%,[11] and the Contract Summary provides an "Assured Cash Value Interest Rate" of 4% per year[12], meaning that Defendant (and their predecessors-in-interest) have been incurring losses in crediting interest on policies such as Richard's. Due to the decrease in interest rates since the issuance of the Policy and others like it, Defendant (and its predecessors-in-interest) have incurred investment losses.

33.  Defendant (and its predecessors-in-interest) could only base the COI upon "future outlook for mortality and expenses," not their "actual mortality and expense experience."  Mortality rates have greatly improved since 1986, and expenses are limited under the policy to five years after issuance of the policy.

34.  Yet Defendant (and its predecessors-in-interest) increased the COI, apparently in an attempt to recoup expenses and investment losses.  These practices were not permitted under the Policy, nor were they disclosed to Richard and other class members.

_____

[11] *See* Contract Summary, pg. 2.1A.

[12] *See id.* Also, the Policy states that "[t]he assured interest rate we use to calculate Cash Values is shown on the Contract Summary. We may use rates greater than the assured rate to calculate all or any part of the Cash Value…" *See* Policy, pg. 7.

35.   It was never explained to Richard and other class members that a drop in interest crediting rates might lead to explosive premium increases to make up the difference. In essence, in order to cover the amount needed to pay the COI, Defendant (and its predecessors-in-interest) turned what was sold as a life insurance policy with "flexible payments" into a prohibitively expensive term policy.

36.   Defendant (and its predecessors-in-interest) have breached the contract by, among other things, seeking to recoup losses from decreasing interest rates; increasing the COI to subsidize the losses in meeting the interest guarantee under the Policy; failing to account for improved mortality rates when charging the cost of insurance; and shocking the insurance policy owners so as to induce a cancellation or lapse of their policies.

37.   Starting approximately six years ago, Richard began receiving demands from MetLife/Brighthouse to pay increasing amounts of COI. Despite Richard's payments, Metlife/Brighthouse kept demanding ever-increasing amounts of premiums to keep Richard's policy from lapsing.  Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

38.   After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017, Brighthouse cancelled Richard's policy, and

refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.

39.   Over the years, Richard paid to Defendant (and its predecessors-in-interest) at least $345,071.96 in premiums and expenses for his $500,000 face amount policy. Now, because of the cancellation of the Policy by Brighthouse, Richard has no death benefit at all.

40.   By increasing the COI rate in excess of five percent annually, and by calculating the COI rate with impermissible and undisclosed factors (including, by way of example, outdated mortality information, expenses, and attempted recoupment of financial or investment losses), Defendant (and its predecessors-in-interest) have intentionally, repeatedly, and continuously breached the Policy of Richard and other class members.

41.   The nature of the conduct of the Defendant (and its predecessors-in-interest) is such that Richard and other class members would be unaware that their insurers were charging improperly calculated COI rates.  For example, Defendant (and their predecessors-in-interest) possess the actuarial and other information used to calculate the rates and COI charges.  Defendant (and its predecessors-in-interest) did not disclose such information to Richard and the class members (who would not be equipped to interpret such data in any regard), and the information regarding the COI

rates and charges were not reasonably discoverable by Richard or the class members harmed by the breaches of Defendant (and its predecessors-in-interest).

42.   Richard exercised reasonable care and diligence with regards to the Policy. Richard had no reason to believe his insurer was not computing the COI rate as it said it would in the Policy. Nor did Richard have any reason to believe that his insurer would intentionally and shockingly increase his COI so as to cause its eventual lapse. Indeed, Richard reasonably relied upon the periodic account statements sent to him as the true indicators of the COI necessary to maintain the Policy. Richard had no actual or presumptive knowledge of the breaches described herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

43.   Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI rates and calculations and intentionally chose not to disclose such information to Richard and the other class members.  This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members as to all claims for damages asserted herein.

## CLASS ALLEGATIONS

44.  Richard brings this case as a class action under Fed. R. Civ. P. 23 23 (including Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or (c)(4)), on behalf of himself and as a representative of the following class (the "Class"):

> All persons who own or owned a universal life insurance policy issued by Brighthouse or its predecessors-in-interest, the terms of which provide or provided for: 1) a cost-of-insurance charge based on the insured's sex, age, and applicable rate class, where such rates are based only on future outlook for mortality and expenses and not actual mortality and expense experience, and where any rate change would be made on a uniform basis for the insureds' same age, sex, duration, and rate class; 2) a guarantee that the cost-of-insurance rates would not be increased by more than 5% in any contract year; 3) an interest-earning cash value component; and 4) a death benefit.

45.  Also pursuant to Fed. R. Civ. P. 23, Richard brings this case as a class action, on behalf of himself and as a representative of the following subclass (the "Georgia Subclass"):

> All persons who own or owned a universal life insurance policy as set forth in the Class Definition who are or were citizens or residents of the State of Georgia while owning such a life insurance policy.

46.  **Numerosity**. The members of the Class and Subclass are so numerous that individual joinder of Class and Subclass members as parties to this cause would be impractical. It is reasonably believed there are hundreds if not thousands of Class and Subclass members. The exact number of class members may only be determined through appropriate discovery.

47. **Existence and Predominance of Common Questions of Law or Fact**. Questions of law of common and general interest to the class exist as to all Class and Subclass members, and such questions predominate over any questions affecting only individual members of the class. Such common questions include, but are not limited to, the following.

a. As to all Class members, whether Defendant (and its predecessors-in-interest) increased the COI using factors other than future outlook for mortality and expenses, and whether such use is permissible under the Class policies;

b. As to all Class members, whether Defendant (and its predecessors-in-interest) based the COI charges upon actual mortality and expense experience instead of future outlook for mortality and expenses;

c. As to all Class members, whether any rate change for COI was made on a uniform basis for the insureds' same age, sex, duration, and rate class;

d. As to all Class members, whether Defendant (and its predecessors-in-interest) treated investment losses as expenses;

e. As to all Class members, whether Defendant (and its predecessors-in-interest) charged amounts in excess of those specifically authorized;

f.  As to all Class members, whether Defendant (and its predecessors-in-interest) breached their contracts with Plaintiff and class members;

g.  As to all Class members, whether Defendant (and its predecessors-in-interest) suppressed and concealed the fact that the COI would be increased due to undisclosed and contractually-impermissible factors;

h.  As to all Class members, whether Defendant (and its predecessors-in-interest) acted in bad faith by failing to utilize improved mortality outlook in their calculation of COI charges;

i.  As to all Class members, whether Defendant (and its predecessors-in-interest) intended to increase COI charges to insureds so that insureds would not be able to afford the premium payment, so as to induce policy lapses, and whether such practices were done in bad faith;

j.  As to all Class members, whether Defendant (and its predecessors-in-interest) concealed or suppressed the fact that they experienced losses, and would seek to induce lapses as insureds aged in order to reduce losses due to the low levels of treasury rates on which interest crediting is based;

k.  As to all Class members, whether the terms of the policies of insurance issued by Defendant (and its predecessors-in-interest) are so vague, ambiguous, or contradictory that they cannot be performed;

l.  As to all Class members, whether the Class sustained damages as a result of breaches of contract by Defendant (and its predecessors-in-interest);

m.  As to all Class members, whether the Class is entitled to damages, restitution, and/or other declaratory or equitable relief to remedy the breaches of contract of Defendant (and its predecessors-in-interest);

n.  As to all Class members, whether Defendant (and its predecessors-in-interest) increased COI rates in excess of 5% annually;

o.  As to all Class members, whether Defendant (and its predecessors-in-interest) suppressed and concealed that they were imposing increases in COI rates in excess of 5% annually;

p.  As to all Class members, whether Defendant (and its predecessors-in-interest) concealed the actual COI rates charged, thereby making it impossible for Class members to determine what the COI rates were, and whether such concealment complied with the contract provisions;

      q.  As to the Georgia Subclass, whether Defendant (and its predecessors-in-interest) have violated the Georgia's RICO Act, for which the members of the Subclass are entitled to recover.

48.  **Predominance**. The questions set forth above predominate over any questions affecting only individual persons.  Further, individualized damages questions do not predominate as damages due to individual class members can be readily calculated on a uniform and standard basis.

49.  **Typicality**.  The claims of the Plaintiff are typical of the claims of all Class and Subclass members, as all of the claims arise out of the same or similar insurance policies and the breach of such policies by Defendant (and/or its predecessors-in-interest). The Class and Subclass have suffered the same or similar injuries as the Plaintiff.

50.  **Adequacy**. The Plaintiff will adequately represent the Class and Subclass, as he is a member of the Class and Subclass and his interests do not conflict with the interests of those he seeks to represent.  The Plaintiff has hired counsel who are experienced class action counsel who have represented consumer classes in numerous actions.

51.  Defendant (and its predecessors-in-interest) have acted on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the Class as a whole.

52.  **Superiority**. A class action is superior to other available methods for a fair and efficient adjudication of this controversy since individual joinder of all members of the class is impractical. This is particularly true in light of the fact class members are in retirement age or senior years, and cannot afford the cost of hiring counsel and litigating the common issues in individual cases. Damages are capable of being computed on a uniform basis as the provisions of the fraud and overcharges arise from a uniform policy with the same wrongful acts causing damage to each class member.

53.  **Risk of Inconsistent or Varying Individual Adjudications**. Class action treatment is proper as any individual resolution would risk inconsistent or varying adjudications. Such inconsistent or varying adjudications would establish incompatible standards of conduct for Defendant and the adjudication of the claim of one Class or Subclass member over another could, as a practicality, establish precedent which could or would affect the outcome of other Class and Subclass members, all while placing a substantial and unnecessary burden on the courts.

54.   This case is appropriate for class action treatment for all the reasons stated herein.

**COUNT I**
**BREACH OF CONTRACT**
**IMPROPER ANNUAL INCREASES IN COST OF INSURANCE RATES**
**As to the Class**

55.   The Contract Summary, which was incorporated into the Policy, limits the annual increase in the COI rates as follows:

> The Company's declared rates are guaranteed not to exceed the 1980 CSO for the cost of insurance calculation, ***and the company guarantees that they will not be increased by more than 5% in any contract year.*** (emphasis supplied).

56.   Yet, Defendant (and its predecessors-in-interest) consistently increased the rate of COI charges more than 5% from one contract year to the next, and therefore breached the contract of insurance.

57.   A reasonable policyholder, even with the legal experience of Richard, has but one interpretation of the 5% rate cap identified in the Contract Summary: That the prior year COI rate could not increase more than 5% in any contract year, and that such COI rate increase amount was not cumulative

58.   The following chart compares the COI rates and resulting COI that Richard should have had to pay pursuant to the 5% rate cap with the COI and estimated COI

rates that Richard actually had to pay to calculate the total amount in COI that

Defendant (and its predecessors-in-interest) overcharged Richard[13]:

| Age | Contract Year | Guaranteed 5% Monthly Rate Per 1,000 | Est. Monthly Rate Actually Charged Per 1,000 | COI from 5% Rate Annual Charge | Annual COI Actually Charged |
|---|---|---|---|---|---|
| 51 | 1986-1987 | 0.3755 | 0.375996605 | $2,245.65 | $2,241.26 |
| 52 | 1987-1988 | 0.394275 | 0.403910945 | $2,357.93 | $2,395.42 |
| 53 | 1988-1989 | 0.41398875 | 0.430527443 | $2,475.83 | $2,537.00 |
| 54 | 1989-1990 | 0.434688188 | 0.456848657 | $2,599.62 | $2,674.34 |
| 55 | 1990-1991 | 0.456422597 | 0.467858551 | $2,729.60 | $2,719.77 |
| 56 | 1991-1992 | 0.479243727 | 0.492835176 | $2,866.08 | $2,846.87 |
| 57 | 1992-1993 | 0.503205913 | 0.538487206 | $3,009.38 | $3,109.33 |
| 58 | 1993-1994 | 0.528366209 | 0.583437058 | $3,159.85 | $3,382.10 |
| 59 | 1994-1995 | 0.554784519 | 0.620629256 | $3,317.85 | $3,589.13 |
| 60 | 1995-1996 | 0.582523745 | 0.695841506 | $3,483.74 | $4,019.40 |
| 61 | 1996-1997 | 0.611649932 | 0.816683667 | $3,657.92 | $4,750.86 |
| 62 | 1997-1998 | 0.642232429 | 0.946942673 | $3,840.82 | $5,561.22 |
| 63 | 1998-1999 | 0.67434405 | 1.086973355 | $4,032.86 | $6,443.86 |
| 64 | 1999-2000 | 0.708061253 | 1.212683333 | $4,234.51 | $7,223.59 |
| 65 | 2001-2002 | 0.743464316 | 1.306936405 | $4,446.23 | $7,800.00 |
| 66 | 2002-2003 | 0.780637531 | 1.423850641 | $4,668.54 | $8,503.50 |
| 67 | 2003-2004 | 0.819669408 | 1.521077999 | $4,901.97 | $9,074.83 |
| 68 | 2004-2005 | 0.860652878 | 1.631236999 | $5,147.07 | $9,738.37 |
| 69 | 2005-2006 | 0.903685522 | 1.720055861 | $5,404.42 | $10,262.28 |
| 70 | 2006-2007 | 0.948869798 | 1.823298984 | $5,674.64 | $10,853.93 |

---

[13] In the 2017-18 Contract Year, Richard paid approximately $14,318.00 in premiums, an amount likely in excess of the COI calculated pursuant to the maximum allowable rate increase. This chart does not include that payment as Richard does not currently possess sufficient information to estimate the COI rate that Brighthouse actually charged for that year. To the extent that Richard is later able to compute the excessive amount charged for that year, Richard will seek all compensable damages.

| 71 | 2007-2008 | 0.996313288 | 2.07320622 | $5,958.37 | $12,353.48 |
|----|-----------|-------------|------------|-----------|------------|
| 72 | 2008-2009 | 1.046128953 | 2.299547127 | $6,256.29 | $13,732.06 |
| 73 | 2009-2010 | 1.0984354 | 2.515258563 | $6,569.11 | $15,023.00 |
| 74 | 2010-2011 | 1.15335717 | 2.759125808 | $6,897.56 | $16,449.34 |
| 75 | 2011-2012 | 1.211025029 | 2.967399968 | $7,242.44 | $17,658.35 |
| 76 | 2012-2013 | 1.27157628 | 3.328278016 | $7,604.56 | $19,776.46 |
| 77 | 2012-2013 | 1.335155094 | 3.734272633 | $7,984.79 | $22,210.39 |
| 78 | 2013-2014 | 1.401912849 | 3.77267897 | $8,384.03 | $22,474.91 |
| 79 | 2014-2015 | 1.472008491 | 4.463532001 | $8,803.23 | $26,631.08 |
| 80 | 2015-2016 | 1.545608916 | 4.1617617 | $9,243.39 | $24,882.97 |
| 81 | 2016-2017 | 1.622889362 | 5.390064544 | $10,223.79 | $32,234.86 |
|    |           |             |            | **$159,422.07** | **$333,153.96** |
|    |           |             |            | **Overcharge** | **$173,731.89** |

59.   The chart above is a uniform method of the computation of damages for all class members. Comparison of what the COI should have been charged pursuant to the 5% rate increase cap to the actual rates used and COI charged allows the exact and accurate computation of damages on a class-wide basis.

60.   These computations do not include any interest earned on the Cash Value or Accumulation Account, which would make the overcharge even larger. The exact amount of interest earned on such account is not readily available, and will be determined through the discovery process.

61.   The clear terms of the Contract Summary (a document expressly incorporated into the Policy) did not allow a COI rate increase exceeding 5% from one contract year to the next. Alternatively, even if this language is ambiguous or if it conflicts with other policy language, since Defendant's predecessor-in-interest

-25-

drafted the Policy, the Court should adopt Plaintiff's reasonable construction of the COI rate-setting provisions set forth above.

62.   The Defendant (and its predecessors-in-interest) repeatedly demanded amounts which were substantially higher than the amounts allowed to be charged under the Policy.

63.   The actions of the Defendant (and its predecessors-in-interest) were illegal and a breach of the Policy.

64.   The nature of the conduct of the Defendant (and its predecessors-in-interest) is such that Richard and other class members would be unaware that their insurers were charging improperly calculated COI rates.  For example, Defendant (and their predecessors-in-interest) possess the actuarial and other information used to calculate the rates and COI charges.  Defendant (and its predecessors-in-interest) did not disclose such information to Richard and the class members (who would not be equipped to interpret such data in any regard), and the information regarding the COI rates and charges were not reasonably discoverable by Richard or the class members harmed by the breaches of Defendant (and its predecessors-in-interest).

65.   Richard exercised reasonable care and diligence with regards to the Policy. Richard had no reason to believe his insurer was not computing the COI rate as it said it would in the Policy. Nor did Richard have any reason to believe that his

insurer would intentionally and shockingly increase his COI so as to cause its eventual lapse. Indeed, Richard reasonably relied upon the periodic account statements sent to him as the true indicators of the COI necessary to maintain the Policy. Richard had no actual or presumptive knowledge of the breaches described herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

66.   Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI rates and calculations and intentionally chose not to disclose such information to Richard and the other class members.  This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members.

67.   As a direct and proximate result of the breach of Defendant (and its predecessors-in-interest), Richard and the other Subclass members have been damaged.  They are entitled to receive all damages from such breach, with interest. Such damages include, but may not be limited to, any cost of insurance paid in excess of the allowed five percent annual rate increase, as illustrated above.

**COUNT II:**
**BREACH OF CONTRACT FOR USE OF IMPROPER FACTORS IN THE COMPUTATION OF COST OF INSURANCE**
**As to the Class**

68.   According to the Policy, the COI is computed as follows:

The cost is based on the Insured's:
      1. sex;
      2. attained age; and
      3. rate class shown on the Contract Summary for;
          a. the Initial Stated Amount; and
          b. each increase in the Stated Amount.
…

The cost of insurance rates are shown in the Cost of Insurance Table. We may use rates less than those shown. ***<u>We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year.</u>*** Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class. (emphasis supplied)

69.  No provision in the Policy permitted Defendant (or its predecessors-in-interest) to include, among other things, investment losses, persistency, taxes, profit assumptions, capital and research requirements, administrative expenses beyond those allowed in the Contract Summary, or other unspecified factors into the calculation of COI. Thus, for example, actual investment earnings by the Defendant well below those anticipated at the inception of the contract could not have been properly recouped by increasing the COI.

70.  When Travelers sold the Policy to Richard on July 5, 1986, the 5-year Treasury Rate (one of the index rates used to determine the "Cash Value Interest

Rate" as set forth in the Contract Summary[14]) was 7.15%; in contrast, the current 5-year Treasury rate is under 1%.[15] This caused Richard's cash value to accumulate much less than anticipated.   Further, the Contract Summary indicates that the intended "spread" (or the insurer's retained interest) is 1% to 1.5%,[16] and the Contract Summary provides an "Assured Cash Value Interest Rate" of 4% per year[17], meaning that Defendant (and their predecessors-in-interest) have been incurring losses in crediting interest on policies such as Richard's. Due to the decrease in interest rates since the issuance of the Policy and others like it, Defendant (and its predecessors-in-interest) have incurred investment losses.

71.   As a consequence, and contrary to the provisions of the Policy, Defendant (and its predecessors-in-interest) increased COI to recover past investment losses and/or losses from decreasing interest rates. It also increased the COI based upon other undisclosed and impermissible factors, such as unanticipated administrative expenses, persistency, taxes, capital requirements, and the like. These practices were not disclosed to Richard and the other members of the class.

---

[14] *See* Contract Summary, pg. 2.1A.

[15] This rate has been trending downward since 1989, and it has been below 7.15% since 1995.

[16] *See* Contract Summary, pg. 2.1A.

[17] *See id.* Also, the Policy states that "[t]he assured interest rate we use to calculate Cash Values is shown on the Contract Summary. We may use rates greater than the assured rate to calculate all or any part of the Cash Value…" *See* Policy, pg. 7.

72.   Additionally, Defendant (and its predecessors-in-interest) could only base the COI upon "future outlook for mortality and expenses," not their "actual mortality and expense experience."  Mortality rates have greatly improved since 1986, and expenses are limited under the policy to five years after issuance of the policy.

73.   Starting approximately six years ago, Richard began receiving demands from MetLife/Brighthouse to pay increasing amounts of COI. Despite Richard's payments, Metlife/Brighthouse kept demanding ever-increasing amounts of premiums to keep Richard's policy from lapsing.  Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

74.   After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017, Brighthouse cancelled Richard's policy, and refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.

75.   Over the years, Richard paid to Defendant (and its predecessors-in-interest) at least $345,071.96 in premiums and costs for his $500,000 face amount policy. Now, because of the cancellation of the Policy by Brighthouse, Richard has no death benefit at all.

76.   Richard's payment of excessive COI charges and ultimate cancellation of his Policy was caused by the breaches of contract by the Defendant (and its predecessors-in-interest). Such breaches, include, among other things, increasing the COI to recoup past investment losses; increasing the COI to subsidize the losses in meeting the interest guarantee under the Policy; increasing the COI seeking to recoup expenses beyond those allowed in the Contract Summary; failing to account for improved mortality rates when charging the cost of insurance; and shocking the insurance policy owners so as to induce a cancellation or lapse of their policies. Defendant (and its predecessors-in-interest) have intentionally, repeatedly, and continuously breached the Policy of Richard and other class members.

77.   Additionally, contrary to the terms of the Policy and in breach of its duty of good faith and fair dealing, the increases in the COI by Defendant (and its predecessors-in-interest) were wholly unrelated to changes of future expectations regarding mortality. Since the issuance of the Policy, life expectancy has substantially increased due to mortality improvements, and the duty of good faith and fair dealing required the Defendant (and its predecessors-in-interest) to reflect such mortality improvement in COI changes.

78.   Neither the Defendant nor its predecessors-in-interest ever specifically set forth their specific method used to calculate the COI for a given year.  Where such

discretion is given to a party to a contract, good faith and fair dealing requires the discretion be utilized reasonably and fairly to the other party.

79.  If the Defendant (and its predecessors-in-interest) had acted in good faith and fair dealing as required by law, they would not have sought to collect COI charges in excess of those allowed by the Policy, but instead would have reduced the COI because of increased life expectancy. The actions of Defendant (and its predecessors-in-interest) in failing to account for improved mortality and using improper factors to increase the COI exhibited bad faith.

80.  The reason Defendant (and its predecessors-in-interest) failed to utilize improved mortality and life expectancy was not, as required by the Policy, to reflect future mortality expectations, but to recover for (without limitation) past financial and investment losses, as well as for administrative expenses they imprudently limited to the first five years. As such factors are not allowed by the Policy to be considered in computing COI, Defendant (and its predecessors-in-interest) have breached the contract of insurance.

81.  Defendant (and its predecessors-in-interest) breached their duty of good faith and fair dealing by instituting drastic COI increases with the intention of causing "shock lapses" by insureds like Richard and the class who are in advanced

age. Such insureds have paid premiums for years, are more likely to cause Defendant

to pay a death benefit, and cannot be insured at a reasonable rate by other insurers.

82.   The nature of the conduct of the Defendant (and its predecessors-in-interest)

is such that Richard and other class members would be unaware that their insurers

were charging improperly calculated COI rates.  For example, Defendant (and their

predecessors-in-interest) possess the actuarial and other information used to

calculate the rates and COI charges.  Defendant (and its predecessors-in-interest) did

not disclose such information to Richard and the class members (who would not be

equipped to interpret such data in any regard), and the information regarding the COI

rates and charges were not reasonably discoverable by Richard or the class members

harmed by the breaches of Defendant (and its predecessors-in-interest).

83.   Richard exercised reasonable care and diligence with regards to the Policy.

Richard had no reason to believe his insurer was not computing the COI rate as it

said it would in the Policy. Nor did Richard have any reason to believe that his

insurer would intentionally and shockingly increase his COI so as to cause its

eventual lapse. Indeed, Richard reasonably relied upon the periodic account

statements sent to him as the true indicators of the COI necessary to maintain the

Policy. Richard had no actual or presumptive knowledge of the breaches described

herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

84. Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI rates and calculations and intentionally chose not to disclose such information to Richard and the other class members. This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members.

85. As direct and proximate result of Defendant (and its predecessors-in-interest) conduct, Richard and the other class members have been damaged. They are entitled to receive all damages to remedy this wrongful conduct, with interest.

## COUNT III
## DECLARATORY RELIEF
### As to the Class

86. Since the inception of the Policy, due to Defendant's breaches of contract, Richard has paid $345,071.96 for a policy for which he now has no death benefit at all.

87. Richard suffered a policy lapse due to shockingly increased premiums at an age when he cannot procure a new life insurance policy at reasonable rates. The same has happened or is likely to happen to other members of the Class.

88.   Thus, an actual controversy has arisen and now exists between Richard and the Class members, on the one hand, and Defendant, on the other, concerning the respective rights and duties of the parties under the Policies of Richard and the Class members.

89.   Plaintiff contends that Defendant (and its predecessors-in-interest) have breached the terms of the Policies as set forth in the preceding Counts. These breaches have caused Richard and the Class to either a) wrongfully suffer a lapse and/or cancellation of their policies; or b) continue to pay COI charges in excess of contractual limitations.

90.   Plaintiff therefore seeks a declaration of the parties' respective rights and duties under the Policies of Richard and the Class members, and Plaintiff requests that the Court declare the Defendant (and its predecessors-in-interest) have been in material breach of the Policies so that future controversies may be avoided.

<u>**COUNT IV**</u>
<u>**FRAUDULENT SUPPRESSION AND CONCEALMENT**</u>
<u>**As to the Class**</u>

91.   The Policy obliged the Defendant (and its predecessors-in-interest) to calculate the COI rates at the start of each contract year.  According to the Policy, the COI is computed as follows:

> The cost is based on the Insured's:
> 1. sex;

> 2. attained age; and
> 3. rate class shown on the Contract Summary for;
>     a. the Initial Stated Amount; and
>     b. each increase in the Stated Amount.
>
> …
>
> The cost of insurance rates are shown in the Cost of Insurance Table. We may use rates less than those shown. We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class.

92.   Travelers, Defendant's predecessor-in-interest, prepared and made a part of the Policy a Contract Summary which was attached to the Policy. The Contract Summary did not give the Defendant (or its predecessors-in-interest) the right to increase COI rates except in an amount not exceeding 5% of the prior contract year's COI rate.

93.   Nonetheless, (as demonstrated in the below chart), Defendant (and its predecessors-in-interest) regularly increased COI rates in excess of 5% annually, especially when considering the cumulative increases in the COI rates over the life of the policy.   Defendant (and its predecessors-in-interest) made these charges without notifying Richard (or the other class members) that they were increasing the

COI in excess of contractual limits. Over the years, as shown in the below chart,

Richard has overcharged Richard for the COI in an amount exceeding $173,731.89:

| Age | Contract Year | Guaranteed 5% Monthly Rate Per 1,000 | Est. Monthly Rate Actually Charged Per 1,000 | COI from 5% Rate Annual Charge | Annual COI Actually Charged |
|---|---|---|---|---|---|
| 51 | 1986-1987 | 0.3755 | 0.375996605 | $2,245.65 | $2,241.26 |
| 52 | 1987-1988 | 0.394275 | 0.403910945 | $2,357.93 | $2,395.42 |
| 53 | 1988-1989 | 0.41398875 | 0.430527443 | $2,475.83 | $2,537.00 |
| 54 | 1989-1990 | 0.434688188 | 0.456848657 | $2,599.62 | $2,674.34 |
| 55 | 1990-1991 | 0.456422597 | 0.467858551 | $2,729.60 | $2,719.77 |
| 56 | 1991-1992 | 0.479243727 | 0.492835176 | $2,866.08 | $2,846.87 |
| 57 | 1992-1993 | 0.503205913 | 0.538487206 | $3,009.38 | $3,109.33 |
| 58 | 1993-1994 | 0.528366209 | 0.583437058 | $3,159.85 | $3,382.10 |
| 59 | 1994-1995 | 0.554784519 | 0.620629256 | $3,317.85 | $3,589.13 |
| 60 | 1995-1996 | 0.582523745 | 0.695841506 | $3,483.74 | $4,019.40 |
| 61 | 1996-1997 | 0.611649932 | 0.816683667 | $3,657.92 | $4,750.86 |
| 62 | 1997-1998 | 0.642232429 | 0.946942673 | $3,840.82 | $5,561.22 |
| 63 | 1998-1999 | 0.67434405 | 1.086973355 | $4,032.86 | $6,443.86 |
| 64 | 1999-2000 | 0.708061253 | 1.212683333 | $4,234.51 | $7,223.59 |
| 65 | 2001-2002 | 0.743464316 | 1.306936405 | $4,446.23 | $7,800.00 |
| 66 | 2002-2003 | 0.780637531 | 1.423850641 | $4,668.54 | $8,503.50 |
| 67 | 2003-2004 | 0.819669408 | 1.521077999 | $4,901.97 | $9,074.83 |
| 68 | 2004-2005 | 0.860652878 | 1.631236999 | $5,147.07 | $9,738.37 |
| 69 | 2005-2006 | 0.903685522 | 1.720055861 | $5,404.42 | $10,262.28 |
| 70 | 2006-2007 | 0.948869798 | 1.823298984 | $5,674.64 | $10,853.93 |
| 71 | 2007-2008 | 0.996313288 | 2.07320622 | $5,958.37 | $12,353.48 |
| 72 | 2008-2009 | 1.046128953 | 2.299547127 | $6,256.29 | $13,732.06 |
| 73 | 2009-2010 | 1.0984354 | 2.515258563 | $6,569.11 | $15,023.00 |
| 74 | 2010-2011 | 1.15335717 | 2.759125808 | $6,897.56 | $16,449.34 |
| 75 | 2011-2012 | 1.211025029 | 2.967399968 | $7,242.44 | $17,658.35 |
| 76 | 2012-2013 | 1.27157628 | 3.328278016 | $7,604.56 | $19,776.46 |
| 77 | 2012-2013 | 1.335155094 | 3.734272633 | $7,984.79 | $22,210.39 |
| 78 | 2013-2014 | 1.401912849 | 3.77267897 | $8,384.03 | $22,474.91 |

| 79 | 2014-2015 | 1.472008491 | 4.463532001 | $8,803.23 | $26,631.08 |
|---|---|---|---|---|---|
| 80 | 2015-2016 | 1.545608916 | 4.1617617 | $9,243.39 | $24,882.97 |
| 81 | 2016-2017 | 1.622889362 | 5.390064544 | $10,223.79 | $32,234.86 |
| | | | | **$159,422.07** | **$333,153.96** |
| | | | | **Overcharge** | **$173,731.89** |

94.   Further, after Defendant (and its predecessors-in-interest) began incurring investment losses due to incorrect projections about interest rates and return on investment (as described in Paragraphs 70-71 herein), they had the specific purpose and intent of breaching the terms of the Policy, especially when their insureds began to reach an advanced age, by steeply increasing the COI in order to recover their financial or investment losses. Defendant (and its predecessors-in-interest) concealed their intent from Richard and other Class members. Defendant (and its predecessors-in-interest) in fact did begin increasing the COI using improper factors to calculate the COI such as, by way of example, outdated mortality information that failed to account for improvements in mortality since the issuance of the Policy, expenses in excess of those allowed in the Contract Summary, and financial or investment losses.

95.   To effectuate its aims, after the issuance of the Policy, the Defendant (and its predecessors-in-interest) regularly sent out account statements and other account notices to Richard and the other Class members which did not disclose that the COI

had been charged at rates higher than allowed under the Policy. Nor did these statements disclose the use of improper factors to inflate the COI. The amounts of the COI set forth in the statements correspond with the amounts that Richard was charged as set forth in the chart above. The same formulae to compute COI and premiums were used uniformly on all class members as were used in the computation of Richard's COI.

96.  In addition to transmitting statements to Richard and other class members containing inflated COI charges, Defendant (and its predecessors-in-interest) began sending notices to Richard and class members demanding ever-increasing premiums, which resulted from increasing incorrect and fraudulent COI charges.

97.  For example, beginning on July 3, 2014, MetLife/Brighthouse constantly began sending letters demanding ever-increased payments to maintain his policy. Richard received such letters on at least the following dates:

a) A notice from MetLife to Richard dated July 3, 2014 demanding $6,765.78 to keep the Policy in effect until August 5, 2014.

b) A notice from MetLife to Richard dated October 3, 2014, demanding $7,298.80 to keep the Policy in effect until November 5, 2014.

c) A notice from MetLife to Richard dated January 5, 2015, demanding

$7,327.25 to keep the Policy in effect until February 5, 2015.

d) A notice from MetLife to Richard dated April 2, 2015, demanding $8,869.40 to keep the Policy in effect until May 5, 2015.

e) A notice from MetLife to Richard dated July 2, 2015, demanding $9,483.41 to keep the Policy in effect until August 5, 2015.

f) A notice from MetLife to Richard dated September 17, 2015, demanding $7,773.90 to keep the Policy in effect until November 5, 2015.

g) A notice from MetLife to Richard dated December 10, 2015, demanding $9,723.69 to keep the Policy in effect until January 5, 2016.

98.  Similarly, after MetLife rebranded as Brighthouse, Richard received the following demands for increased payment to keep the Policy in effect:  March 30, 2017 (requiring an increased monthly payment of $2,694.58), June 5, 2017 (demanding a payment of $13,322.70), June 8, 2017 (demanding payment of $5,238.96), July 12, 2017 (demanding payment of $14,642.28), and September 20, 2017 (demanding payment of $14,243.60).

99.  In response to these demands, Richard would make ever-increasing payments to MetLife/Brighthouse before Brighthouse canceled the policy.

100.   Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

101.   After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017, Brighthouse cancelled Richard's policy, and refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.   For example, on February 7, 2018, Brighthouse demanded payment of $15,708.64 "to consider reinstatement of your policy."

102.   The Defendant (and its predecessors-in-interest) made similar uniform misrepresentations regarding the improperly computed COI charges to the class members, by way of regular statements or account notices such as the ones described above.

103.   Additionally, Defendant (and its predecessors-in-interest) have been under a duty to Richard, the class, and the purchasing public to ensure that their reasonable expectations were fulfilled in connection with the Policies, such that Defendant (and its predecessors-in-interest) have an obligation to communicate material facts regarding the policies to its insureds.

104.   Throughout the term of the Policy, Defendant (and its predecessors-in-interest) intentionally withheld information from Richard and other Class members

and failed to warn its insureds of the danger and implications of interest rates that were lower than initial projections, including lower cash value accumulations.

105.   For example, Defendant's predecessor-in-interest, Travelers, persuaded Richard to replace his whole life policy with a new universal life policy with illustrations that were based on projected interest rates that were much higher than they have been in recent memory. When Richard received his "Statement of Policy Cost and Benefit Information" for his Policy in 1986, Travelers told Richard that during the twentieth year of the life of the Policy, the projected death benefit would be $500,000, the projected cash surrender value would be $124,892, and the annual premium would be $6,489.96. These projections assumed an interest rate of 9.5%. As it turned out, as of July 4, 2006, the cash value of Richard's Policy was only $2,560.89, and Richard had paid $11,300.00 in premiums that year.

106.   It was never explained to Richard and other class members that a drop in interest crediting rates might lead to explosive premium increases to make up the difference. In essence, in order to cover the amount needed to pay the COI, Defendant (and its predecessors-in-interest) turned what was sold as a life insurance policy with "flexible payments" into a prohibitively expensive term policy.

107.   Further, Defendant (and its predecessors-in-interest) intentionally withheld information from Richard and other Class members that they would seek to recoup their own investment or financial losses by steeply increasing the COI charges.

108.   Specifically, Defendant (and its predecessors-in-interest) knew, understood and intended:

    a.   the universal life Policy of Richard and class members would not remain in force and effect until maturity, which was decades in the future (for Richard, in 2030), based upon the premiums collected and prevailing market interest rates;

    b.   the universal life Policy of Richard (and other class members) would, be in danger of lapsing at some point after the 16th contract year (as set forth in the "Table of Values" in the Contract Summary), but before maturity unless Richard and the class paid shockingly increased premiums;

    c.   the requirements for the COI calculation in the Policy would not be followed, but the Defendant (and its predecessors-in-interest) would substantially and shockingly increase the COI so as to bring about the lapse of the Policy of Richard and class members; and,

d. the Defendant (and its predecessors-in-interest) would attempt to recoup lower investment earnings, while also increasing COI's and thereby premiums, based on factors other than future outlook for mortality and expenses, as stipulated by the Policy.

109.  The conduct of the Defendant (and its predecessors-in-interest), in collecting excessive COI charges to which they were not entitled, was fraudulent. Each account statement and each demand for increased premiums were tantamount to actual fraud. The Defendant (and its predecessors-in-interest) knew, but did not disclose, that the premiums resulted from the use of COI rates in excess of 5% of the prior years' stated COI rates. Further, the Defendant (and its predecessors-in-interest knew, but did not disclose, that their COI computation included the use of factors not allowed by the terms and conditions of the Policy.

110.  Similarly fraudulent was the Defendant's (and its predecessors-in-interest's) intentional suppression, concealment, and failure to warn Richard and the class of the material information set forth above regarding the faulty product design and the improper charging of excessive COI.

111.  The Defendant (and its predecessors-in-interest) knew its representations and actions to conceal were fraudulent, and they made them with the intent to harm.

112.   Each of the statements Defendant (and its predecessors-in-interest) made regarding the COI were material. The statements and the actions to conceal information were part of a fraud perpetrated by the Defendant (and its predecessors-in-interest) in order to unlawfully obtain premiums. The funds paid to Defendant (and its predecessors-in-interest) caused Richard and the class to pay illegal premiums in order to maintain their policies.

113.   Richard and the class relied upon the annual statements containing the COI charges to their detriment by paying the excessive COI in order to keep their policies in effect. Similarly, Richard and the class relied upon the concealment of the impact of the flawed product design features to their detriment by paying the excessive COI in order to keep their policies in effect.

114.   Richard and the class members were entitled to rely upon their insurers' representations and their strategic silence to keep their policies in full force and effect.  If Richard and the other class members had known the true state of affairs, they would have made different financial decisions rather than pay exorbitant COI increases to continue insurance policies they had no realistic chance of maintaining to maturity.

115.   The fraud of the Defendant (and its predecessors-in-interest) ultimately caused Richard's Policy to lapse after he paid premiums in the amount of $345,071.96.

116.  The Defendant (and its predecessors-in-interest) knew that their representations and silence would be relied upon by Richard and the class. Defendant (and its predecessors-in-interest) intended to defraud Richard and the class out of their premiums and, ultimately, to cause their policies to lapse so as to avoid payment of the policies upon the maturity of the Policies or upon the deaths of the insureds.

117.   In this way, the Defendant (and its predecessors-in-interest) planned to obtain, and did obtain, the benefit of the payment of premiums by Richard and the class members over a period of years without any reasonable explanation of the impact of the flawed product design features.

118.   The Defendant (and its predecessors-in-interest) knew and intended that, as Richard and the class members reached or neared the end of their working life and entered retirement, they would not be able to pay the increased premiums and their policies would lapse.

119.   Defendant (and its predecessors-in-interest) were in exclusive possession of the actuarial and other information used to calculate the COI rates and charges,

and neither Defendant nor its predecessors-in-interest disclosed such information to Richard and the class members, who would not be equipped to interpret such data in any regard. The information regarding the COI rates and charges were not reasonably discoverable by Richard or the class members harmed by the breaches of Defendant (and its predecessors-in-interest).

120.   Richard exercised reasonable care and diligence with regards to the Policy. Richard had no reason to believe his insurer was not computing the COI rate as it said it would in the Policy. Nor did Richard have any reason to believe that his insurer would intentionally and shockingly increase his COI so as to cause its eventual lapse. Indeed, Richard reasonably relied upon the periodic account statements sent to him as the true indicators of the COI necessary to maintain the Policy. Richard had no actual or presumptive knowledge of the breaches described herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

121. As Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI calculations and as they intentionally chose not to disclose such information to Richard and the other class members, the conduct and suppression of material information alleged herein should toll the statute of

limitations as to all claims asserted in this Complaint, so as to allow the recovery of damages from the issuance of the Policy to the filing of this Complaint.

122.   On behalf of himself and the class, Richard seeks all damages and consequential damages proximately caused by the conduct of Defendant (and its predecessors-in-interest).

123.   Richard and the class are entitled to recover from the Defendant an award of punitive damages without limitation in an amount so as to deter such activity as alleged in this Complaint in the future.

## COUNT V
## UNIFORM AND WRITTEN FRAUD
### As to the Class

124. The Policy obliged the Defendant (and its predecessors-in-interest) to calculate the COI rates at the start of each contract year.  According to the Policy, the COI is computed as follows:

> The cost is based on the Insured's:
> 1. sex;
> 2. attained age; and
> 3. rate class shown on the Contract Summary for:
>     a. the Initial Stated Amount; and
>     b. each increase in the Stated Amount.
> …
> The cost of insurance rates are shown in the Cost of Insurance Table. We may use rates less than those shown. We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be

affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class.

125.   Travelers, Defendant's predecessor-in-interest, prepared and made a part of the Policy a Contract Summary which was attached to the Policy. The Contract Summary did not give the Defendant (or its predecessors-in-interest) the right to increase COI rates except in an amount not exceeding 5% of the prior contract year's COI rates.

126.   Nonetheless, (as demonstrated in the below chart), Defendant (and its predecessors-in-interest) regularly increased COI rates in excess of 5% annually, especially when considering the cumulative increases in the COI rates over the life of the policy.   Defendant (and its predecessors-in-interest) made these charges without notifying Richard (or the other class members) that they were increasing the COI in excess of contractual limits. Over the years, as shown in the below chart, Richard has overcharged Richard for the COI in an amount exceeding $173,731.89:

| Age | Contract Year | Guaranteed 5% Monthly Rate Per 1,000 | Est. Monthly Rate Actually Charged Per 1,000 | COI from 5% Rate Annual Charge | Annual COI Actually Charged |
|-----|---------------|--------------------------------------|----------------------------------------------|--------------------------------|-----------------------------|
| 51  | 1986-1987     | 0.3755                               | 0.375996605                                  | $2,245.65                      | $2,241.26                   |

| 52 | 1987-1988 | 0.394275 | 0.403910945 | $2,357.93 | $2,395.42 |
|----|-----------|----------|-------------|-----------|-----------|
| 53 | 1988-1989 | 0.41398875 | 0.430527443 | $2,475.83 | $2,537.00 |
| 54 | 1989-1990 | 0.434688188 | 0.456848657 | $2,599.62 | $2,674.34 |
| 55 | 1990-1991 | 0.456422597 | 0.467858551 | $2,729.60 | $2,719.77 |
| 56 | 1991-1992 | 0.479243727 | 0.492835176 | $2,866.08 | $2,846.87 |
| 57 | 1992-1993 | 0.503205913 | 0.538487206 | $3,009.38 | $3,109.33 |
| 58 | 1993-1994 | 0.528366209 | 0.583437058 | $3,159.85 | $3,382.10 |
| 59 | 1994-1995 | 0.554784519 | 0.620629256 | $3,317.85 | $3,589.13 |
| 60 | 1995-1996 | 0.582523745 | 0.695841506 | $3,483.74 | $4,019.40 |
| 61 | 1996-1997 | 0.611649932 | 0.816683667 | $3,657.92 | $4,750.86 |
| 62 | 1997-1998 | 0.642232429 | 0.946942673 | $3,840.82 | $5,561.22 |
| 63 | 1998-1999 | 0.67434405 | 1.086973355 | $4,032.86 | $6,443.86 |
| 64 | 1999-2000 | 0.708061253 | 1.212683333 | $4,234.51 | $7,223.59 |
| 65 | 2001-2002 | 0.743464316 | 1.306936405 | $4,446.23 | $7,800.00 |
| 66 | 2002-2003 | 0.780637531 | 1.423850641 | $4,668.54 | $8,503.50 |
| 67 | 2003-2004 | 0.819669408 | 1.521077999 | $4,901.97 | $9,074.83 |
| 68 | 2004-2005 | 0.860652878 | 1.631236999 | $5,147.07 | $9,738.37 |
| 69 | 2005-2006 | 0.903685522 | 1.720055861 | $5,404.42 | $10,262.28 |
| 70 | 2006-2007 | 0.948869798 | 1.823298984 | $5,674.64 | $10,853.93 |
| 71 | 2007-2008 | 0.996313288 | 2.07320622 | $5,958.37 | $12,353.48 |
| 72 | 2008-2009 | 1.046128953 | 2.299547127 | $6,256.29 | $13,732.06 |
| 73 | 2009-2010 | 1.0984354 | 2.515258563 | $6,569.11 | $15,023.00 |
| 74 | 2010-2011 | 1.15335717 | 2.759125808 | $6,897.56 | $16,449.34 |
| 75 | 2011-2012 | 1.211025029 | 2.967399968 | $7,242.44 | $17,658.35 |
| 76 | 2012-2013 | 1.27157628 | 3.328278016 | $7,604.56 | $19,776.46 |
| 77 | 2012-2013 | 1.335155094 | 3.734272633 | $7,984.79 | $22,210.39 |
| 78 | 2013-2014 | 1.401912849 | 3.77267897 | $8,384.03 | $22,474.91 |
| 79 | 2014-2015 | 1.472008491 | 4.463532001 | $8,803.23 | $26,631.08 |
| 80 | 2015-2016 | 1.545608916 | 4.1617617 | $9,243.39 | $24,882.97 |
| 81 | 2016-2017 | 1.622889362 | 5.390064544 | $10,223.79 | $32,234.86 |
| | | | | **$159,422.07** | **$333,153.96** |
| | | | | **Overcharge** | **$173,731.89** |

127.   Further, after Defendant (and its predecessors-in-interest) began incurring investment losses due to incorrect projections about interest rates and return on investment (as described in Paragraphs 70-71 herein), they had the specific purpose and intent of breaching the terms of the Policy, especially when their insureds began to reach an advanced age, by steeply increasing the COI in order to recover their financial or investment losses. Defendant (and its predecessors-in-interest) concealed their intent from Richard and other Class members. Defendant (and its predecessors-in-interest) in fact did begin increasing the COI using improper factors to calculate the COI such as, by way of example, outdated mortality information that failed to account for improvements in mortality since the issuance of the Policy, expenses in excess of those allowed in the Contract Summary, and financial or investment losses.

128.   After the issuance of the Policy, the Defendant (and its predecessors-in-interest) regularly sent out account statements and other account notices to Richard and the other Class members which did not disclose that the COI had been charged at rates higher than allowed under the Policy. Nor did these statements disclose the use of improper factors to inflate the COI. The amounts of the COI set forth in the statements correspond with the amounts that Richard was charged as set forth in the chart above.   The same formulae to compute the fraudulent COI charges and

premiums were used uniformly on all class members as were used in the computation of Richard's COI.

129.   In addition to transmitting statements to Richard and other class members containing inflated COI charges, Defendant (and its predecessors-in-interest) began sending notices to Richard and class members demanding ever-increasing premiums, which resulted from increasing incorrect and fraudulent COI charges.

130.   For example, beginning on July 3, 2014, MetLife/Brighthouse constantly began sending letters demanding ever-increased payments to maintain his policy. Richard received such letters on at least the following dates:

> a) A notice from MetLife to Richard dated July 3, 2014
>
> demanding $6,765.78 to keep the Policy in effect until August 5,
>
> 2014.
>
> b) A notice from MetLife to Richard dated October 3, 2014, demanding
>
> $7,298.80 to keep the Policy in effect until November 5, 2014.
>
> c) A notice from MetLife to Richard dated January 5, 2015, demanding
>
> $7,327.25 to keep the Policy in effect until February 5, 2015.
>
> d) A notice from MetLife to Richard dated April 2, 2015, demanding
>
> $8,869.40 to keep the Policy in effect until May 5, 2015.
>
> e) A notice from MetLife to Richard dated July 2, 2015, demanding

$9,483.41 to keep the Policy in effect until August 5, 2015.

f) A notice from MetLife to Richard dated September 17, 2015, demanding $7,773.90 to keep the Policy in effect until November 5, 2015.

g) A notice from MetLife to Richard dated December 10, 2015, demanding $9,723.69 to keep the Policy in effect until January 5, 2016.

131.   Similarly, after MetLife rebranded as Brighthouse, Richard received the following demands for increased payment to keep the Policy in effect:  March 30, 2017 (requiring an increased monthly payment of $2,694.58), June 5, 2017 (demanding a payment of $13,322.70), June 8, 2017 (demanding payment of $5,238.96), July 12, 2017 (demanding payment of $14,642.28), and September 20, 2017 (demanding payment of $14,243.60).

132.   In response to these demands, Richard would make ever-increasing payments to MetLife/Brighthouse before Brighthouse canceled the policy.

133.   Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

134.   After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017, Brighthouse cancelled Richard's policy, and

refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.  For example, on February 7, 2018, Brighthouse demanded payment of $15,708.64 "to consider reinstatement of your policy."

135.  The Defendant (and its predecessors-in-interest) made similar uniform misrepresentations regarding the improperly computed COI charges to the class members, by way of regular statements or account notices such as the ones described above.

136.  Each account statement and each demand for increased premiums were tantamount to actual fraud. The Defendant (and its predecessors-in-interest) knew, but did not disclose, that the premiums resulted from the use of COI rates in excess of 5% of the prior years' stated COI rates. Further, the Defendant (and its predecessors-in-interest) had actual knowledge that their COI computation included the use of factors not allowed by the terms and conditions of the Policy.

137. The Defendant (and its predecessors-in-interest) knew the statements contained therein regarding the COI charges were fraudulent when made, and they made them with the intent to harm.

138.  Richard and the class relied upon such statements regarding the COI charges to their detriment by paying the excessive COI in order to keep their policies in effect.

139.   If Richard and the other class members knew the true state of affairs, they would have made different financial decisions rather than pay exorbitant COI increases to continue insurance policies they had no realistic chance of maintaining to maturity.

140.   Each of the statements Defendant (and its predecessors-in-interest) made regarding the COI were material. The statements were part of a fraud perpetrated by the Defendant (and its predecessors-in-interest) in order to unlawfully obtain premiums. The funds paid to Defendant (and its predecessors-in-interest) caused Richard and the class to pay illegal premiums in order to maintain their policies.

141.   Richard and the class were entitled to rely on the representations of the Defendant (and its predecessors-in-interest) in order to keep their policies in full force and effect.

142.   The fraud of the Defendant (and its predecessors-in-interest) ultimately caused Richard's Policy to lapse after he paid premiums in the amount of $345,071.96.

143.   The Defendant (and its predecessors-in-interest) knew that their representations would be relied upon by Richard and the class. Defendant (and its predecessors-in-interest) made these representations with the intent to defraud Richard and the class out of their premiums and, ultimately, to cause their policies

to lapse so as to avoid payment of the policies upon the maturity of the Policies or upon the deaths of the insureds.

144.   The actions of Defendant (and its predecessors-in-interest) in fraudulently computing COI was uniform among all members of the class.

145.   The nature of the conduct of the Defendant (and its predecessors-in-interest) is such that Richard and other class members would be unaware that their insurers were charging improperly calculated COI rates.   For example, Defendant (and their predecessors-in-interest) possess the actuarial and other information used to calculate the rates and COI charges.  Defendant (and its predecessors-in-interest) did not disclose such information to Richard and the class members (who would not be equipped to interpret such data in any regard), and the information regarding the COI rates and charges were not reasonably discoverable by Richard or the class members harmed by the breaches of Defendant (and its predecessors-in-interest).

146.   Richard exercised reasonable care and diligence with regards to the Policy. Richard had no reason to believe his insurer was not computing the COI rate as it said it would in the Policy. Nor did Richard have any reason to believe that his insurer would intentionally and shockingly increase his COI so as to cause its eventual lapse. Indeed, Richard reasonably relied upon the periodic account statements sent to him as the true indicators of the COI necessary to maintain the

Policy. Richard had no actual or presumptive knowledge of the breaches described herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

147.   Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI rates and calculations and intentionally chose not to disclose such information to Richard and the other class members.  This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members as to all claims asserted herein.

148.   On behalf of himself and the class, Richard seeks all damages and consequential damages proximately caused by the conduct of Defendant (and its predecessors-in-interest).

149.   Richard and the class are entitled to recover from Defendant an award of punitive damages without limitation in an amount so as to deter such activity as alleged in this Complaint in the future.

### COUNT VI
### VIOLATION OF THE RACETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### Ga. Code § 16-14-1 *et. seq.* (hereinafter "RICO")
### As to the Georgia Subclass

150.   The Policy obliged the Defendant (and its predecessors-in-interest) to calculate the COI rates at the start of each contract year.  According to the Policy, the COI is computed as follows:

> The cost is based on the Insured's:
>     1. sex;
>     2. attained age; and
>     3. rate class shown on the Contract Summary for;
>         a. the Initial Stated Amount; and
>         b. each increase in the Stated Amount.
> …
> The cost of insurance rates are shown in the Cost of Insurance Table. We may use rates less than those shown. We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class.

151.   Travelers, Defendant's predecessor-in-interest, prepared and made a part of the Policy a Contract Summary which was attached to the Policy. The Contract Summary did not give the Defendant (or its predecessors-in-interest) the right to increase COI rates except in an amount not exceeding 5% of the prior contract year's COI rates.

152.   Nonetheless, (as demonstrated in the below chart), Defendant (and its predecessors-in-interest) regularly increased COI rates in excess of 5% annually,

especially when considering the cumulative increases in the COI rates over the life of the policy.    Defendant (and its predecessors-in-interest) made these charges without notifying Richard (or the other subclass members) that they were increasing the COI in excess of contractual limits. Over the years, as shown in the below chart, Richard has overcharged Richard for the COI in an amount exceeding $173,731.89:

| Age | Contract Year | Guaranteed 5% Monthly Rate Per 1,000 | Est. Monthly Rate Actually Charged Per 1,000 | COI from 5% Rate Annual Charge | Annual COI Actually Charged |
|---|---|---|---|---|---|
| 51 | 1986-1987 | 0.3755 | 0.375996605 | $2,245.65 | $2,241.26 |
| 52 | 1987-1988 | 0.394275 | 0.403910945 | $2,357.93 | $2,395.42 |
| 53 | 1988-1989 | 0.41398875 | 0.430527443 | $2,475.83 | $2,537.00 |
| 54 | 1989-1990 | 0.434688188 | 0.456848657 | $2,599.62 | $2,674.34 |
| 55 | 1990-1991 | 0.456422597 | 0.467858551 | $2,729.60 | $2,719.77 |
| 56 | 1991-1992 | 0.479243727 | 0.492835176 | $2,866.08 | $2,846.87 |
| 57 | 1992-1993 | 0.503205913 | 0.538487206 | $3,009.38 | $3,109.33 |
| 58 | 1993-1994 | 0.528366209 | 0.583437058 | $3,159.85 | $3,382.10 |
| 59 | 1994-1995 | 0.554784519 | 0.620629256 | $3,317.85 | $3,589.13 |
| 60 | 1995-1996 | 0.582523745 | 0.695841506 | $3,483.74 | $4,019.40 |
| 61 | 1996-1997 | 0.611649932 | 0.816683667 | $3,657.92 | $4,750.86 |
| 62 | 1997-1998 | 0.642232429 | 0.946942673 | $3,840.82 | $5,561.22 |
| 63 | 1998-1999 | 0.67434405 | 1.086973355 | $4,032.86 | $6,443.86 |
| 64 | 1999-2000 | 0.708061253 | 1.212683333 | $4,234.51 | $7,223.59 |
| 65 | 2001-2002 | 0.743464316 | 1.306936405 | $4,446.23 | $7,800.00 |
| 66 | 2002-2003 | 0.780637531 | 1.423850641 | $4,668.54 | $8,503.50 |
| 67 | 2003-2004 | 0.819669408 | 1.521077999 | $4,901.97 | $9,074.83 |
| 68 | 2004-2005 | 0.860652878 | 1.631236999 | $5,147.07 | $9,738.37 |
| 69 | 2005-2006 | 0.903685522 | 1.720055861 | $5,404.42 | $10,262.28 |
| 70 | 2006-2007 | 0.948869798 | 1.823298984 | $5,674.64 | $10,853.93 |
| 71 | 2007-2008 | 0.996313288 | 2.07320622 | $5,958.37 | $12,353.48 |
| 72 | 2008-2009 | 1.046128953 | 2.299547127 | $6,256.29 | $13,732.06 |

| 73 | 2009-2010 | 1.0984354 | 2.515258563 | $6,569.11 | $15,023.00 |
| 74 | 2010-2011 | 1.15335717 | 2.759125808 | $6,897.56 | $16,449.34 |
| 75 | 2011-2012 | 1.211025029 | 2.967399968 | $7,242.44 | $17,658.35 |
| 76 | 2012-2013 | 1.27157628 | 3.328278016 | $7,604.56 | $19,776.46 |
| 77 | 2012-2013 | 1.335155094 | 3.734272633 | $7,984.79 | $22,210.39 |
| 78 | 2013-2014 | 1.401912849 | 3.77267897 | $8,384.03 | $22,474.91 |
| 79 | 2014-2015 | 1.472008491 | 4.463532001 | $8,803.23 | $26,631.08 |
| 80 | 2015-2016 | 1.545608916 | 4.1617617 | $9,243.39 | $24,882.97 |
| 81 | 2016-2017 | 1.622889362 | 5.390064544 | $10,223.79 | $32,234.86 |
| | | | | **$159,422.07** | **$333,153.96** |
| | | | | **Overcharge** | **$173,731.89** |

153.   Further, after Defendant (and its predecessors-in-interest) began incurring investment losses due to incorrect projections about interest rates and return on investment (as described in Paragraphs 70-71 herein), they had the specific purpose and intent of breaching the terms of the Policy, especially when their insureds began to reach an advanced age, by steeply increasing the COI in order to recover their financial or investment losses. Defendant (and its predecessors-in-interest) concealed their intent from Richard and other subclass members. Defendant (and its predecessors-in-interest) in fact did begin increasing the COI using improper factors to calculate the COI such as, by way of example, outdated mortality information that failed to account for improvements in mortality since the issuance of the Policy, expenses in excess of those allowed in the Contract Summary, and financial or investment losses.

-60-

154.   After the issuance of the Policy, the Defendant (and its predecessors-in-interest) regularly sent out account statements and other account notices to Richard and the other subclass members which did not disclose that the COI had been charged at rates higher than allowed under the Policy. Nor did these statements disclose the use of improper factors to inflate the COI. The amounts of the COI set forth in the statements correspond with the amounts that Richard was charged as set forth in the above chart.  The same formulae to compute the fraudulent COI charges and premiums were used uniformly on all subclass members as were used in the computation of Richard's COI.

155.   In addition to transmitting statements to Richard and other subclass members containing inflated COI charges, Defendant (and its predecessors-in-interest) began sending notices to Richard and subclass members demanding ever-increasing premiums, which resulted from increasing incorrect and fraudulent COI charges.

156.   For example, beginning on July 3, 2014, MetLife/Brighthouse constantly began sending letters demanding ever-increased payments to maintain his policy. Richard received such letters on at least the following dates:

        a) A notice from MetLife to Richard dated July 3, 2014

        demanding $6,765.78 to keep the Policy in effect until August 5,

2014.

b) A notice from MetLife to Richard dated October 3, 2014, demanding $7,298.80 to keep the Policy in effect until November 5, 2014.

c) A notice from MetLife to Richard dated January 5, 2015, demanding $7,327.25 to keep the Policy in effect until February 5, 2015.

d) A notice from MetLife to Richard dated April 2, 2015, demanding $8,869.40 to keep the Policy in effect until May 5, 2015.

e) A notice from MetLife to Richard dated July 2, 2015, demanding $9,483.41 to keep the Policy in effect until August 5, 2015.

f) A notice from MetLife to Richard dated September 17, 2015, demanding $7,773.90 to keep the Policy in effect until November 5, 2015.

g) A notice from MetLife to Richard dated December 10, 2015, demanding $9,723.69 to keep the Policy in effect until January 5, 2016.

157.  Similarly, after MetLife rebranded as Brighthouse, Richard received the following demands for increased payment to keep the Policy in effect:  March 30, 2017 (requiring an increased monthly payment of $2,694.58), June 5, 2017 (demanding a payment of $13,322.70), June 8, 2017 (demanding payment of

$5,238.96), July 12, 2017 (demanding payment of $14,642.28), and September 20, 2017 (demanding payment of $14,243.60).

158.   In response to these demands, Richard would make ever-increasing payments to MetLife/Brighthouse before Brighthouse canceled the policy.

159.   Richard constantly corresponded and called on the telephone with representatives of Metlife/Brighthouse asking for an explanation of the premium increases.

160.   After repeated inquiries by Richard and with a lack of communication or explanation, on November 20, 2017, Brighthouse cancelled Richard's policy, and refused to reinstate the Policy unless Richard paid amounts which were in excess of the allowable COI.   For example, on February 7, 2018, Brighthouse demanded payment of $15,708.64 "to consider reinstatement of your policy."

161.   The Defendant (and its predecessors-in-interest) made similar uniform misrepresentations regarding the improperly computed COI charges to the subclass members, by way of regular statements or account notices such as the ones described above.

162.   Each account statement and each demand for increased premiums were tantamount to actual fraud. The Defendant (and its predecessors-in-interest) knew, but did not disclose, that the premiums resulted from the use of COI rates in excess

of 5% of the prior years' stated COI rates. Further, the Defendant (and its predecessors-in-interest) had actual knowledge that their COI computation included the use of factors not allowed by the terms and conditions of the Policy.

163.  The Defendant (and its predecessors-in-interest) knew the statements contained therein regarding the COI charges were fraudulent when made, and they made them with the intent to harm.

164.  Richard and the subclass relied upon such statements regarding the COI charges to their detriment by paying the excessive COI in order to keep their policies in effect.

165.  If Richard and the other subclass members knew the true state of affairs, they would have made different financial decisions rather than pay exorbitant COI increases to continue insurance policies they had no realistic chance of maintaining to maturity.

166.  Each of the statements Defendant (and its predecessors-in-interest) made regarding the COI were material. The statements were part of a fraud perpetrated by the Defendant (and its predecessors-in-interest) in order to unlawfully obtain premiums. The funds paid to Defendant (and its predecessors-in-interest) caused Richard and the subclass to pay illegal premiums in order to maintain their policies.

167.   Richard and the subclass were entitled to rely on the representations of the Defendant (and its predecessors-in-interest) in order to keep their policies in full force and effect.

168.   The fraud of the Defendant (and its predecessors-in-interest) ultimately caused Richard's Policy to lapse after he paid premiums in the amount of $345,071.96.

169.   The Defendant (and its predecessors-in-interest) knew that their representations would be relied upon by Richard and the subclass. Defendant (and its predecessors-in-interest) made these representations with the intent to defraud Richard and the subclass out of their premiums and to cause their policies to lapse so as to avoid payment of the policies upon the maturity of the Policies or upon the deaths of the insureds.

170.   The facts set forth above serve as the basis for the various predicate acts alleged herein.

171.   Defendant (and its predecessors-in-interest) may be defined as an "enterprise" pursuant to O.C.G.A. § 16-4-3(3).

172.   Defendant (and its predecessors-in-interest) have engaged in a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-3 by, among other things, engaging in the following activities:

(a) **Mail and Wire Fraud**. Defendant (and its predecessors-in-interest) have demanded and sought to collect improperly inflated cost of insurance payments from insured like Richard for which they are not entitled.  Defendant (and its predecessors-in-interest) have done this by: transmitting letters demanding payment; collecting payment through various means (including accepting checks, automatic drafts, and wires, and by improperly crediting excessive amounts against the cash accumulation accounts of insured); and transmitting statements reflecting improperly inflated cost of insurance payments. These transmittals occurred across state lines. Defendant (and its predecessors-in-interest) wrongfully utilized interstate mails and wires to provide false and improper demands for payment of premiums which Defendant (and its predecessors-in-interest) knew were false in order to obtain property to which they were not entitled. Defendant (and its predecessors-in-interest) knowingly devised this scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. Defendant (and its predecessors-in-interest) acted with the specific intent to deprive Richard and the subclass of money paid in premiums and to increase the probability Richard and the

subclass would be required to lapse or cancel their policies, thereby unlawfully enriching the Defendant (and its predecessors-in-interest). The conduct of Defendant (and its predecessors-in-interest) described herein constitutes repeated and continuous violations of 18 U.S.C. §1341 (mail fraud), and 18 U.S.C. § 1343 (wire fraud), and conspiracy to violate the same. Such conduct is defined as racketeering activity by 18 U.S.C. § 1961, and thereby by O.C.G.A. § 16-14-3(5)(C).

(b) **Theft by Deception**. Defendant (and its predecessors-in-interest) have demanded and collected improperly inflated cost of insurance payments from insured like Richard for which they are not entitled. By failing to disclose that they were not entitled to the cost of insurance payments they demanded and collected, Defendant (and its predecessors-in-interest) have obtained property from insured like Richard and other members of the subclass by deceitful means or artful practice with the intention of depriving them of their personal property. Defendant (and its predecessors-in-interest) deceived Richard and the other subclass members by: creating the impression that they were charging cost of insurance rates allowed by the policy, when Defendant (and its predecessors-in-interest) knew that they were improperly

increasing the cost of insurance rates or using improper factors to calculate such rates; failing to inform Richard and other subclass members that they had been demanding and collecting improperly inflated cost of insurance rates to keep policies from lapsing; and, by failing to disclose its methodology for computation of cost of insurance to Richard and other subclass members, preventing Richard and the subclass members from acquiring information pertinent to the disposition of the property. These deceitful means and artful practices included falsity of matters of pecuniary significance, calculated to deceive a reasonable and ordinary insured.  Such conduct is defined as Theft by Deception by O.C.G.A. § 16-8-3 and thereby as racketeering activity pursuant to O.C.G.A. § 16-14-3(5)(A)(xii).

**(c) Theft by Taking and Theft by Conversion**. Defendant (and its predecessors-in-interest) have collected improperly inflated cost of insurance payments from Richard and other members of the subclass by applying the funds in their cash accumulation accounts. Defendant (and its predecessors-in-interest) lawfully obtained the funds of Richard and other subclass members by collecting premium payments to fund cost of insurance charges and the cash accumulation accounts.

Defendant (and its predecessors-in-interest) were only authorized to apply funds from the cash accumulation accounts to pay for cost of insurance charges they were entitled to charge under the Policy. However, Defendant (and its predecessors-in-interest) knowingly converted the funds to their own use in violation of the contractually mandated parameters for setting the cost of insurance, depriving Richard and other members of the subclass of the funds they were properly entitled to in the process.   Such conduct meets the requirements of Theft by Taking as defined in O.C.G.A. § 16-8-2 and the requirements of Theft by Conversion, as defined by O.C.G.A. § 16-8-4, and thereby as racketeering activity pursuant to O.C.G.A. § 16-14-3(5)(A)(xii).

173.  O.C.G.A. § 16-14-4(a) makes it "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."

174.  Defendant (and its predecessors-in-interest) have acquired and maintained money procured through a pattern of racketeering activity as described herein from Richard and the subclass.

175.   Defendant (and its predecessors-in-interest) have, through a pattern of racketeering activity or proceeds derived therefrom, intentionally acquired and/or maintained an interest in their respective enterprises.

176.   Defendant (and its predecessors-in-interest) have violated O.C.G.A. § 16-14-4(b) by conducting or participating in the pattern of racketeering activity specified above.

177.   O.C.G.A. § 16-14-4(c) makes it illegal to conspire with others to take, receive or maintain property, including money, resulting from a racketeering activity, and to conspire to conduct or participate in the pattern of racketeering activity.  Defendant (and its predecessors-in-interest), acting through their officers and employees, have conspired to acquire and obtain money from racketeering activities, and to conduct or participate in the pattern of racketeering activity.

178.   O.C.G.A. § 16-14-4(c) makes it illegal to, through a pattern of racketeering activity or proceeds derived therefore, conspire with others to acquire or maintain an interest in an enterprise. Defendant (and its predecessors-in-interest), acting through their officers and employees, have conspired to acquire or maintain an interest in their respective enterprises.

179.   The actions of Defendant (and its predecessors-in-interest), through their pattern of racketeering activity, caused Richard and the subclass to sustain losses.

180.   The nature of the conduct of the Defendant (and its predecessors-in-interest) is such that Richard and other class members would be unaware that their insurers were charging improperly calculated COI rates.  For example, Defendant (and their predecessors-in-interest) possess the actuarial and other information used to calculate the rates and COI charges.  Defendant (and its predecessors-in-interest) did not disclose such information to Richard and the class members (who would not be equipped to interpret such data in any regard), and the information regarding the COI rates and charges were not reasonably discoverable by Richard or the class members harmed by the breaches of Defendant (and its predecessors-in-interest).

181.   Richard exercised reasonable care and diligence with regards to the Policy. Richard had no reason to believe his insurer was not computing the COI rate as it said it would in the Policy. Nor did Richard have any reason to believe that his insurer would intentionally and shockingly increase his COI so as to cause its eventual lapse. Indeed, Richard reasonably relied upon the periodic account statements sent to him as the true indicators of the COI necessary to maintain the Policy. Richard had no actual or presumptive knowledge of the breaches described herein, Richard was not at fault for failing to discover the breaches, and the facts showing breach were not reasonably discoverable by Richard.

182.   Defendant (and its predecessors-in-interest) possessed superior knowledge of their COI rates and calculations and intentionally chose not to disclose such information to Richard and the other class members.  This conduct and suppression of material information constitutes fraudulent concealment, tolling the statute of limitations for Richard and the class members.

183.   Richard is entitled to recover treble damages for his loss, punitive damages and attorney fees.

184.   The actions of the Defendant (and its predecessors-in-interest) in regard to the fraud and violation of the RICO Act were intentional acts and with a specific intent to harm Richard and the Georgia subclass.

185.   Richard and the members of the Georgia subclass are entitled to recover from the Defendant an award of punitive damages without limitation in an amount so as to punish the Defendant and to from such activity as alleged in this Complaint in the future.

186.   Richard and the subclass are entitled to recover attorney fees for the violation of the RICO Act pursuant to O.C.G.A. § 16-14-6(c).

### **COUNT VII**
### **INTEREST**
### **As to the Georgia Subclass**

187.   The amounts overcharged by the Defendant (and its predecessors-in-interest) as part of their scheme described herein are easily computed to a finite number, and are, therefore, liquidated. The Defendant is liable for interest at the rate of 7% on the overcharges as they are liquidated amounts, and such interest is authorized pursuant to O.C.G.A. § 7-4-15 and 7-4-2, for which Richard and the members of the Georgia subclass are entitled to recover.

## COUNT VIII
## ATTORNEY FEES

188.   The actions of the Defendant as described herein have been in bad faith. Further, the Defendant has been stubbornly litigious and caused Richard and the class unnecessary trouble and expense.

189.   Richard and the class are entitled to recover attorney fees pursuant to O.C.G.A. § 13-6-11 because of such actions as alleged in this cause.

**WHEREFORE**, the plaintiff prays as follows:

A.   That process and summons issue and the Defendant be personally served as provided by law;

B.   That this action be certified as a class action;

C.   That the plaintiff and the class recover on the breaches of contract set forth above for all damages proven at the time of trial, with interest;

D. That the Court issue a declaration that Defendant's actions are in breach of the Policy;

E. That Defendant be permanently enjoined (a) from continuing to engage in conduct in breach of the Policies of plaintiff and the Class members, which have culminated and will continue to culminate in shock lapses; (b) to comply with the terms of the Policies of plaintiff and the class members; and (c) where necessary, to reinstate policies that have lapsed or been cancelled as a result of the excessive COI charged by Defendant (and its predecessors-in-interest).

F. That the plaintiff and the class have the statute of limitations tolled, as to all claims for damages herein, because of the fraudulent suppression and concealment of facts by Defendant (and its predecessors-in-interest) concerning the increasing premiums;

G. That the plaintiff and the class recover on the uniform and fraudulent representations of Defendant (and its predecessors-in-interest);

H. That the plaintiff and the Georgia subclass recover for the violation of the Georgia RICO Act in treble damages for all losses of the plaintiff and the class;

I. That the plaintiff and the Georgia subclass recover interest on the rate set forth for liquidated damages;

J.   That the plaintiff and the class recover from Defendant an award of attorney

fees;

K.   That the plaintiff and class recover punitive damages;

L.   That the plaintiff and the class have a trial by jury on all issues raised in this

cause; and,

M.   That the plaintiff and the class have any and all other relief the court may

deem just and equitable.

Respectfully submitted, this 25th day of March, 2021.

THE BARNES LAW GROUP, LLC

*/s/ Roy E. Barnes*
Roy E. Barnes
Georgia Bar No. 039000
Counsel for Plaintiff and the
Proposed Class

*/s/ J. Cameron Tribble*
J. Cameron Tribble
Georgia Bar No. 754759
Counsel for Plaintiff and the
Proposed Class

THE BARNES LAW GROUP, LLC
31 ATLANTA STREET
MARIETTA, GEORGIA 30060
T: 770.419.8505
F: 770.227.6373
EMAIL: roy@barneslawgroup.com
EMAIL: ctribble@barneslawgroup.com

# EXHIBIT A

 

## The Travelers

**THE TRAVELERS INSURANCE COMPANY** ○ One Tower Square ○ Hartford, Connecticut ○ 06183

**A STOCK COMPANY**

| Insured | | |
|---|---|---|
| RICHARD A NEWTON SR | $500,000 | Stated Amount |

| Contract Number | | |
|---|---|---|
| 6712 | JUL 05 1986 | Contract Date |

We are pleased to provide you the benefits of this Life Insurance Contract.  Please read your Contract and the copy of the application(s).  We want to be sure that we have issued this Contract correctly. If there is any error, tell us as soon as you can.  We will then make any change necessary.

### APPLICANT'S RIGHT TO CANCEL

If this Contract is returned to us at our Office or to our agent to be cancelled within 20 days of its delivery, we will pay the Applicant, within 10 days after its return, all premium paid for this Contract. After the contract is returned, it will be considered as never in effect.

This Contract is issued in consideration of the application(s) and the payment of the premium. It is subject to the terms and conditions stated on the attached pages, all of which are a part of it. It is made effective as stated in the application. The entire contract between us and the Applicant consists of the policy, all attached pages, and the written application(s). For any increase which requires evidence of insurability, we will require an additional application which will become a part of this Contract. All statements made in the application(s) are considered to be to the best knowledge and belief of the Applicant and not as promises of truth. Unless it is contained in the written application(s), we will not use any statement to void this Contract or to deny a claim.

No person other than one of our officers can, for us, alter or waive any terms or provisions of this Contract.

Signed at Hartford, Connecticut

Secretary, LHFS

President

**This is a legal contract between you and us.**     Read your contract carefully.

**This is a Flexible Premium Adjustable Life Insurance Contract to Maturity Date Without Dividends. Premiums can vary by Frequency and Amount. Premiums are payable to the Maturity Date or until the Insured's Prior Death.**

L1-UL

TIC 1

## DEFINITIONS

1. "We, us, our" means The Travelers Insurance Company;

2. "You, your" means the owner;

3. "Age" means age last birthday;

4. "Contract years" means twelve month periods beginning with the Contract Date;

5. "Contract month" means the twelve periods during the contract year, each of which begins on the Contract Date or the same date in any calendar month;

6. "Basic contract" means this Contract excluding any additional benefit for which a separate charge is made;

7. "Our Office" means the Home Office, One Tower Square, Hartford, Connecticut, 0618 or any other office which we may name for the purpose of administering this Contract; and

8. "Proof of the Insured's death" means:

   a. A copy of a certified death certificate; or

   b. A copy of a certified decree of a court of competent jurisdiction as to the finding of death; or

   c. A written statement by a medical doctor who attended the deceased; or

   d. Any other proof satisfactory to us.

L1-UL

CONTRACT SUMMARY

L1-UL

## CONTRACT SUMMARY

INSURED        RICHARD A NEWTON SR                          $500,000      STATED AMOUN

CONTRACT NUMBER        ████6712

ISSUE AGE        51                                  JUL 05, 1986      CONTRACT DAT

                                                    JUN 05, 1982      DATE OF ISSUE

MATURITY DATE        JUL 05, 2030    5TH DAY OF EACH MONTH   MONTHLY DEDUCTION DA
************************************************************************************
*      BENEFIT DESCRIPTION
************************************************************************************

INSURANCE OPTION 1 (LEVEL) : INITIAL STATED AMOUNT, $500,000
MINIMUM STATED AMOUNT: $100,000
MAXIMUM LOAN INTEREST RATE : 7.4% IN ADVANCE
MINIMUM COVERAGE AMOUNT: THE GREATER OF 150% OF CASH VALUE UP TO AGE 40, THE
   PERCENTAGE DECREASES TO 0% AT AGE 95; OR THE AMOUNT REQUIRED BY FEDERAL
   INCOME TAX LAWS OR REGULATIONS TO QUALIFY AS LIFE INSURANCE.
REINSTATEMENT: 3 MONTHS PREMIUM REQUIRED
FIRST PREMIUM: $661.08
AMOUNT OF EACH PLANNED PREMIUM: $540.83
           (THE COMPANY RESERVES THE RIGHT TO LIMIT ADDITIONAL PREMIUM
           PAYMENTS IF THERE ARE LOANS OUTSTANDING ON THIS CONTRACT.)
PLANNED PREMIUMS PAYABLE: MONTHLY
CASH VALUE PERCENTAGE FACTOR: 100.0%
INTEREST FACTOR: 1.0032737
LATE PERIOD: 61 DAYS
MONTHLY EXPENSE CHARGES:  $0.22 PER THOUSAND OF STATED AMOUNT FOR THE FIRST
   FIVE CONTRACT YEARS, PLUS  $0.22 PER THOUSAND OF ANY ELECTED INCREASE IN
   STATED AMOUNT FOR THE FIRST 5 YEARS FOLLOWING THE INCREASE.
ASSURED CASH VALUE INTEREST RATE: 4.0% PER YEAR
CASH VALUE INTEREST RATE FOR LOAN AMOUNTS OUTSTANDING: 4.0 % PER YEAR.
MORTALITY TABLE AND INTEREST RATE USED IN THE GUARANTEED CASH VALUES COMPUTATION
   AND FOR PAID UP INSURANCE BENEFITS: 1980 CSO AT THE ASSURED CASH VALUE
   INTEREST RATE.
THE COMPANY'S DECLARED RATES ARE GUARANTEED NOT TO EXCEED THE 1980 CSO
FOR THE COST OF INSURANCE CALCULATION, AND THE COMPANY ALSO GUARANTEES
THAT THEY WILL NOT BE INCREASED BY MORE THAN 5% IN ANY CONTRACT YEAR.

HANDLING CHARGE: NONE.

CONTINUED ON NEXT PAGE
PAGE 2                                    FORM: ULX

CONTRACT SUMMARY


INSURED        RICHARD A NEWTON SR              $500,000     STATED AMOUNT


CONTRACT NUMBER      ██6712                    JUL 05, 1986    CONTRACT DATE

   ISSUE AGE        51                         JUN 05, 1982    DATE OF ISSUE

MATURITY DATE     JUL 05, 2030    5TH DAY OF EACH MONTH   MONTHLY DEDUCTION DAY
**********************************************************************
  BENEFIT DESCRIPTION
**********************************************************************

SURRENDER PENALTY: FULL SURRENDER- 7% OF PREMIUMS PAID WITHIN THE LAST FIVE
YEARS PRECEEDING THE SURRENDER, NOT TO EXCEED THE INTEREST CREDITED OVER
THE ASSURED CASH VALUE INTEREST RATE FOR THE 12 MONTHS PRECEEDING SURRENDER;
PLUS $12.98 PER THOUSAND OF INITIAL STATED AMOUNT, AND ANY INCREASE IN STATED
AMOUNT, IN THE FIRST YEAR, THEN DECREASING BY 10% PER YEAR FOR 10 YEARS
FOLLOWING ISSUE, OR THE EFFECTIVE DATE OF ANY INCREASE.


PARTIAL SURRENDER - 7% OF PREMIUMS PAID WITHIN THE LAST FIVE YEARS PRECEEDING
THE SURRENDER, NOT TO EXCEED THE INTEREST CREDITED OVER THE ASSURED CASH VALUE
INTEREST RATE FOR THE 12 MONTHS PRECEEDING SURRENDER.


THE METHOD BY WHICH LOANS AND PARTIAL SURRENDERS WILL BE PAID WILL BE
DETERMINED ACCORDING TO OUR ADMINISTRATIVE RULES. GENERALLY, THIS WILL
BE ON A LAST-IN-FIRST-OUT (LIFO) BASIS. OUR ADMINISTRATIVE RULES
DETERMINE WHICH PART OF THE CASH VALUE IS BEING LOANED OR SURRENDERED.


RATE CLASS: STANDARD.


MATURITY DATE IS THE CONTRACT ANNIVERSARY ON WHICH THE INSURED IS AGE 95.
COVERAGE MAY EXPIRE PRIOR TO THE MATURITY DATE IF NO PREMIUMS ARE PAID AFTER
THE INITIAL PREMIUM OR IF SUBSEQUENT PREMIUMS ARE INSUFFICIENT TO CONTINUE
COVERAGE TO SUCH DATE. COVERAGE MAY ALSO BE AFFECTED BY A CHANGE IN CURRENT
VALUES.

   NOTE:  THE TAX STATUS OF THIS POLICY AS IT APPLIES TO THE HOLDER
          OF THIS POLICY SHOULD BE REVIEWED EACH YEAR.


CONTINUED ON NEXT PAGE
PAGE 2-1                          TIC ED. 12-81

CONTRACT SUMMARY

INSURED     RICHARD A NEWTON SR          $500,000    STATED AMOUNT

CONTRACT NUMBER    ██6712                JUL 05, 1986    CONTRACT DATE

*********************************************************************************
*    BENEFIT DESCRIPTION                                                        *
*********************************************************************************

DETERMINATION OF THE CASH VALUE INTEREST RATE:
_____ ___ ___ ____ _____ _____ ____

THE CASH VALUE INTEREST RATE WILL BE DETERMINED QUARTERLY ON JANUARY 1, APRIL 1,
JULY 1, AND OCTOBER 1 FOR THE FOLLOWING CALENDAR QUARTER. THE RATE WILL BE
DETERMINED BASED UPON TREASURY RATES UP TO THE FIRST FRIDAY OF THE MONTH
PRECEDING THE START OF THE NEW QUARTER.

THE CASH VALUE INTEREST RATE WHICH APPLIES TO THE FIRST YEAR FOLLOWING A
PREMIUM PAYMENT IN THAT QUARTER WILL BE AT LEAST THE GREATER OF (A) OR
(B) WHERE:
 (A)  IS THE AVERAGE OF THE 3-MONTH TREASURY BILL RATES FOR THE 13 WEEKS
      IMMEDIATELY PRIOR TO THE DATE OF DETERMINATION LESS 1.5%. AS USED
      IN THESE COMPUTATIONS, THE 3-MONTH TREASURY BILL RATE (THE INDEX)
      FOR EACH WEEK WILL BE THE RATE, ON A BID DISCOUNT BASIS, AS OF 3:00
      PM ON EACH FRIDAY AS PUBLISHED BY THE SALOMON BROTHERS BOND MARKET
      ROUNDUP; AND

      IS THE AVERAGE OF 1-YEAR TREASURY BILL RATES AND 5-YEAR TREASURY BOND
      RATES FOR 13 WEEKS IMMEDIATELY PRIOR TO THE DATE OF DETERMINATION LESS
      1%. AS USED IN THESE COMPUTATIONS, THE 1-YEAR TREASURY BILL RATE (THE
      INDEX) FOR EACH WEEK WILL BE THE RATE ON A BID DISCOUNT BASIS, AS OF
      3:00 PM ON EACH FRIDAY AND THE 5-YEAR TREASURY BOND RATE (THE INDEX)
      FOR EACH WEEK WILL BE THE RATE IN EFFECT ON EACH THURSDAY AS PUBLISHED
      IN THE SALOMON BROTHERS BOND MARKET ROUNDUP.

THE CASH VALUE INTEREST RATE WHICH APPLIES FOR THE PERIOD BEYOND 1 YEAR
FROM THE TIME A PREMIUM IS MADE WILL BE AT LEAST THE GREATER OF (C) OR
(D) WHERE:
 (C)  IS THE AVERAGE OF THE 3-MONTH TREASURY BILL RATES, AS DEFINED IN (A), FOR
      THE 2 YEARS IMMEDIATELY PRIOR TO THE DATE OF DETERMINATION (BUT EXCLUDING
      ANY INTEREST RATES PRIOR TO SEPTEMBER 1, 1984) LESS 1.5%; AND

 (D)  IS THE AVERAGE OF 1-YEAR TREASURY BILL RATES AND 5-YEAR TREASURY BONDS
      AS DEFINED IN (B), FOR THE 2 YEARS IMMEDIATELY PRIOR TO THE DATE OF
      DETERMINATION (BUT EXCLUDING ANY INTEREST RATES PRIOR TO SEPTEMBER 1,
      1984) LESS 1%.

THE COMPANY MAY REDUCE THE CASH VALUE INTEREST RATE IF ANY PORTION OF INTEREST
CREDITED TO ACCOUNT VALUES BECOMES NON-DEDUCTIBLE BY THE COMPANY IN DETERMINING
ITS STATE AND FEDERAL INCOME TAX LIABILITY.
THE RATE IS REDUCED BY THE NON-DEDUCTIBLE PORTION MULTIPLIED BY THE MAXIMUM
ORDINARY INCOME CORPORATE TAX RATE IN EFFECT AT THE TIME. THE ABOVE METHOD
AND INDICES CANNOT BE CHANGED WITHOUT FILING THE NEW METHOD AND INDEX,
IF ANY, WITH THE APPROPRIATE STATE INSURANCE DEPARTMENTS.

CONTRACT SUMMARY

INSURED        RICHARD A NEWTON SR          $500,000     STATED AMOUNT

CONTRACT NUMBER    ███6712                  JUL 05, 1986    CONTRACT DATE

****************************************************************************
:    BENEFIT DESCRIPTION
****************************************************************************

TABLE OF VALUES - OPTION 1

| CONTRACT YEAR | AMOUNT INSURED AT END OF YEAR | BASIC PREMIUM* | MINIMUM CASH SURRENDER VALUES GUARANTEED | MINIMUM CASH VALUES | PAID UP INSURANCE** |
|---|---|---|---|---|---|
| 1  | $500,000 | $6,610.21 | $0      | $3,121  | $0      |
| 2  | $500,000 | $6,489.96 | $122    | $5,962  | $279    |
| 3  | $500,000 | $6,489.96 | $3,433  | $8,628  | $7,598  |
| 4  | $500,000 | $6,489.96 | $6,551  | $11,091 | $14,102 |
| 5  | $500,000 | $6,489.96 | $9,437  | $13,327 | $19,767 |
| 6  | $500,000 | $6,489.96 | $13,234 | $16,479 | $26,987 |
| 7  | $500,000 | $6,489.96 | $16,605 | $19,200 | $32,978 |
| 8  | $500,000 | $6,489.96 | $19,483 | $21,433 | $37,698 |
| 9  | $500,000 | $6,489.96 | $21,817 | $23,112 | $41,144 |
| 10 | $500,000 | $6,489.96 | $23,514 | $24,164 | $43,240 |
| 11 | $500,000 | $6,489.96 | $24,142 | $24,142 | $43,309 |
| 12 | $500,000 | $6,489.96 | $22,891 | $22,891 | $40,082 |
| 13 | $500,000 | $6,489.96 | $20,243 | $20,243 | $34,617 |
| 14 | $500,000 | $6,489.96 | $15,986 | $15,986 | $26,714 |
| 15 | $500,000 | $6,489.96 | $9,888  | $9,888  | $16,157 |
| 16 | $500,000 | $6,489.96 | $2,056  | $2,056  | $3,286  |
| 17 | $0       | $0.00     | $0      | $0      | $0      |

THE MINIMUM VALUES SHOWN ARE BASED ON THE ASSUMPTION THAT THE PREMIUMS ARE PAID AS ILLUSTRATED AND THAT THE DEATH BENEFITS (AMOUNTS INSURED) ARE AS ILLUSTRATED. THE VALUES ARE CALCULATED USING THE ASSURED RATE OF INTEREST AND THE ASSURED COST OF INSURANCE.

*THE PREMIUMS SHOWN ABOVE ARE THE INITIAL PREMIUM AND THE PLANNED PERIODIC PREMIUM PAYABLE DURING THE CONTRACT YEAR.

*THE AMOUNT OF PAID UP INSURANCE WHICH MAY BE ELECTED MAY NOT EXCEED THE AMOUNT OF INSURANCE THAT WOULD HAVE BEEN PAYABLE UNDER THE BASIC CONTRACT IF THE INSURED HAD DIED ON THE DATE PAID UP INSURANCE WAS ELECTED UNLESS EVIDENCE OF INSURABILITY SATISFACTORY TO US IS FURNISHED FOR ANY EXCESS. AMOUNTS OF PAID UP INSURANCE SUBJECT TO EVIDENCE OF INSURABILITY WILL BE CONTESTABLE FOR TWO YEARS AFTER THE EXCESS PAID UP INSURANCE TAKES EFFECT. ANY CASH SURRENDER VALUE IN EXCESS OF THE AMOUNT APPLIED TO PURCHASE PAID UP INSURANCE WILL BE RETURNED.

3

CONTINUED ON NEXT PAGE
PAGE 2A

TIC NO. 12-81

CONTRACT SUMMARY

INSURED        RICHARD A NEWTON SR          $500,000      STATED AMOUNT

CONTRACT NUMBER        ███ 6712                JUL 05, 1986   CONTRACT DATE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
    BENEFIT DESCRIPTION
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TOTAL INITIAL ANNUAL PREMIUM IS $6,610.21

.IFE INSURANCE PREMIUM FOR THE BASIC CONTRACT IS PAYABLE TO THE MATURITY DATE OR
INTIL THE PRIOR DEATH OF THE INSURED AND THE CHARGE FOR ADDITIONAL INSURANCE
'ROVISIONS TO THE APPLICABLE EXPIRY DATES ABOVE OR UNTIL PRIOR DEATH OF THE
NSURED.

1-UL-A\*S3\*L-CI\*L1-ULBV\*L-OIP(R85)\*L-10893

## CONTRACT SUMMARY

| | | | |
|---|---|---|---|
| INSURED | RICHARD A NEWTON SR | $500,000 | STATED AMOUNT |
| CONTRACT NUMBER | ■6712 | JUL 05, 1986 | CONTRACT DATE |
| ISSUE AGE | 51 | JUN 05, 1982 | DATE OF ISSUE |

### COST OF INSURANCE TABLE
#### (MONTHLY RATE FOR EACH $1,000 OF COVERAGE AMOUNT)

| AGE | RATE | AGE | RATE | AGE | RATE | AGE | RATE |
|---|---|---|---|---|---|---|---|
| 51 | .3755 | 62 | 1.5217 | 73 | 4.7555 | 84 | 13.2508 |
| 52 | .4239 | 63 | 1.7465 | 74 | 5.2677 | 85 | 14.5325 |
| 53 | .4744 | 64 | 1.9899 | 75 | 5.8188 | 86 | 15.8744 |
| 54 | .5286 | 65 | 2.2504 | 76 | 6.4006 | 87 | 17.2697 |
| 55 | .5859 | 66 | 2.4663 | 77 | 7.0068 | 88 | 18.7194 |
| 56 | .6772 | 67 | 2.6961 | 78 | 7.6431 | 89 | 20.2361 |
| 57 | .7760 | 68 | 2.9435 | 79 | 8.3307 | 90 | 21.8455 |
| 58 | .8821 | 69 | 3.2170 | 80 | 9.0934 | 91 | 23.5954 |
| 59 | .9962 | 70 | 3.5268 | 81 | 9.9561 | 92 | 25.5745 |
| 60 | 1.1185 | 71 | 3.8818 | 82 | 10.9409 | 93 | 28.0075 |
| 61 | 1.3121 | 72 | 4.2910 | 83 | 12.0462 | 94 | 31.4016 |

THE RATES USED IN THE COST OF INSURANCE CALCULATION ARE GUARANTEED NOT TO EXCEED
THE MAXIMUM RATES SHOWN ABOVE.

## BENEFITS—BASIC CONTRACT

**Death Benefit**

If the Insured dies while this Contract is in effect, we will, on receiving proof of the Insured's death, pay the beneficiary the Death Benefit of the basic contract. The Death Benefit as described below will be the total amount of insurance in effect at the time of death, less:

1. any outstanding loan, secured by the basic contract, and made under its "Cash Loan" provision; and
2. any monthly Deduction Amount due but not paid; and
3. any amount payable to an assignee under a collateral assignment of the contract.

The Death Benefit depends on:

1. the Insurance Option in effect at date of death; and
2. any increase or decrease you made to the Initial Stated Amount shown on the CONTRACT SUMMARY.

There are two Insurance Options. Under Option 1, the Amount Insured is the Stated Amount on the Insured's date of death. Under Option 2, the Amount Insured is the Stated Amount plus the Cash Value on the Insured's date of death.

The Coverage Amount (net amount at risk) is the Amount Insured less the Cash Value. Under either Option, the Amount Insured can never be less than the Cash Value plus the Minimum Coverage Amount shown in the CONTRACT SUMMARY.

**Maturity Benefit**

We will:

1. if the Insured is living on the Maturity Date; and
2. on surrender of this Contract;

pay to you:

1. the amount of Cash Value;
2. less any outstanding loan secured by the basic contract, and made under its "Cash Loans" provision; and
3. less any amount payable to an assignee under a collateral assignment of the basic contract.

On maturity insurance will end and we will have no other obligations under this Contract.

**Adjustments to Benefits**

If the Insured commits suicide within two years of the Date of Issue, the Death Benefit will be limited by the "Suicide" provision. If the Insured's sex or date of birth was misstated in the Application, the Death Benefit and the Maturity Benefit will be limited by the "Sex and Age" provision. Our right to contest payment of any death benefit is limited by the "Contest" provision.

**Requested Changes**

At any time after the first contract year, you may request changes. The request must be made:

1. in writing;
2. to our Office.

For an increase in the Stated Amount we may require:

1. a new application; and
2. evidence of insurability satisfactory to us.

An increase will go into effect on the Deduction Day on or after the date we approve the application for the increase. We will send you a new CONTRACT SUMMARY with the new date shown on it for the increase.

We will effect any decrease on the later of:

1. the Deduction Day on or after the date we receive your request at our Office; or
2. the Deduction Day on or after the day you request it to be effective.

We will apply the decrease:

1. first against the most recent increase in the Stated Amount;
2. then to other increases in the Stated Amount in the reverse order in which they occurred; and
3. last, to the Initial Stated Amount.

You may change the Insurance Option in effect. We will effect the change on the Deduction Day on or following the date we receive the request. If you request to change from Option 2 to Option 1, the Stated Amount will be increased by the Cash Value. If you request to change from Option 1 to Option 2, the Stated Amount will be decreased by the amount of the Cash Value. We may require evidence of insurability satisfactory to us if you request a change.

The remaining Coverage Amount and the remaining Stated Amount in effect after any change may not be less than the respective minimum amounts we allow as shown on the CONTRACT SUMMARY.

## CONTRACT VALUES AND BENEFITS

**Cash Values**

The Cash Value on the Contract Date is equal to the first premium payment times the Cash Value Percentage Factor shown on the CONTRACT SUMMARY. The first Deduction Day is the Contract Date. The monthly Deduction Day is shown on the CONTRACT SUMMARY.

On each monthly Deduction Day, the Cash Value is equal to $a$ minus $b$ plus $c$ plus $d$ minus $e$, where:

$a$ is the Cash Value on the preceding Deduction Day;

$b$ is the deduction amount for the preceding month;

L1-ULBV

*b* is the deduction amount for the preceding month;

Page 5

*c* is one month's interest on *a* minus *b;*

*d* are all premiums received since the preceding Deduction Day multiplied by the Cash Value Percentage Factor and accumulated at interest to the current Deduction Day; and

*e* is the amount of any partial surrenders since the preceding Deduction Day accumulated at interest to the current Deduction Day.

During the thirty days following the anniversary of the Contract Date, the Cash Value will be the same as on that date less any partial surrenders taken during the thirty days.

All contract values provided by this Contract are not less than the minimum values and benefits required by the insurance laws of the state in which this Contract is delivered. A detailed statement of the method of computation of Cash Values under this Contract has been filed with the insurance department of the state in which this Contract is delivered. Contract values on any day other than a Deduction Day are computed in a manner consistent with this method.

**Deduction Amount**

The Deduction Amount is a monthly charge made against the Cash Value. It is equal to:

1. the cost of insurance; plus

2. the cost of any additional benefits, as shown on the CONTRACT SUMMARY, and for which a separate charge is made; plus

3. the expense charges shown on the CONTRACT SUMMARY.

We will take the Deduction Amount for the following month out of the Cash Value on the monthly Deduction Day shown on the CONTRACT SUMMARY.

If:

1. the Cash Surrender Value on a Deduction Day is not enough to pay the Deduction Amount for the following month; and

2. no further premium payments are made;

this Contract will stay in effect for the late period shown on the CONTRACT SUMMARY. We will mail to your and any assignee's, last known address, notice of the required premium. If enough premium is not paid:

1. to cover the Deduction Amount;

2. by the end of the late period;

this Contract will end. The contract will have no Cash Value. If enough premium is not paid to cover the deduction amount, this Contract ends without value 31 days after we mail notice of termination to your, and any assignee's, last known address.

If the Insured dies during the late period, we will reduce the Death Benefit by any Deduction Amount due but not paid.

The cost of insurance for any month is equal to $c$ times the result of $a$ minus $b$ where:

$a$ is the Amount Insured for the month divided by the Interest Factor shown on the CONTRACT SUMMARY page;

$b$ is the Cash Value on the Deduction Day at the beginning of the contract month; and

$c$ is the cost for each $1,000 of Coverage Amount as shown in the COST OF INSURANCE TABLE at the Insured's then attained age, divided by $1,000.

The cost is based on the Insured's:

1. sex;

2. attained age; and

3. rate class shown on the CONTRACT SUMMARY for;

   a. the Initial Stated Amount; and

   b. each increase in the Stated Amount.

When the Amount Insured is equal to the Minimum Coverage Amount plus the Cash Value, to determine the cost of any increased amount, we will use the rate class for the most recent increase that required evidence of insurability.

If:

1. you have elected Insurance Option 1; and

2. you have made increases in the Stated Amount;

the Cash Value will be first considered a part of the Initial Stated Amount. If the Cash Value exceeds the Initial Stated Amount, it will then be considered a part of the additional Stated Amount resulting from increases in the order of those increases.

The cost of insurance rates are shown in the COST OF INSURANCE TABLE. We may use rates less than those shown. We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expense experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class.

**Interest Rate**

The assured interest rate we use to calculate Cash Values is shown on the CONTRACT SUMMARY. We may use rates greater than the assured rate to calculate all or any part of the Cash Value. We may use a different rate for that part of the Cash Value equal to the amount of

an outstanding loan on this Contract, but the rate will not be less than that shown on the CONTRACT SUMMARY.

**Cash Surrender Value**

Cash Surrender Value means the Cash Value, less any outstanding loan on or secured by this Contract, less any applicable Surrender Penalty and less any Handling Charge shown on the CONTRACT SUMMARY.

**Cash Surrender**

We will pay the Cash Surrender Value to you, on written request and surrender of this Contract, without the consent of any beneficiary unless irrevocably named.

We will calculate your Cash Surrender Value as of the day we receive your request. You may make this request at any time:

1. during the life of the Insured; and
2. before the Maturity Date.

This Contract will end on the later of:

1. the Deduction Day on or after the date we receive your request for surrender at our Office; or
2. the Deduction Day on or after the day you request the surrender to be effective.

You may make a written request to receive only a part of the Cash Surrender Value at any time:

1. during the life of the Insured; and
2. before the Maturity Date.

The amount of any partial Cash Surrender may not exceed the Cash Surrender Value. Each time you make a partial Cash Surrender, we will deduct the Surrender Penalty, if any, and any Handling Charge shown on the CONTRACT SUMMARY from the amount you request. We will reduce the amount of the Surrender Penalty on a full surrender for the amount(s) of any charge(s) previously deducted on any partial surrender(s).

We may require the return of the contract to record the reduction in Cash Value.

We will reduce:

1. the Amount Insured; and
2. the Cash Value;

by the amount of the Cash Surrender Value you request. If you have elected Death Benefit Option 1, we will reduce the Stated Amount by the amount of the Cash Surrender. After the reduction, the Coverage Amount and the Stated Amount remaining must be no less than the respective minimum amounts shown on the CONTRACT SUMMARY.

.1-ULBV                    Page 8

We may delay payment of any Cash Surrender Value (in whole or in part), other than one to pay premium due us, for a period of not more than six months after we receive the request.

**Continuation of Insurance**

If:

1. planned premium is:
   a. shown on the CONTRACT SUMMARY; and
   b. not paid; and
2. no unscheduled premium is paid;

this Contract will continue until the end of the late period following the Deduction Day on which the Cash Surrender Value would not be enough to pay the monthly Deduction Amount due on that day, or until the Maturity Date, if earlier. (See "Maturity Benefit" Provision)

If no planned premium is shown on the CONTRACT SUMMARY, this Contract will continue until the end of the late period following the Deduction Day on which the Cash Surrender Value would not be enough to pay the monthly Deduction Amount due on that day, or until the Maturity Date, if earlier. (See "Maturity Benefit" Provision)

**Loan Value**

The Loan Value is equal to the Cash Surrender Value, plus the amount of any outstanding Loan.

**Cash Loans**

We will, if you assign this Contract to us while it is in effect, make a loan to you with this Contract as security. We may defer the loan, other than one to pay premium due us, for no longer than six months after we receive the request for the loan at our office.

The maximum loan available will be the Loan Value on the date of the loan. We will deduct from the loan proceeds the amount of any outstanding loan. We may also deduct interest on the loan to the end of the current contract year. Interest on the loan will be payable in advance, at the beginning of each contract year. Interest not paid when due will be added to the loan and will bear interest at the same rate.

Interest on any loan, including outstanding loans, is payable:

1. in advance; and
2. at a variable rate:
   a. not more than the Maximum Loan Rate shown on the CONTRACT SUMMARY; and
   b. which we may name from time to time.

The effective date of any increase in the loan rate will not be less than one year after the effective date of the previous rate. If the loan rate is increased, the amount of the increase will not be more than one percent per year. We will give notice:

1. of the variable loan rate currently in effect, when:

a. you make a loan; and

b. we give you notice of interest due;

2. at least 30 days before the effective date of any increase in the variable loan rate, as to any loans outstanding 40 days before the effective date of any increase; and

3. of the increase when the loan is made as to any loans made during the 40 days before the effective date of the increase.

All or part of any loan may be repaid while the Insured is living and the contract is in effect. You may not repay a loan that exists at the end of a late period unless you reinstate this Contract.

If the loan exceeds the Loan Value, this Contract ends without value 31 days after we mail notice of termination to your, and any assignee's, last known address.

**Paid-up Insurance Benefit**

If Paid-up Insurance Values are shown in the Table of Values at any time before the Maturity Date you may continue this Contract as Paid-up Insurance:

1. subject to the conditions on the CONTRACT SUMMARY under TABLE OF VALUES;

2. in an amount equal to what the Cash Surrender Value applied as a net single premium will buy when applied at the then age of the Insured.

We will not apply an interest rate higher than the assured rate to Paid-up Insurance Values.

**Basis of Values, Benefits and Computations**

The basis for all present values and net single premiums referred to under "Paid-up Insurance Benefit" is shown on the CONTRACT SUMMARY. All Cash Values for this Contract are computed on the basis of the Mortality Table and interest rate shown on the CONTRACT SUMMARY and which shows any other information required by the Insurance Department of the State where this contract was issued for delivery.

## PREMIUM PAYMENT AND REINSTATEMENT

**Premium**

The amount of the first premium is shown on the CONTRACT SUMMARY. We will send you a receipt signed by one of our officers and properly countersigned. Each premium after the first is payable to us at our Office or to one of our authorized representatives. No insurance will take effect under this Contract until the first premium is paid.

Premium payments are flexible. You may change the amount and frequency of payments. At any time before the Maturity Date additional premium payments may be made subject to our limits. We may limit the number and amount of additional payments.

We reserve the right to limit any premium payment which results in an increase in the net amount at risk unless the Insured furnishes evidence of insurability satisfactory to us.

The amount and the frequency of the Planned Premiums are shown on the CONTRACT SUMMARY. You may request us to change the amount and frequency subject to our minimum and maximum limits.

The "Deduction Amount" provision of "CONTRACT VALUES AND BENEFITS" explains what happens when there is not enough Cash Value to pay the cost of insurance benefits.

**Reinstatement**     If this Contract ends at the end of a late period, then anytime within three years from the date to which the cost of insurance was paid, we will restore this Contract if it has not been surrendered for cash. Evidence of insurability acceptable to us is required. We also require payment of enough premium to keep this Contract in effect for the number of months shown on the CONTRACT SUMMARY. Any outstanding loan on or secured by this Contract, with loan interest to date, must be paid or restored. Any interest charged will not exceed 6% a year. The Cash Value of the basic contract on reinstatement will be the amount provided by the premium paid.

## OWNERSHIP, ASSIGNMENT AND BENEFICIARY

**Ownership**     The original owner is shown in the application. You, during the Insured's lifetime, may, without the consent of any beneficiary unless irrevocably named, exercise all rights given in this Contract.

**Assignment**     Ownership is transferable by assignment. No assignment is binding on us until we receive a copy of the written assignment at our Office. We will not determine if an assignment is valid.

Proof of interest must be filed with any claim under a collateral assignment.

**Beneficiary**     The original beneficiary is stated in the application. You may name a new beneficiary during the lifetime of the Insured and while this Contract continues. Any change will be effective from the date you signed the notice of change, even if the Insured is not living when we receive it. We will have no further responsibility for any payment we make before we receive the notice at our Office.

The interest of any beneficiary who is not living when the Insured dies will pass to you or your executors, administrators or assigns unless you have stated differently. The rights of any collateral assignee may affect the interest of the beneficiary.

## GENERAL PROVISIONS

**Contest**

We will not use material misstatements made in the application(s) to contest payment of any Death Benefit represented by:

1. the Initial Stated Amount after the contract has been in effect during the Insured's lifetime for two years from Date of Issue;

2. increases in the Stated Amount after an increase has been in effect during the Insured's lifetime for two years.

If this Contract is reinstated, this provision will be measured from the reinstatement date.

**Suicide**

If the Insured commits suicide, while sane or insane, within two years from the Date of Issue, the Death Benefit represented by the Initial Stated Amount will be limited to:

1. the premium paid;

2. less the amount of any partial surrenders;

3. less any outstanding loan, secured by the basic contract, and made under its "Cash Loans" provision; and

4. less the Deduction Amount for any other insureds under this Contract.

If, within two years from the effective date of any increase in the Stated Amount, the Insured commits suicide while sane or insane, the Death Benefit for that increase will be limited to an amount equal to the Deduction Amounts for the increases.

If this Contract is reinstated, this provision will be measured from the reinstatement date.

**Sex and Age**

If the Insured's sex or date of birth was misstated in the application(s), all benefits of this Contract are what the Deduction Amount would have purchased at the correct sex and age. Proof of the Insured's age may be filed at any time at our Office.

**Changes**

You may change this Contract to another form or an amount, or both, with our consent and our requirements. We may reduce premiums or grant values or benefits greater than those stated in the contract.

**Contract Payments**

All payments we make will be paid at our Office.

**No Dividends**

We will not pay any dividends under this Contract.

**Annual Statement**

At least once in each contract year, we will send you a statement which shows:

1. the Amount Insured;

2. the Stated Amount;

3. the Cash Value; and

4. the amount of any outstanding loan;

L1-ULBV

as of the date of the statement, and which shows all:

1. premiums paid;
2. deductions; and
3. partial surrenders;

since the date of the last statement we sent to you.

**Illustrative Reports**

You may request an up-to-date illustrative report of values based on:

1. past results; and
2. current assumptions.

We will provide the illustrative report

1. within a reasonable time; and
2. for the service fee that is in effect at the time of the request.

## OPTIONAL INCOME PROVISIONS

We will pay any amount payable under this Contract under the terms of any Option if:

1. the amount is payable in one sum; and

2. the amount placed under an option is at least $5,000; and

3. the election is made:

   a. in writing; and

   b. by you, if the Insured is living; or

   c. by the beneficiary, if the Insured has died.

Your election as to payments after the Insured dies is not binding on the payee unless restricted in the election. If you have not made an election when the Insured dies, the person or persons entitled to the insurance proceeds may make the election. While the Insured is living, you may cancel an election you made:

1. before the Maturity Date if the contract is an endowment; or

2. before surrender if the contract has a Cash Value;

unless you made the election irrevocable.

If you cancel an election and have not named a beneficiary under this Contract when the Insured dies, the beneficiary is you, your executors, administrators, or assigns.

**Option 1—Payments of a Fixed Amount**—We will make equal monthly payments of the amount elected until the amount placed under this option, with interest at a rate not less than 3½% per year, has been paid. The amount of each monthly payment must be at least $4.50 for each $1,000 of proceeds. The last payment will include any amount that is not enough to make another full payment.

**Option 2—Payments for a Fixed Period**—We will make equal monthly payments as shown in Table A, for the number of years elected.

**Option 3—Amounts Held at Interest**—We will keep amounts under this option and pay interest on them (monthly, quarterly, semi-annually, or annually, as elected) during the lifetime of the first payee, or for any other period agreed on. Interest will be at rates we set from time to time, but not less than 3½% per year. We will not make interest payments to any other payee after the 30th anniversary of the date this option first became payable. On the 30th anniversary we will pay any amounts being kept for any other payee in one sum. If the death of the first payee occurs on or after the 30th anniversary, we will pay the balance to the next payee in one sum.

**Option 4—Monthly Life Income**—We will make monthly payments, as shown in Table B, during the lifetime of the person on whose life the payments are based either:

1. with the number of payments assured for 60, 120, 180 or 240 months as elected; or

2. on the cash refund basis where, if at the death of that person payments have been made for less than the number of months elected, we will pay in one sum any amount used to provide this income that exceeds the sum of monthly payments already made.

**Option 5—Joint and Survivor Level Amount Monthly Life Income**—We will make monthly payments, as shown in Table C based on the lifetime of two persons. We will make monthly payments as long as either person lives.

The payments will be either:

1. without payments assured (no payments will be made after the death of the survivor); or

2. with payments assured for 120 months.

**Option 6—Joint and Survivor Monthly Life Income—Two-thirds to Survivor**—We will make

## OPTIONAL INCOME PROVISIONS (Continued)

monthly payments, as shown in Table D, during the joint lifetime of two persons on whose lives payments are based. After the death of either, we will make payments of two-thirds the original amount during the lifetime of the survivor. No payments will be made after the death of the survivor.

**Option 7—Joint and Last Survivor Monthly Life Income—Monthly Payment Reduces on Death of First Person Named**—We will make monthly income payments, as shown in Table E, during the joint lifetime of two persons on whose lives payments are based. One of the two persons will be named the first person. The other will be named the second person. If the second person dies first, we will continue to make monthly payments during the life of the first person. These payments will be in the same amount that was payable during the joint lifetime of the two persons. If the first person dies first, we will continue to make monthly payments during the life of the second person in an amount equal to 50% of the payments we would have made during the lifetime of the first person. No payments will be made after the death of the survivor.

**Option 8—Other Options**—We will make any other arrangements for income payments as may be agreed on.

If any periodic payment due any payee is less than $50.00, we may make payments less often.

If, at the date the first payment under an option is due, we have declared a higher rate under an option, we will base the payments on the higher rate.

**Payment Due**—The first payment under an option, except Option 3, is due on the date the proceeds become payable under that option. Under Option 3 the first payment is due one month after that date.

**Payee**—We will make each payment under an elected option when due to the designated payee, with the designation applying at the due date of each payment. If two or more payees are to share payments under Option 3, we will divide the proceeds on which interest is payable in the proportions designated. Any rights of each payee will apply to each payee's share of the proceeds.

If any payee or the last surviving payee dies while receiving payments, we will pay in one sum:

1. any amounts not paid which remain (as to that payee) under the option; or

2. the present value of any remaining payments assured;

to the executors, administrators or assigns of that payee.

**Rights of Payee**—Unless restricted, a payee under Option 3 has the right to:

1. Elect Option 1, 2 or 4; but no election may be made under Option 1 or 2 which would continue payments past the 30th anniversary of the date the first payment was due;

2. Withdraw part or all of the proceeds at any time but not more than four times in any one calendar year; after four times in a calendar year, the payee has the right to withdraw in one sum the entire amount not already paid.

Unless restricted, the payee under options 1, 2, 4, 5, 6, and 7 has:

1. the right to assign any payments under an option; and

2. has the right to receive the present value of future benefits.

A payee has no right to receive the present value of future benefits under a Life Income Option during the lifetime of the person on whose life the payments are based.

## OPTIONAL INCOME PROVISIONS (Continued)

Any payee who has a right to withdraw or receive the present value of future benefits can exercise that right to the exclusion of the rights of any succeeding payee. The calculation of the present value of future benefits under any option will be at an interest rate which will not exceed the actual rate which was used to calculate those benefits by more than one percent.

If, at the time an option is elected, there is any outstanding loan on or secured by this Contract, that loan may be repaid to us in whole or in part.

All amounts we hold and payments we make under an option are exempt from the claims of all creditors to the extent allowed by law. Amounts payable under any option are a part of and invested in our general corporate funds.

### Table A—Monthly Payments For Fixed Period Per $1,000 of Proceeds—3½%

| Years | Monthly Instalment | Years | Monthly Instalment | Years | Monthly Instalment | Years | Monthly Instalment | Years | Monthly Instalment | Years | Monthly Instalment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $84.654 | 6 | $15.350 | 11 | $9.086 | 16 | $6.763 | 21 | $5.565 | 26 | $4.842 |
| 2 | 43.055 | 7 | 13.376 | 12 | 8.464 | 17 | 6.465 | 22 | 5.393 | 27 | 4.732 |
| 3 | 29.194 | 8 | 11.899 | 13 | 7.939 | 18 | 6.201 | 23 | 5.236 | 28 | 4.630 |
| 4 | 22.268 | 9 | 10.751 | 14 | 7.490 | 19 | 5.966 | 24 | 5.093 | 29 | 4.535 |
| 5 | 18.115 | 10 | 9.835 | 15 | 7.101 | 20 | 5.755 | 25 | 4.963 | 30 | 4.447 |

## Table B—Monthly Life Income Per $1,000 of Proceeds
### Male

| Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. | Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. | Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20* | 3.35 | 3.39 | 3.38 | 3.37 | 3.36 | 44 | 4.06 | 4.20 | 4.18 | 4.14 | 4.09 | 68 | 6.10 | 6.87 | 6.52 | 6.01 | 5.44 |
| 21 | 3.37 | 3.40 | 3.39 | 3.38 | 3.37 | 45 | 4.11 | 4.26 | 4.24 | 4.19 | 4.13 | 69 | 6.26 | 7.09 | 6.68 | 6.11 | 5.49 |
| 22 | 3.38 | 3.42 | 3.41 | 3.40 | 3.39 | 46 | 4.16 | 4.32 | 4.30 | 4.25 | 4.18 | 70 | 6.42 | 7.31 | 6.85 | 6.21 | 5.53 |
| 23 | 3.40 | 3.44 | 3.43 | 3.42 | 3.41 | 47 | 4.21 | 4.39 | 4.36 | 4.30 | 4.23 | 71 | 6.60 | 7.55 | 7.02 | 6.30 | 5.57 |
| 24 | 3.43 | 3.47 | 3.46 | 3.45 | 3.44 | 48 | 4.26 | 4.45 | 4.42 | 4.36 | 4.28 | 72 | 6.79 | 7.81 | 7.19 | 6.40 | 5.61 |
| 25 | 3.45 | 3.49 | 3.48 | 3.47 | 3.46 | 49 | 4.32 | 4.53 | 4.49 | 4.42 | 4.33 | 73 | 6.99 | 8.08 | 7.37 | 6.48 | 5.64 |
| 26 | 3.47 | 3.51 | 3.50 | 3.49 | 3.48 | 50 | 4.38 | 4.60 | 4.56 | 4.48 | 4.39 | 74 | 7.20 | 8.37 | 7.56 | 6.57 | 5.66 |
| 27 | 3.49 | 3.54 | 3.53 | 3.52 | 3.51 | 51 | 4.44 | 4.68 | 4.63 | 4.55 | 4.44 | 75 | 7.44 | 8.67 | 7.74 | 6.65 | 5.69 |
| 28 | 3.52 | 3.56 | 3.55 | 3.54 | 3.53 | 52 | 4.50 | 4.76 | 4.70 | 4.61 | 4.49 | 76 | 7.67 | 8.99 | 7.92 | 6.72 | 5.70 |
| 29 | 3.54 | 3.59 | 3.58 | 3.57 | 3.56 | 53 | 4.57 | 4.84 | 4.78 | 4.68 | 4.55 | 77 | 7.94 | 9.33 | 8.11 | 6.79 | 5.72 |
| 30 | 3.57 | 3.61 | 3.60 | 3.59 | 3.58 | 54 | 4.64 | 4.93 | 4.86 | 4.76 | 4.61 | 78 | 8.24 | 9.69 | 8.29 | 6.85 | 5.73 |
| 31 | 3.60 | 3.64 | 3.63 | 3.62 | 3.61 | 55 | 4.71 | 5.03 | 4.95 | 4.83 | 4.67 | 79 | 8.53 | 10.07 | 8.47 | 6.90 | 5.74 |
| 32 | 3.62 | 3.67 | 3.66 | 3.65 | 3.64 | 56 | 4.79 | 5.12 | 5.04 | 4.91 | 4.73 | 80 | 8.87 | 10.46 | 8.64 | 6.95 | 5.74 |
| 33 | 3.65 | 3.71 | 3.70 | 3.69 | 3.67 | 57 | 4.87 | 5.23 | 5.13 | 4.99 | 4.79 | 81 | 9.26 | 10.88 | 8.81 | 6.99 | 5.75 |
| 34 | 3.68 | 3.74 | 3.73 | 3.72 | 3.70 | 58 | 4.95 | 5.34 | 5.23 | 5.07 | 4.85 | 82 | 9.62 | 11.31 | 8.97 | 7.02 | 5.75 |
| 35 | 3.71 | 3.78 | 3.77 | 3.75 | 3.74 | 59 | 5.04 | 5.45 | 5.34 | 5.15 | 4.91 | 83 | 10.08 | 11.77 | 9.11 | 7.04 | 5.75 |
| 36 | 3.75 | 3.81 | 3.80 | 3.79 | 3.77 | 60 | 5.14 | 5.58 | 5.44 | 5.24 | 4.98 | 84 | 10.52 | 12.24 | 9.25 | 7.06 | 5.75 |
| 37 | 3.78 | 3.85 | 3.84 | 3.83 | 3.80 | 61 | 5.23 | 5.70 | 5.56 | 5.33 | 5.04 | 85 and over | 11.06 | 12.73 | 9.36 | 7.07 | 5.75 |
| 38 | 3.82 | 3.89 | 3.89 | 3.87 | 3.84 | 62 | 5.34 | 5.84 | 5.68 | 5.42 | 5.10 | | | | | | |
| 39 | 3.85 | 3.94 | 3.93 | 3.91 | 3.88 | 63 | 5.45 | 5.99 | 5.80 | 5.52 | 5.16 | | | | | | |
| 40 | 3.89 | 3.99 | 3.97 | 3.95 | 3.92 | 64 | 5.57 | 6.14 | 5.93 | 5.61 | 5.22 | | | | | | |
| 41 | 3.93 | 4.04 | 4.02 | 4.00 | 3.96 | 65 | 5.69 | 6.31 | 6.07 | 5.71 | 5.28 | | | | | | |
| 42 | 3.97 | 4.09 | 4.07 | 4.04 | 4.00 | 66 | 5.82 | 6.49 | 6.22 | 5.81 | 5.33 | | | | | | |
| 43 | 4.02 | 4.14 | 4.12 | 4.09 | 4.04 | 67 | 5.96 | 6.67 | 6.36 | 5.91 | 5.39 | | | | | | |

*and under 20

## Table B—Monthly Life Income Per $1,000 of Proceeds
### Female

| Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. | Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. | Age | Cash Ref. | 60 Mo. | 120 Mo. | 180 Mo. | 240 Mo. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20* | 3.25 | 3.28 | 3.27 | 3.26 | 3.25 | 44 | 3.83 | 3.89 | 3.88 | 3.87 | 3.85 | 68 | 5.63 | 6.09 | 5.93 | 5.65 | 5.27 |
| 21 | 3.26 | 3.30 | 3.29 | 3.28 | 3.27 | 45 | 3.87 | 3.94 | 3.93 | 3.91 | 3.89 | 69 | 5.78 | 6.28 | 6.09 | 5.76 | 5.33 |
| 22 | 3.28 | 3.31 | 3.30 | 3.29 | 3.28 | 46 | 3.91 | 3.99 | 3.98 | 3.96 | 3.93 | 70 | 5.93 | 6.48 | 6.26 | 5.88 | 5.38 |
| 23 | 3.29 | 3.33 | 3.32 | 3.31 | 3.31 | 47 | 3.96 | 4.03 | 4.02 | 4.00 | 3.97 | 71 | 6.08 | 6.70 | 6.43 | 5.99 | 5.44 |
| 24 | 3.31 | 3.35 | 3.34 | 3.33 | 3.32 | 48 | 4.00 | 4.09 | 4.08 | 4.05 | 4.02 | 72 | 6.26 | 6.93 | 6.61 | 6.10 | 5.49 |
| 25 | 3.33 | 3.36 | 3.35 | 3.34 | 3.33 | 49 | 4.05 | 4.14 | 4.13 | 4.10 | 4.07 | 73 | 6.43 | 7.18 | 6.80 | 6.21 | 5.53 |
| 26 | 3.34 | 3.38 | 3.37 | 3.36 | 3.35 | 50 | 4.10 | 4.20 | 4.19 | 4.16 | 4.12 | 74 | 6.62 | 7.44 | 6.99 | 6.31 | 5.57 |
| 27 | 3.36 | 3.40 | 3.39 | 3.38 | 3.37 | 51 | 4.15 | 4.26 | 4.25 | 4.21 | 4.17 | 75 | 6.83 | 7.73 | 7.19 | 6.41 | 5.60 |
| 28 | 3.38 | 3.42 | 3.41 | 3.40 | 3.39 | 52 | 4.21 | 4.33 | 4.31 | 4.27 | 4.22 | 76 | 7.04 | 8.03 | 7.39 | 6.50 | 5.63 |
| 29 | 3.40 | 3.44 | 3.43 | 3.42 | 3.41 | 53 | 4.26 | 4.40 | 4.38 | 4.33 | 4.27 | 77 | 7.28 | 8.35 | 7.59 | 6.58 | 5.65 |
| 30 | 3.42 | 3.46 | 3.45 | 3.44 | 3.43 | 54 | 4.32 | 4.47 | 4.44 | 4.40 | 4.33 | 78 | 7.54 | 8.70 | 7.79 | 6.66 | 5.67 |
| 31 | 3.45 | 3.48 | 3.47 | 3.46 | 3.45 | 55 | 4.39 | 4.55 | 4.52 | 4.47 | 4.39 | 79 | 7.78 | 9.06 | 7.99 | 6.73 | 5.69 |
| 32 | 3.47 | 3.51 | 3.50 | 3.49 | 3.48 | 56 | 4.45 | 4.63 | 4.59 | 4.54 | 4.45 | 80 | 8.07 | 9.44 | 8.18 | 6.79 | 5.70 |
| 33 | 3.49 | 3.53 | 3.52 | 3.51 | 3.50 | 57 | 4.53 | 4.71 | 4.67 | 4.61 | 4.52 | 81 | 8.35 | 9.84 | 8.36 | 6.84 | 5.72 |
| 34 | 3.52 | 3.56 | 3.55 | 3.54 | 3.53 | 58 | 4.60 | 4.80 | 4.76 | 4.69 | 4.58 | 82 | 8.66 | 10.25 | 8.53 | 6.88 | 5.72 |
| 35 | 3.54 | 3.58 | 3.57 | 3.56 | 3.55 | 59 | 4.68 | 4.90 | 4.85 | 4.77 | 4.65 | 83 | 9.00 | 10.68 | 8.68 | 6.92 | 5.73 |
| 36 | 3.57 | 3.61 | 3.60 | 3.59 | 3.58 | 60 | 4.76 | 5.00 | 4.94 | 4.85 | 4.71 | 84 | 9.32 | 11.11 | 8.83 | 6.96 | 5.74 |
| 37 | 3.60 | 3.64 | 3.63 | 3.62 | 3.61 | 61 | 4.85 | 5.10 | 5.04 | 4.94 | 4.78 | 85 and over | 9.69 | 11.55 | 8.96 | 6.98 | 5.74 |
| 38 | 3.63 | 3.67 | 3.66 | 3.65 | 3.64 | 62 | 4.94 | 5.22 | 5.15 | 5.03 | 4.85 | | | | | | |
| 39 | 3.66 | 3.70 | 3.69 | 3.68 | 3.67 | 63 | 5.04 | 5.34 | 5.26 | 5.12 | 4.92 | | | | | | |
| 40 | 3.69 | 3.74 | 3.73 | 3.72 | 3.70 | 64 | 5.15 | 5.47 | 5.38 | 5.22 | 4.99 | | | | | | |
| 41 | 3.72 | 3.77 | 3.76 | 3.75 | 3.74 | 65 | 5.26 | 5.61 | 5.50 | 5.33 | 5.06 | | | | | | |
| 42 | 3.76 | 3.81 | 3.80 | 3.79 | 3.77 | 66 | 5.38 | 5.76 | 5.64 | 5.43 | 5.13 | | | | | | |
| 43 | 3.79 | 3.85 | 3.84 | 3.83 | 3.81 | 67 | 5.50 | 5.92 | 5.78 | 5.54 | 5.20 | | | | | | |

*and under 20

## Joint and Survivor Monthly Life Income Per $1,000 of Proceeds

| Age and Sex | TABLE C—Level Amount | | | | | | | | | | TABLE D—½ To Survivor | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Male | 50 | | 55 | | 60 | | 65 | | 70 | | 50 | 55 | 60 | 65 | 70 |
| Fem. | 55 | | 60 | | 65 | | 70 | | 75 | | 55 | 60 | 65 | 70 | 75 |
| | No Ref. | 120 Mo. | No Ref. | 120 Mo. | No Ref. | 120 Mo. | No Ref. | 120 Mo. | No Ref. | 120 Mo. | No Ref. | No Ref. | No Ref. | No Ref. | No Ref. |
| 50  55 | $4.04 | $4.03 | $4.17 | $4.16 | $4.28 | $4.27 | $4.37 | $4.36 | $4.45 | $4.44 | $4.40 | $4.58 | $4.77 | $4.98 | $5.21 |
| 51  56 | 4.07 | 4.06 | 4.20 | 4.19 | 4.32 | 4.31 | 4.42 | 4.41 | 4.51 | 4.50 | 4.44 | 4.62 | 4.82 | 5.04 | 5.28 |
| 52  57 | 4.08 | 4.08 | 4.23 | 4.22 | 4.36 | 4.35 | 4.48 | 4.47 | 4.57 | 4.56 | 4.47 | 4.66 | 4.86 | 5.09 | 5.34 |
| 53  58 | 4.12 | 4.11 | 4.27 | 4.26 | 4.41 | 4.40 | 4.53 | 4.52 | 4.63 | 4.62 | 4.51 | 4.70 | 4.91 | 5.15 | 5.40 |
| 54  59 | 4.14 | 4.13 | 4.30 | 4.29 | 4.45 | 4.44 | 4.59 | 4.58 | 4.70 | 4.69 | 4.54 | 4.74 | 4.96 | 5.21 | 5.47 |
| 55  60 | 4.17 | 4.16 | 4.34 | 4.33 | 4.50 | 4.49 | 4.64 | 4.63 | 4.77 | 4.75 | 4.58 | 4.79 | 5.01 | 5.27 | 5.54 |
| 56  61 | 4.19 | 4.18 | 4.37 | 4.36 | 4.54 | 4.53 | 4.70 | 4.69 | 4.84 | 4.82 | 4.62 | 4.83 | 5.07 | 5.33 | 5.61 |
| 57  62 | 4.21 | 4.20 | 4.40 | 4.39 | 4.59 | 4.58 | 4.76 | 4.75 | 4.91 | 4.89 | 4.65 | 4.87 | 5.12 | 5.39 | 5.69 |
| 58  63 | 4.23 | 4.22 | 4.44 | 4.43 | 4.63 | 4.62 | 4.82 | 4.81 | 4.99 | 4.97 | 4.69 | 4.92 | 5.17 | 5.46 | 5.77 |
| 59  64 | 4.26 | 4.25 | 4.47 | 4.46 | 4.68 | 4.67 | 4.88 | 4.87 | 5.06 | 5.04 | 4.73 | 4.97 | 5.23 | 5.52 | 5.85 |
| 60  65 | 4.28 | 4.27 | 4.50 | 4.49 | 4.72 | 4.71 | 4.95 | 4.93 | 5.14 | 5.12 | 4.77 | 5.01 | 5.29 | 5.59 | 5.93 |
| 61  66 | 4.30 | 4.29 | 4.53 | 4.52 | 4.77 | 4.76 | 5.01 | 4.99 | 5.22 | 5.19 | 4.81 | 5.06 | 5.34 | 5.66 | 6.01 |
| 62  67 | 4.32 | 4.31 | 4.56 | 4.55 | 4.81 | 4.80 | 5.07 | 5.05 | 5.31 | 5.27 | 4.85 | 5.11 | 5.40 | 5.73 | 6.10 |
| 63  68 | 4.34 | 4.33 | 4.59 | 4.58 | 4.86 | 4.84 | 5.13 | 5.11 | 5.39 | 5.35 | 4.90 | 5.16 | 5.47 | 5.81 | 6.19 |
| 64  69 | 4.35 | 4.34 | 4.62 | 4.61 | 4.90 | 4.89 | 5.20 | 5.17 | 5.48 | 5.43 | 4.94 | 5.21 | 5.53 | 5.89 | 6.29 |
| 65  70 | 4.37 | 4.36 | 4.64 | 4.63 | 4.95 | 4.93 | 5.26 | 5.23 | 5.56 | 5.52 | 4.98 | 5.27 | 5.59 | 5.96 | 6.38 |

## Table E—Joint and Last Survivor Monthly Life Income Per $1,000 of Proceeds
### Monthly Payment Reduces on Death of First Person Named

| Age and Sex | | Age and Sex-Second Person Named | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Male | 50 | 55 | 60 | 65 | 70 |
| | Female | 55 | 60 | 65 | 70 | 75 |
| | | No Ref. | No Ref. | No Ref. | No Ref. | No Ref. |
| | 50  55 | $4.30 | $4.37 | $4.44 | $4.49 | $4.53 |
| First Person Named | 51  56 | 4.35 | 4.43 | 4.50 | 4.55 | 4.60 |
| | 52  57 | 4.40 | 4.49 | 4.56 | 4.62 | 4.67 |
| | 53  58 | 4.45 | 4.54 | 4.62 | 4.69 | 4.75 |
| | 54  59 | 4.51 | 4.60 | 4.69 | 4.76 | 4.82 |
| | 55  60 | 4.56 | 4.66 | 4.76 | 4.84 | 4.91 |
| | 56  61 | 4.62 | 4.73 | 4.83 | 4.92 | 4.99 |
| | 57  62 | 4.67 | 4.79 | 4.90 | 5.00 | 5.08 |
| | 58  63 | 4.73 | 4.86 | 4.98 | 5.08 | 5.17 |
| | 59  64 | 4.79 | 4.93 | 5.05 | 5.17 | 5.27 |
| | 60  65 | 4.85 | 5.00 | 5.13 | 5.26 | 5.37 |
| | 61  66 | 4.92 | 5.07 | 5.22 | 5.36 | 5.48 |
| | 62  67 | 4.98 | 5.14 | 5.30 | 5.45 | 5.59 |
| | 63  68 | 5.05 | 5.22 | 5.39 | 5.56 | 5.70 |
| | 64  69 | 5.12 | 5.30 | 5.48 | 5.66 | 5.82 |
| | 65  70 | 5.19 | 5.38 | 5.58 | 5.77 | 5.95 |

We will furnish the amount of monthly income for other age combinations on request.
Age as used above means age when income begins.

THE TRAVELERS INSURANCE COMPANIES

It is requested by the Undersigned Owner (and Irrevocable Beneficiary, if presently named or collateral assignee, if any) that the present insurance be changed as directed below.

INSURED: Richard A. Newton Sr.

CONTRACT NO.(S) ███████ 269

ADDRESS FOR PREMIUM NOTICES (No. and Street)

**IF CONVERSION OR ATTAINED AGE IS DESIRED COMPLETE SECTION I AND II. FOR ALL ORIGINAL DATE CHANGES COMPLETE SECTIONS II AND III.**

## I. CONVERSION OF TERM INSURANCE TO PERMANENT INSURANCE AND ATTAINED AGE CHANGE TO A HIGHER PREMIUM FORM.

☐ CONVERSION OF BASIC CONTRACT          ☐ ADD APL PROVISION

☑ CONVERSION OF **Term Insurance** _____ PROVISION

IF NOT A FULL CONVERSION
☐ BALANCE TERMINATED
☐ BALANCE CONTINUED
☐ SUBJECT TO MINIMUM AMOUNTS

DATE NEW POLICY: July 5th 1986

AMOUNT OF NEW INSURANCE: $ 500,000.00

NEW POLICY FORM OF INSURANCE: ULXP 86 Level N.S.

NEW CONTRACT MODE OF PAYMENT
☐ ANNUAL          ☐ QUARTERLY
☐ SEMI-ANNUAL     ☑ APC

QUOTED MODE PREMIUM: $ 540.83

NOTE:
A. Present provisions will be continued, if available, unless cancellation is requested.
B. The new contract date will be the premium paid to date of the contract being converted. If premiums are paid in advance the new Contract will be dated current date and any unearned premium will be refunded or applied to the new contract.
C. Insureds date of birth as shown on the present contract will be used to determine the issue age of the new contract unless documentary evidence is submitted.

SPECIAL INSTRUCTIONS — INCLUDING ADDITION OR DELETION OF PROVISIONS

### I. BENEFICIARY AND METHOD OF PAYMENT (See reverse side for sample designations of Beneficiary.)

☑ PRESENT ARRANGEMENT REAFFIRMED AND TO BE CONTINUED UNDER NEW CONTRACT

☐ NEW DESIGNATION EFFECTIVE ONLY UNDER NEW CONTRACT
(Proceeds payable in one sum unless optional method of payment is elected.)

NEW DESIGNATION:

Unless otherwise stipulated payment due two or more beneficiaries shall be in equal shares and the survivors or survivor of them.

### II. ORIGINAL DATE AND AGE CHANGES TO A LOWER PREMIUM FORM.
(SUBJECT TO EVIDENCE OF INSURABILITY. SEE LIFE MANUAL FOR REQUIREMENTS)

ORIGINAL DATE AND AGE CHANGES TO A HIGHER PREMIUM FORM. REDUCTION IN AMOUNT OF INSURANCE

AMOUNT OF NEW CONTRACT | NEW POLICY FORM OF INSURANCE | PREMIUM MODE OF PAYMENT

AMOUNT OF NEW CONTRACT | NEW POLICY FORM OF INSURANCE | PREMIUM MODE OF PAYMENT

If split into multiple contracts show amount for each contract. Amounts cannot be increased except on date of birth and age changes. Amounts can be reduced subject to minimum amounts.

A. On changes resulting in a credit with an outstanding loan, the credit will be applied to reduce or cancel the loan unless otherwise requested.
B. Present provisions will be continued, if available, unless cancellation is requested.

SPECIAL INSTRUCTIONS — INCLUDING ADDITION OR DELETION OF PROVISIONS

In consideration of issue of new contract(s) if so required in replacement and effective upon delivery thereof, any aforesaid contract(s) or instrument(s) is (are) hereby released and surrendered to The Travelers Insurance Company, Hartford, Connecticut, together with all right, title, claim, interest and benefit which the undersigned have or may have thereunder; and the undersigned do hereby certify and declare that no person, firm or corporation other than those joining in this release have any interest or right therein or any title, legal or equitable, in whole or in part thereto.

INSURED: Richard A. Newton Sr.

PRESENT BENEFICIARY, IF IRREVOCABLY NAMED:

DATED AT: Atlanta, Ga

COLLATERAL ASSIGNEE, IF ANY:

DATE: 6-25-86

AGENTS PLATE:
NEWTON/Boyd B
P.O. Box
Valdosta, GA  31601
2300050000P30  - MIKE BURKE, PROD. MGR.
ATLANTA - 005
0J6878

(Required for attained age conversion or attained age change)

FOR COMPANY USE ONLY: IF THIS REQUEST IS FOR ATTAINED AGE CONVERSION OF CONVERTIBLE TERM INSURANCE, THE PRODUCING AGENT SHOULD SIGN HIS NAME.

SIGNED (Agent): Boyd B. Newton

This is a Flexible Premium Adjustable Life Insurance Contract
to Maturity Date Without Dividends. Premiums can vary by
Frequency and Amount. Premiums are payable to the Maturity
Date or until the Insured's Prior Death.


ENDORSEMENTS

LI-UL

PRINTED IN U.S.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing **SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of Court using the CM/ECF system, is personally serving Defendant's registered agent and have mailed a copy of the same to the following address:

Elizabeth J. Bondurant, Esq.
Nikole Crow, Esq.
WOMBLE BOND DICKINSON (US) LLP
271 17th Street, N.W., Suite 2400
Atlanta, GA 30363
Lisa.bondurant@wbd-us.com
Nikole.crow@wbd-us.com

Joseph M. McLaughlin, Esq.
Joshua Polster, Esq.
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
jmclaughlin@stblaw.com
Joshua.polster@stblaw.com

Respectfully submitted this 25th day of March, 2021.


*/s/ Roy E. Barnes*
Roy E. Barnes
GA Bar No. 039000
roy@barneslawgroup.com

-76-

BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060
Telephone: 770-227-6375
Facsimile: 770-227-6373

*Attorneys for Plaintiff*