IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| RICHARD A. NEWTON SR., Individually and on behalf of a Class of Individuals Similarly Situated, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | |
| BRIGHTHOUSE LIFE INSURANCE COMPANY, | : : : | CIVIL ACTION NO. 1:20-cv-02001-AT |
| Defendant. | : | |

## ORDER

Before the Court is Plaintiff Richard A. Newton Sr.'s Motion for Class Certification. [Doc. 116]. For the below reasons, Plaintiff's Motion is **GRANTED IN PART and DENIED IN PART**.

## I.    BACKGROUND

Plaintiff Richard A. Newton Sr. brings this putative class action on behalf of himself and other purchasers of Defendant Brighthouse Life Insurance Company's ULXP86 an ULXP88 universal life insurance policies. He alleges that Brighthouse improperly inflated the "cost of insurance" component of the policyholders' premiums, and that this conduct constitutes breach of contract, fraud, and violations of Georgia's Racketeering Influenced and Corrupt Organizations ("RICO") Act.

Universal life insurance policies are "hybrid products that combine elements of life insurance with a long-term investment savings component using market-based yields." *Anderson v. Wilco Life Ins. Co.*, 943 F.3d 917, 920–21 (11th Cir. 2019) ("*Anderson I*"). More simply, these policies have two core components: life insurance and an interest-bearing cash account.

The policyholder makes payments into their cash account, from which the insurance company deducts the monthly life insurance premiums. *Id.* at 921. The monthly deduction is generally the sum of the policyholder's cost of insurance and other expenses. *See id.* The cash balance remaining after the deductions is the "cash value" or "accumulation value" of the policy, which earns interest at a specified rate. *See id.*[1]

Under this structure, policyholders have the option to make the minimum payments needed to maintain their policy or to grow the cash value of their policy by making payments exceeding their monthly deductions. As the cash value of their policies grow, policyholders gain the ability to have the accumulated cash balance cover some or all of their monthly deductions. *See Anderson I*, 943 F.3d at 921. This gives policyholders greater control over how they structure their payments over the life of their policy. For example, Newton understood that growing the cash value of his policy during his younger years could reduce the payments that he had

---

[1] Here, Brighthouse guaranteed that the cash value of the subject policies would earn at least 4% interest annually. *See* (Third Am. Compl. ("TAC"), Doc. 107 ¶ 4); (Newton's Policy, Doc. 107-1 at ECF 4).

to make later in life. *See* (Newton Sept. 23, 2021 Dep., Doc. 127-26 at 80:11–80:19). But if the cash value of a policyholder's account drops below the cost of their monthly deductions, their policy may lapse if adequate payments are not timely made.

### A.    The Relevant Policy Provisions

Between 1985 and 1995, the Travelers Insurance Company—Brighthouse's predecessor in interest—issued several life insurance policy product lines.[2] (Hause Decl., Doc. 116-2 ¶ 7). This case centers around identical provisions in Brighthouse's ULXP86 and ULXP88 universal life insurance policies (the "Policies") that dictate how policyholders' cost of insurance is calculated.[3] The Policies are based on a common L1-UL policy form that, along with the attached "Contract Summary," provide identical policy provisions that are supplemented by information specific to the individual policyholder. *See* (*id.* ¶¶ 8–10).

Newton purchased his $500,000 Travelers ULXP86 universal life insurance policy in July 1986, when he was 51 years old. *See* (Compl. ¶ 15). The policy states that his monthly deduction would be the sum of the cost of insurance + the cost of any additional benefits + expenses. (Doc. 107-1 at 12).[4] To calculate the "cost of

---

[2] In this order, "Brighthouse" refers to Brighthouse and its predecessors in interest: Travelers Insurance and MetLife.

[3] Neither party disputes that the relevant terms of the ULXP86 and ULXP88 policies are the same. And upon reviewing of the Policies, the Court is satisfied that the relevant terms are, in fact, identical. *Compare* (Newton's ULXP86 Policy, Doc. 107-1) *to* (Sample ULXP88 Policy, Doc. 146).

[4] Citations to page numbers in this Order refer to the ECF number generated by the Court's filing system. However, citations to transcripts (e.g., deposition or hearing transcripts) refer to the official transcript page number.

insurance" component of his monthly deduction, his policy provides the following formula:

> The cost of insurance for any month is equal to $c$ times the result of $a$ minus $b$ where:
>
>> $a$ is the Amount Insured for the month divided by the Interest Factor shown on the CONTRACT SUMMARY page;
>>
>> $b$ is the Cash Value on the Deduction Day at the beginning of the contract month; and
>>
>> $c$ is the cost for each $1,000 of Coverage Amount as shown in the COST OF INSURANCE TABLE at the Insured's then attained age, divided by $1,000.

(*Id.* at 13). Stated as a simple equation, the formula is: Cost of Insurance = $c\,(a - b)$.

At issue in this litigation is the "cost for each $1,000 of Coverage Amount," which is known as the "cost of insurance rate" ("COI rate").[5] Since the COI rate dictates the value of the multiplier "$c$" in the cost of insurance formula, as the COI rate increases, so too does the cost of insurance.

Like other universal life insurance contracts,[6] the Policies provide for two categories of COI rates: (1) the maximum COI rates that Brighthouse may use, as

---

[5] "Cost of insurance rate" is the shorthand that the Policies use for the "cost for each $1,000 of Coverage Amount" in variable "$c$" of the cost of insurance formula. *See* (Newton Policy, Doc. 107-1 at 13) (referring to the data in the Cost of Insurance Table as both "the cost of insurance rates" and "the cost of each $1,000 of Coverage Amount").

[6] *See Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*, 93 F.4th 1315, 1320–21 1332 (11th Cir. 2024) (describing how the policy provided (1) a table of "guaranteed" maximum COI rates for each "attained age" and (2) "internal" COI rates that it actually used)*; Anderson v. Wilco Life Ins. Co.*, 17 F.4th 1339, 1342–44 (11th Cir. 2021) ("*Anderson II*") (describing how the policy provided for (1) "guaranteed" maximum COI rates and (2) the "current" COI rate the life insurance company actually used).

declared in the Policies' Cost of Insurance Table; and (2) the lower, internally calculated COI rates that Brighthouse could choose to use instead. *See* (*id.*) ("The cost of insurance rates are shown in the COST OF INSURANCE TABLE. We may use rates less than those shown."). Different policy provisions govern each category of COI rates.

### 1.     *Brighthouse's Declared Maximum COI Rate*

The first category is Brighthouse's guaranteed maximum COI rates, which is stated in the Policies' "Cost of Insurance Table." The Cost of Insurance Table is a mortality table found in the Policies' Contract Summary that assigns a COI rate to each year that the policyholder ages:

COST OF INSURANCE TABLE
(MONTHLY RATE FOR EACH $1,000 OF COVERAGE AMOUNT)

| AGE | RATE | AGE | RATE | AGE | RATE | AGE | RATE |
|-----|--------|-----|--------|-----|---------|-----|---------|
| 51 | .3755 | 62 | 1.5217 | 73 | 4.7555 | 84 | 13.2508 |
| 52 | .4239 | 63 | 1.7465 | 74 | 5.2677 | 85 | 14.5325 |
| 53 | .4744 | 64 | 1.9899 | 75 | 5.8188 | 86 | 15.8744 |
| 54 | .5286 | 65 | 2.2504 | 76 | 6.4006 | 87 | 17.2697 |
| 55 | .5859 | 66 | 2.4663 | 77 | 7.0068 | 88 | 18.7194 |
| 56 | .6772 | 67 | 2.6961 | 78 | 7.6431 | 89 | 20.2361 |
| 57 | .7760 | 68 | 2.9435 | 79 | 8.3307 | 90 | 21.8455 |
| 58 | .8821 | 69 | 3.2170 | 80 | 9.0934 | 91 | 23.5954 |
| 59 | .9962 | 70 | 3.5268 | 81 | 9.9561 | 92 | 25.5745 |
| 60 | 1.1185 | 71 | 3.8818 | 82 | 10.9409 | 93 | 28.0075 |
| 61 | 1.3121 | 72 | 4.2910 | 83 | 12.0462 | 94 | 31.4016 |

(*Id.* at 9). Each rate in the Cost of Insurance Table is "based on the Insured's: 1. sex; 2. attained age; and 3. rate class." (*Id.* at 13). And Brighthouse "guarantees" that the rates it actually uses for its cost of insurance calculations, will not "exceed the maximum rates shown" in the table. (*Id.*).

A separate Contract Summary provision references this "mortality table" and states, "THE COMPANY'S DECLARED RATES ARE GUARANTEED NOT TO

EXCEED THE 1980 CSO FOR THE COST OF INSURANCE CALCULATION, AND THE COMPANY ALSO GUARANTEES THAT THEY WILL NOT BE INCREASED BY MORE THAN 5% IN ANY CONTRACT YEAR." (*Id.* at 4).[7] It therefore dictates that Brighthouse's declared maximum COI rates in the Cost of Insurance Table (a) can be increased by no more than 5% in a single contract year and (b) are capped at the rates stated in the 1980 Commissioners' Standard Ordinary Mortality Table.[8]

### 2.    *Brighthouse's Internal COI Rate*

However, the Policies provide that Brighthouse "may use rates less than those shown" in the Cost of Insurance Table. (Doc. 107-1 at 13).  If it elects to do so, Brighthouse states:

> We will base these rates only on our future outlook for mortality and expenses. Nothing in this Contract will be affected by our actual mortality and expenses experience. We will determine the rates at the start of each contract year and will assure them for the next contract year. Any change we make in the rates will be on a uniform basis for insureds of the same age, sex, duration and rate class.

(*Id.*).

---

[7] Construing the Policies as a whole, it is apparent that the "mortality table" referenced in this provision is the Cost of Insurance Table, as it is the only mortality table in the Policies and the only place in the Policies where Brighthouse "declared" its COI rates. *See (*Newton Policy, Doc. 107-1 at 13) ("The cost of insurance rates are shown in the COST OF INSURANCE TABLE."); (*id.* at 16) (referencing the "Mortality Table" located in the Contract Summary).

[8] The 1980 CSO Mortality Table was "an industry-standard mortality table that insurers commonly used at the time of policy issuance to calculate appropriate COI rates." *Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*, 2020 WL 2198955, at *1 (N.D. Ala. May 6, 2020).

### B.    Newton's Claims

In November 2017, Brighthouse canceled Newton's policy, citing his failure to meet his increasing monthly payments. *See* (TAC, Doc. 107 ¶ 74). And in May 2020, Newton filed this putative class action. (Doc. 1). He alleges that Brighthouse (and its predecessors in interest) knowingly breached its policy terms so it could steadily increase older policyholders' cost of insurance. These increases were purportedly part of a "shock lapse" strategy, under which Brighthouse would dramatically increase policyholders' monthly deductions to induce policy lapses as policyholders reach higher-mortality ages. *See* (TAC, Doc. 107 at 4 & n.3).

Newton first alleges that Brighthouse violated the Policies' "5% Provision," which guarantees that Brighthouse's "declared rates" would not "be increased by more than 5% in any contract year." (Newton's Policy, Doc. 107-1 at 4). He claims that, contrary to this provision, Brighthouse raised his COI rates by more than 5% each year that he aged. *See* (TAC ¶¶ 57–58). For example, Newton alleges that when he was 51, Brighthouse used a COI rate of 0.3755 to calculate his monthly cost of insurance. (*Id.* ¶ 58). Although a 5% increase to that rate would equal 0.3943, Newton claims Brighthouse used a COI rate of 0.4037 when he was 52. *See* (*id.* ¶ 58). In this way, Newton maintains that Brighthouse consistently overcharged him and other class members by improperly raising their COI rates. *See* (*id.* ¶¶ 58–59, 62).

Second, Newton alleges that Brighthouse violated the Policies' "M&E Provision," which says that Brighthouse will base its internal COI rates "*only* on

future outlook for mortality and expenses" and not Brighthouse's "actual mortality and expenses experience." (Newton's Policy, Doc. 107-1 at 13) (emphasis added). He claims that because life expectancy and mortality rates have "substantially" improved since class members purchased their policies, the annual increases to class members' COI rates must be due to Brighthouse's consideration of improper economic factors like profitability, investment losses, and interest rates. *See* (TAC, Doc. 107 ¶¶ 69–71, 72, 77).

Based on these purported violations of the Policies, Newton pursues eight class claims: breach of contract (Counts I & II); declaratory relief (Count III); fraud (Counts IV & V); violations of Georgia's Racketeering Influenced and Corrupt Organizations Act ("Georgia RICO") (Count VI); interest under O.C.G.A. §§ 7-4-2, 7-4-15 (Count VII); and attorney's fees under O.C.G.A. § 13-6-11 (Count VIII). In the Motion for Class Certification currently before the Court, Newton seeks to certify the following class:

> All persons who own or owned a universal life insurance policy issued by Brighthouse or its predecessors-in-interest on Forms ULXP86 and ULXP88, with a state of issuance of Georgia, and who were subject to at least one monthly deduction.

(TAC, Doc. 107 at 1). He also seeks to name himself as the class representative and his counsel as class counsel. [Doc. 116-1 at 35].

## II.    LEGAL STANDARD

"Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691

F.3d 1302, 1304 (11th Cir. 2012) (cleaned up). If this threshold condition is satisfied, the plaintiff must then show that the requirements of Federal Rule of Civil Procedure 23(a) and 23(b) are met. *See id.*

Rule 23(a) sets forth the "prerequisites" of numerosity, commonality, typicality, and adequacy of representation. *See Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1306 (11th Cir. 2023). In addition to meeting these four requirements, the proposed class must fit within one of the three types of class actions permitted under Rule 23(b). *See id.*

Yet "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Since class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," the party seeking to certify a class action bears the burden to prove their compliance with Rule 23's requirements through "evidentiary proof." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 (11th Cir. 2023); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23").

The district court must likewise "conduct a 'rigorous analysis' to determine whether the movant carried his burden," *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016) (citation omitted). Although courts do not determine the merits of plaintiffs' claims at the class certification stage, they "can

and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (quoting *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003)). Ultimately, "[t]he presumption is against class certification," and a district court that has doubts about whether Rule 23's requirements have been met should refuse certification. *Brown*, 817 F.3d at 1233–34.

## III. DISCUSSION

### A. Ascertainability

Before turning to the enumerated Rule 23(a) requirements, the Court must decide that a proposed class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304. A class is "clearly ascertainable" if its membership is capable of being determined by "objective criteria." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1301 (11th Cir. 2021). Ascertainability does not require proof of administrative feasibility. *See id.* at 1304.

Here, the Court finds that the proposed class is adequately defined and clearly ascertainable through objective criteria. Brighthouse's records will identify ULXP86 and ULXP88 universal life insurance policies issued in the state of Georgia that have been subject to at least one monthly deduction.

### B.    Rule 23(a) Requirements

#### 1.    *Numerosity*

Rule 23(a)(1) requires Newton to show that the proposed class "is so numerous that joinder of all members is impracticable." *See Vega*, 564 F.3d at 1266. As a general rule, fewer than 21 proposed class members is inadequate for a finding of numerosity, more than 40 is adequate, and any number between "is open to judgment based on other factors." *Id.* (citation omitted). Although mere allegations of numerosity are insufficient, plaintiffs need not show the exact number of class members. *Id.* (citation omitted).

Here, Rule 23(a)(1)'s numerosity requirement is easily met because Brighthouse's records reflect that over 1,200 ULXP86 and ULXP88 policies were issued in Georgia. (Hause Decl., 116-2 ¶ 63; Brighthouse UL Policy Report, Doc. 114-69).

#### 2.    *Commonality*

Rule 23(a)(2)'s commonality requirement imposes on the plaintiff a "relatively light burden," *Vega*, 564 F.3d at 1268, to show that "there are questions of law or fact common to the class," *Wal-Mart*, 564 U.S. at 349 (quoting Fed. R. Civ. P. 23(a)(2)). "This part of the rule 'does not require that all the questions of law and fact raised by the dispute be common,' or that the common questions of law or fact 'predominate' over individual issues." *Vega*, 564 F.3d at 1268 (internal citation omitted). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) (quoting

*Wal-Mart*, 564 U.S. at 359 (2011)). But "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Here, Newton has sufficiently demonstrated commonality. *See* [Doc. 116-1 at 17–18]. Among other things, the interpretation of the relevant form policy provisions and determination of whether Brighthouse's conduct violated those provisions are common questions central to Newton's claims that will generate common answers bearing on their validity. *See Kleiner v. First Nat. Bank of Atlanta*, 97 F.R.D. 683, 692 (N.D. Ga. 1983) (stating that under Rule 23(a)(2), "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action"); *see also Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."); *Nelson v. Conduent Bus. Servs. LLC*, 2020 WL 5587450, at *5 (N.D. Ga. Sept. 18, 2020) (stating that "common questions aris[ing] out of the performance of a form contract common to each member of the proposed class . . . are routinely found sufficient to establish the less rigorous commonality element."). Thus, the requirements of Rule 23(a)(2) are met.

### 3. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

"Although typicality and commonality may be related," the Eleventh Circuit distinguishes the two concepts "by noting that, '[t]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.'" *Vega*, 564 F.3d at 1275 (quoting *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001)).

To establish typicality, plaintiffs must show "a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza*, 273 F.3d at 1347; *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

Yet, typicality "does not require identical claims or defenses." *Id.* "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.* For example, "a defense which is unique to the class representative and which has the potential to become 'the focus of the litigation' may suffice to destroy typicality." *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1327 (N.D. Ga. 2007) (citations omitted).

Ultimately, "[t]he premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Hillis v. Equifax*

*Consumer Servs., Inc.*, 237 F.R.D. 491, 499 (N.D. Ga. 2006) (quoting *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir. 1998)). "Typicality cannot be satisfied when a named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Hillis*, 237 F.R.D. at 499 (cleaned up).

### a.    *Breach of Contract Claims*

Here, the typicality requirement is satisfied for the breach of contract claims (Counts I & II). Newton has shown that he and the proposed class members were subject to materially identical policy language and that they were purportedly harmed by the same course of conduct—Brighthouse's violations of the 5% Provision and the M&E Provisions. *See* [Doc. 116-1 at 18]. Brighthouse does not dispute that Newton's contract claims are typical of the proposed class, and the Court agrees that Rule 23(a)(3) is satisfied for Counts I & II.

### b.    *Fraud Claims*

However, the Court finds that the typicality requirement is not satisfied for Newton's fraud claims. (Counts IV & V). Explaining why requires the Court to briefly consider the merits of these claims. *See Vega*, 564 F.3d at 1266.

Counts IV and V advance two different species of fraud under Georgia law. Count IV is styled as a fraudulent suppression or omission claim, whereas Count V is styled as a fraudulent written misrepresentation claim. *See* (TAC ¶¶ 91–149). Although the exact contours of the legal theories underlying these claims are a bit

unclear,[9] the Court understands Newton to be alleging the following fraud theories on behalf of the class.

He first claims that Brighthouse engaged in a type of fraudulent misrepresentation known as "inceptive fraud." *See* (Newton Reply Br., Doc. 132 at 3–4). Inceptive fraud is a form of fraudulent inducement, where "the defendant . . . [makes] promises as to future events with the present intention not to perform or with the knowledge that the future event would not occur." *Higginbottom v. Thiele Kaolin Co.*, 304 S.E.2d 365, 368 (Ga. 1983). Here, Newton alleges that Brighthouse engaged in inceptive fraud because when it entered into the Policies with the class members, it knew that it would breach the 5% Provision and the M&E Provision. *See* (TAC, Doc. 107-1 ¶¶ 125–127); (Newton Reply Br., Doc. 132 at 3–4).

Newton next claims that Brighthouse engaged in fraudulent concealment by breaching the 5% Provision and the M&E Provision without notifying the class members of the contract violations. *See* (TAC, Doc. 107-1 ¶¶ 93, 94). This concealment conduct included collecting increased premiums and issuing account statements without disclosing the improper methodology behind Brighthouse's inflated cost of insurance calculations. *See* (*id.* ¶¶ 95–98, 102, 109, 113, 114, 121).

A review of the record reveals that Newton is not sufficiently "typical" of the class members in this case to pursue either of these fraud claims on their behalf.

---

[9] Fraud by omission and fraud by misrepresentation are different legal theories, but the allegations supporting Counts IV and V are nearly identical. Aside from a few alterations, the allegations supporting Count IV are largely copied and pasted under Count V. Merging these allegations in this way blurs the legal theories underlying these two claims.

First, despite basing his fraudulent misrepresentation claim on fraudulent inducement, Newton has explicitly stated that he was not fraudulently induced into buying his policy. *See* (Newton 9/15/2021 Dep., Doc. 127-32 at 21:19–22:1). Indeed, Newton also testified that he did not read his policy before purchasing it, (Newton 2/8/2022 Dep., Doc. 127-28 at 144:2–144:17), that he was not told anything untrue or misleading when he purchased his policy, (Newton 6/10/2022 Dep., Doc. 127-27 at 126:8–126:17), and that he has no complaints about the purchase process,[10] (Doc. 127-32 at 21:9–21:15).

Further, under both fraud theories, Newton must show that he justifiably *relied* on Brighthouse's misrepresentations or concealment of material facts regarding its compliance with the 5% Provision and the M&E Provision. *See Merritt v. Marlin Outdoor Advert., Ltd.*, 679 S.E.2d 97, 103 (Ga. Ct. App. 2009). Yet his deposition testimony casts doubt on his ability to do so.

To start, it is unclear when Newton became aware of—much less assigned a particular meaning to—the 5% Provision and the M&E Provision. He has stated that he does not recall reading the policy before he purchased it, that he cannot recall how much of the policy he read or understood after the purchase, and that he cannot recall reading the policy during his 31 years as a policyholder. *See* (Doc. 127-28 at 144:2–145:12, 149:17–149:21). And at the time he purchased his policy, Newton recalls being drawn to the ability to build its cash value but does not recall

---

[10] This is perhaps unsurprising, as his father was the insurance agent who sold him his policy. *See* (Newton 9/23/2021 Dep., Doc. 127-26 at 35:19–36:21); (Doc. 127-32 at 21:9–21:11).

"having an understanding . . . about how [his] cost of insurance might change from year to year." *See* (Doc. 127-26 at 82:12–83:12).

Newton also indicates that he reached his current understanding of the 5% Provision and the M&E Provision near the time his policy lapsed in November 2017, after he reviewed previous life insurance lawsuits and consulted legal counsel. *See* (Doc. 127-26 at 105:9–108:25; 115:18–118:24). If Newton did not reach this interpretation of these provisions until around the time his policy lapsed, it is unclear how, during the prior 31 years, he could have been misled by, or relied on, Brighthouse's conduct in the way that he claims.

Further, Newton does not recall Brighthouse representatives making misleading or untrue statements regarding his cost of insurance calculations. *See* (Doc. 127-26 at 104:8–105:8); (Doc. 127-27 at 126:8–127:15). Instead, he testified that Brighthouse representatives never explained how his cost of insurance was calculated or what it was based on—nor did he ask for that information. *See* (Doc. 127-26 at 98:4–98:7; 104:8–105:8; 108:8–108:25); (Doc. 127-27 at 129:6–129:18); (Doc. 127-32 at 39:7–39:23; 42:23–43:12; 86:1–86:9). Finally, although Newton believes that his annual statements and written notices from Brighthouse reflected improperly calculated premium charges, he does not recall any containing untrue statements or indicating how his cost of insurance had been calculated. *See* (Doc. 127-26 at 110:6–112:10); (Doc. 127-27 at 128:9–129:5); (Doc. 127-32 at 25:9–27:15).

Under these circumstances, Newton has not established that his fraud claims are typical of the proposed class. To the contrary, his testimony strongly suggests that his position "markedly differs from that of other members of the class." *See Kornberg*, 741 F.2d at 1337. Newton has personally disclaimed the fraudulent inducement theory at the core of the class's fraudulent misrepresentation claim, and he raises substantial doubts as to whether he was exposed to—much less relied on—the types of fraudulent misrepresentations or omissions that he attributes to Brighthouse. Since there is a danger that the absent class members will be harmed by Newton's preoccupation with the "unique defenses" to his claims, the typicality requirement is not met for Counts IV and V. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d at 1327; *see also Hillis*, 237 F.R.D. at 499 (finding typicality requirement not met where Plaintiff could not show "that he was exposed to the representations that form the basis of the proposed class's claim that Defendants made untrue or misleading representations"); *Danielson v. DBM, Inc.*, 2007 WL 9701055, at *5 (N.D. Ga. Mar. 15, 2007) (finding "individual issues with the Plaintiffs' claims prevent Plaintiffs from meeting the typicality requirement").

### c.   *Georgia RICO Claim*

Finally, the typicality requirement is partially satisfied for Newton's Georgia RICO claim (Count VI). "To assert a civil claim based on the Georgia RICO statute, the plaintiff must demonstrate that the statute has been violated, including that the defendant engaged in at least two predicate acts of racketeering activity."

*Vernon v. Assurance Forensic Acct., LLC*, 774 S.E.2d 197, 210 (Ga. Ct. App. 2015). "Furthermore, the plaintiff must suffer an injury 'by reason of' a predicate act to recover under the statute, meaning that the plaintiff must prove that a predicate act was the proximate cause of his injury." *Id.* at 210–11; *see Hansford v. Veal*, 894 S.E.2d 215, 224 (Ga. Ct. App. 2023)

Here, Newton alleges four predicate RICO offenses: federal mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343; theft by deception, in violation of O.C.G.A. § 16-8-3; theft by taking, in violation of O.C.G.A. § 16-8-2; and theft by conversion, in violation of O.C.G.A. § 16-8-4. (TAC, Doc. 107 ¶ 172). At this juncture, the typicality requirement is satisfied for the theft by taking and theft by conversion predicate acts, as Newton has shown that he and the proposed class members were purportedly harmed by the same course of conduct and that there is a sufficient nexus between his claims and defenses and those of the proposed class.

But for the reasons discussed in Section III(B)(3)(b), *supra*, Newton has not satisfied the typicality requirement for the predicate acts of theft by deception and mail/wire fraud. Reliance on a false representation is an essential element of a Georgia theft by deception claim. *See Vernon*, 774 S.E.2d at 211. And Newton would have to show that the misrepresentations or omissions underlying his federal mail and wire fraud claims were the proximate cause of—i.e., led directly to—his injuries. *See Pollman v. Swan*, 723 S.E.2d 290, 292–93 (Ga. Ct. App. 2011). Since it appears the absent class members will be harmed by Newton's

preoccupation with the "unique defenses" to these predicate acts, the typicality requirement is not met for those portions of his Georgia RICO claim. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d at 1327.

### 4.    *Adequacy of Representation*

To prove that representation is adequate, Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "This 'adequacy of representation' analysis encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.*, 350 F.3d at 1189 (cleaned up).

Here, the Court is satisfied that Newton's interests are aligned with the proposed class and that he is able to prosecute this action with forthrightness and vigor. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003) (citation omitted). Further, Newton's counsel are knowledgeable of the relevant law, experienced in complex litigation, and able to devote the time and resources that litigation of this nature requires. Rule 23(a)(4)'s adequacy of representation requirement is therefore met.

* * *

Since Newton has shown that his breach of contract claims (Counts I & II) and theft by taking (O.C.G.A. § 16-8-2) and theft by conversion (O.C.G.A. § 16-8-4) portions of his Georgia RICO claim (Count VI) satisfy Rule 23(a)'s threshold requirements, the Court now turns to the requirements of Rule 23(b).

## C.    Rule 23(b) Requirements

Class certification under Rule 23(b)(3) is appropriate only if the class representatives show that two requirements are met: "(1) that common questions of law or fact predominate over questions affecting only individual class members ('predominance'); and (2) that a class action is superior to other available methods for adjudicating the controversy ('superiority')." *Vega*, 564 F.3d at 1265.

### 1.    *Predominance Requirement*

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (cleaned up). "To determine whether common issues predominate, a district court first must "identify the parties' claims and defenses and their elements" and "then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Brown*, 817 F.3d at 1234.

"An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Tyson Foods*, 577 U.S. at 453 (citation omitted).   When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.*

Brighthouse argues that none of Newton's claims should be certified under Rule 23(b)(3) because common evidence cannot show that each class member's claims are timely. *See* (BH Resp. Br., Doc. 127 at 25–30). Upon review, the Court agrees.

Under Georgia law, the statutes of limitations for breach of contract, RICO, and fraud claims are six years, five years, and four years, respectively. *See* O.C.G.A. § 9-3-24 (breach of contract); O.C.G.A. § 16–14–8 (Georgia RICO); *Coe v. Proskauer Rose, LLP*, 878 S.E.2d 235, 241 (Ga. 2022) (citing O.C.G.A. § 9-3-31). Since this action was filed on May 8, 2020, breach of contract claims accruing before May 8, 2014, Georgia RICO claims accruing before May 8, 2015, and fraud claims accruing before May 8, 2016 are time barred unless tolling applies. To that point, Brighthouse states that "as of May 2014 over 75% of the putative class members' policies had already lapsed, been surrendered, or paid benefits." (BH Resp. Br. at Doc. 26 (citing Doc. 114-69)).

Newton does not dispute this figure but argues that statute of limitations issues generally do not prevent class certification. *See* (Newton Reply Br., Doc. 132 at 12) (citing *In re Checking Account Overdraft Litig.*, 307 F.R.D. 630, 651–52

(S.D. Fla. 2015)). While it is certainly true that "some affirmative defenses *peculiar to some* individual class members" will not defeat Rule 23(b) commonality, *Tyson Foods*, 577 U.S. at 453 (emphasis added), affirmative defenses that apply to "the vast majority of class members" can raise complex, individual questions that prevent a finding of predominance, *see Brown*, 817 F.3d at 1241. That is the case here.

Under the current class definition, it appears that more than 75% of class members' claims would be untimely unless equitably tolled. Although Newton claims that fraudulent concealment tolled the relevant limitations periods, the Court is not persuaded that the applicability of this tolling doctrine can be shown through common, class-wide proof. Fraudulent concealment can only toll the relevant statute of limitations if the claimant can show that they exercised "reasonable diligence" in discovering the cause of action. *See Fed. Ins. Co. v. Westside Supply Co.*, 590 S.E.2d 224, 229 (Ga. Ct. App. 2003) (quoting *Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980)); *Garland v. Advanced Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1207 (N.D. Ga. 2000). And Georgia courts have stated that whether a claimant exercised reasonable diligence in discovering a cause of action is an individualized jury question that turns on "the facts and exigencies of each particular case." *Jim Walter Corp.*, 265 S.E.2d at 9; *see Fed. Ins. Co.*, 590 S.E.2d at 229; *Barrett v. United Ins. Co. of Am., Inc.*, 418 F. Supp. 3d 1274, 1291 (S.D. Ga. 2019).

As the class is currently defined, it therefore appears that the resolution of Brighthouse's statute-of-limitations defense will require the resolution of hundreds of individual, fact-specific tolling claims, which will predominate over the common issues in this lawsuit. *See In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.*, 2017 WL 2536846, at *13 (N.D. Ga. June 9, 2017); *Taylor v. Midland Nat'l Life Ins. Co.*, 2019 WL 13169890, at *6 (S.D. Iowa Sept. 27, 2019). Thus, the Court revises the class to include only those class members who still had an active Brighthouse policy as of May 8, 2015—the outer boundary of the five-year Georgia RICO statute of limitations. For this narrowed class, the Court finds that the predominance requirement of Rule 23(b)(3) is satisfied.

### 2.    *Superiority Requirement*

To meet Rule 23(b)(3)'s superiority requirement, a court must conclude "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The factors relevant in determining superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

*Id.* "The focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Sacred Heart Health Sys., Inc.*, 601 F.3d at 1183–84.

Here, separate actions by individual class members would be duplicative, wasteful of judicial resources, and potentially cost prohibitive to many would-be plaintiffs. The interpretation of the relevant form policy provisions and determination of whether Brighthouse's conduct violated those provisions are common questions that unify all class members, and the fair adjudication of the class claims will therefore "save[ ] the resources of both the court[ ] and the parties." *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155 (1982) (alterations original)). With the class narrowed, individual issues have been sufficiently limited to ensure streamlined and efficient resolution of common claims.

The Court is also not aware of any other litigation pending on behalf of the class members and is satisfied that it would be desirable and not unduly burdensome to concentrate the litigation of the class claims in this forum. Thus, Rule 23(b)(3)'s superiority requirement is met.

## IV.   CONCLUSION

Accordingly, Plaintiff's Motion for Class Certification, [Doc. 116], is **GRANTED IN PART**. The Court certifies the following class:

> All persons who, as of May 8, 2015, owned a universal life insurance policy issued by Brighthouse or its predecessors-in-interest on Forms ULXP86 and ULXP88, with a state of issuance of Georgia, and who were subject to at least one monthly deduction.

Richard A. Newton Sr. is named as the Class Representative and his counsel, Roy E. Barnes and J. Cameron Tribble will serve as Class Counsel. On behalf of the class, Newton will pursue the following claims in the Third Amended Complaint: Counts I & II (breach of contract), Count III (declaratory relief), Count VI (Georgia RICO, based only on the predicate acts of theft by taking and theft by conversion); Count VII (interest) and Count VIII (attorney's fees).

The parties are **DIRECTED** to meet and confer regarding next steps in this case and to file a joint status report by **September 19, 2025**. The status report will address: (1) whether the parties believe mediation would be productive; (2) whether either party believes additional discovery is necessary and if so, the additional time for discovery requested; (3) a proposed timeline for filing motions for summary judgment; and (4) any other topics the parties deem pertinent.

**IT IS SO ORDERED** this 5th day of September, 2025.

**Amy Totenberg**
**United States District Judge**